**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| UTE INDIAN TRIBE OF THE UINTAH AND OURAY INDIAN RESERVATION, 988 S. 7500 E. Fort Duchesne, Utah 84026 | ) ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 1:18-cv-547-RMC |
| UNITED STATES DEPARTMENT OF THE INTERIOR, 1849 C Street, NW Washington, DC 20240 | ) ) ) ) ) | |
| DAVID BERNHARDT, Acting Secretary of the Interior United States Department of the Interior 1849 C Street, NW Washington, DC 20240 | ) ) ) ) ) ) | |
| BUREAU OF RECLAMATION, 1849 C Street, NW Washington, DC 20240 | ) ) ) ) | |
| BUREAU OF INDIAN AFFAIRS, 1849 C Street, NW Washington, DC 20240 | ) ) ) ) | |
| Defendants. | ) ) | |

**FIRST AMENDED COMPLAINT**

Plaintiff, UTE INDIAN TRIBE OF THE UINTAH AND OURAY INDIAN

RESERVATION, for its Complaint against the above-named Defendants, alleges as follows:

## I.   GENERAL NATURE OF THE ACTION

1.     This is an action brought by the Ute Indian Tribe of the Uintah and Ouray Reservation ("the Ute Indian Tribe" or "the Tribe") against the United States Department of the Interior ("DOI"), the Secretary of the Interior ("the Secretary"), the Bureau of Reclamation ("BOR"), and the Bureau of Indian Affairs ("BIA") (collectively referred to as "Defendants") seeking declaratory and injunctive relief in furtherance of enforcing Defendants' fiduciary duties owed to the Tribe and its Members as it relates to the management of the Tribe's Reserved Water Rights and related resources that are administered by Defendants for the benefit of the Tribe.  The Tribe brings this action to obtain declaratory relief to help define the legal status of the Tribe's Reserved Water Rights, as well as injunctive relief compelling Defendants to execute their fiduciary obligations and an accounting of the United States' management of the Tribe's water assets.

## II.   PARTIES

2.     Plaintiff Ute Indian Tribe of the Uintah and Ouray Reservation is a federally recognized, sovereign Indian Tribe, organized with a Constitution approved by the Secretary of the Interior under the Indian Reorganization Act of 1934, 25 U.S.C. § 5101 *et seq.*, 82 Fed. Reg. 4919 (Jan. 17, 2017).   The Constitution establishes, among other things, that the Ute Tribal Business Committee is the Tribe's governing body.  The Tribe is comprised of three bands of Ute Indians, the Uintah, Whiteriver, and Uncompahgre Bands, who today occupy the Uintah and Ouray Indian Reservation in the Green River Basin of northeastern Utah, where the Tribe owns beneficial interests in land, water, various water works, and related funds.  The Reservation is located within a portion of the Tribe's aboriginal lands and encompasses just over four million acres.  The Tribe brings this cause of action on its own behalf and as *parens patriae* on behalf of its tribal members

in order to protect its members' health, welfare, natural resources, and economic security and well-being.

3.      The DOI is a federal agency of the United States of America.  The DOI is vested with numerous trust, fiduciary, and other legal duties owed to the Tribe under various treaties, executive orders, Congressional acts, judicial decrees, regulations, and express and implied contracts.

4.      David Bernhardt is the Acting Secretary of the Interior.  As Acting Secretary, David Bernhardt is vested with numerous trust, fiduciary and other legal duties owed to the Tribe under various treaties, executive orders, Congressional acts, judicial decrees, and express and implied contracts.

5.      The BOR is a federal agency within the DOI.  The BOR is vested with numerous trust, fiduciary, and other legal duties owed to the Tribe under various treaties, executive orders, Congressional acts, judicial decrees, regulations, and express and implied contracts.

6.      The BIA is a federal agency within the DOI. The BIA is vested with numerous trust, fiduciary and other legal duties owed to the Tribe under various treaties, executive orders, Congressional acts, judicial decrees, regulations, and express and implied contracts.

### III.      JURISDICTION AND VENUE

7.      This Court has jurisdiction over the present action pursuant to 28 U.S.C. § 1362, because the present action is a civil action "brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States."  This is a matter arising under the Federal Defendants' enforceable fiduciary duties relating to the management and protection of the

Tribe's water rights and water resources, which have been specifically conferred upon Federal Defendants by the United States Congress.

8.     This Court also has jurisdiction over this matter because this matter arises under the Constitution and various law and treaties of the United States, including, without limitation:

a.   The Treaty of Guadalupe Hidalgo in 1848;

b.   Exec. Order of Oct. 3, 1861, 1 Kapp. 900 (2d ed. 1904);

c.   Act of May 5, 1864, ch. 77 §2;

d.   Act of June 15, 1880, ch. 223, 21 Stat. 1999;

e.   Exec. Order of Jan. 5, 1882, 1 Kapp. 901 (2d ed. 1904);

f.   The Act of February 8, 1887, 25 U.S.C. §§ 381, *et seq*;

g.   Act of March 1, 1899, 30 Stat. 941

h.   The Reclamation Act of 1902, Pub. L. 57-161, ch. 1093, 32 Stat. 388;

i.   The Act of June 19, 1902, 32 Stat. 744;

j.   Act of March 3, 1905 (33 Stat. 1048, amended May 14, 1920 (33 Stat. 1069-1070, c. 1479; 41 Stat. 599-600, c. 187);

k.   The Act of June 21, 1906, Pub. L. 59-258,  Stat. 325, 375;

l.   *Winters v. United States*, 207 U.S. 564 (1908) and its progeny;

m.   The Act of March 3, 1909, 35 Stat. 811;

n.   *Cedarview Irrigation Company*, no. 4427, slip op. (D. Utah 1923) and *Dry Gulch Irrigation Company*, No. 4418, slip op. (D. Utah 1923) ("1923 Decrees");

o.   The Leavitt Act, Act of June 22, 1936, ch. 692, § 3 1804, 49 Stat. 1183, 25 U.S.C. §§ 389, 389a-e;

4

p.  The Act of May 28, 1941, 55 Stat. 209;

q.  Colorado River Storage Project Act of April 11, 1956, P.L. 485, 70 Stat. 105, 43 U.S.C. §§ 620 *et seq.*, as amended.

r.  25 U.S.C. § 177;

s.  Federal regulations governing the BIA's operation and maintenance of the Uintah Indian Irrigation Project, 22 Fed. Reg. 10479, 10637-38 (Dec. 24, 1957);

t.  The Irrigation Operation and Maintenance Regulations, 25 C.F.R. Part 171;

u.  The Reclamation Projects Authorization and Adjustments Act of 1992, Pub. L. 102-575, 106 Stat. 4600.

v.  The Equal Protection and Due Process clauses of the United States Constitution.

9.      This Court also has jurisdiction over the present action pursuant to 28 U.S.C. § 1361 because the present action is, in part, an "action in the nature of mandamus to compel an officer or employee of the United States…to perform a duty owned to the plaintiff."

10.     This Court has jurisdiction to grant Plaintiff's request for declaratory and enforcement under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

11.     The sovereign immunity of the United States does not bar the present action because this is an action for nonmonetary relief against agencies and officers of the United States. 5 U.S.C. § 702.

12.     Further, the sovereign immunity of the United States does not bar the present action as to any claims relating to the Uintah Indian Irrigation Project because the Act of June 21, 1906, Pub. L. 59-258, Stat. 325, 375 expressly provides that the Secretary may "sue and be sued" in matters relating to said Project and Tribal Water Rights.

13.     Venue is appropriate in the District Court for the District of Columbia pursuant to

28 U.S.C. § 1391(e).

## IV.     STATEMENT OF FACTS

### A.     HISTORY OF THE UTE INDIAN TRIBE AND ITS RESERVATION

14.     Utah is the second most arid State in the country.  Because there is little rainfall

over the summer, the only viable source of water is winter snowmelt and the ability to store it.  In

testimony before a Senate Committee in 1990, Utah Senator Jake Garn described Utah's

exceptionally arid conditions, explaining:

> Even with summer droughts, there is sufficient snow melt to carry even today's and
> future population if we have the ability to store it through the summer months.
> [This] is a concept that I have to continue to try to get over to my colleagues of
> winter snowfall, summer drought, and the need to be able to store that [winter
> snowmelt].

15.     This critical need for year-round water applies equally to the Ute Indian Tribe.  In

1905, the Commissioner of Indian Affairs, in his annual report, described the conditions on the

Tribe's reservation:

> The future of these [Ute] Indians depends upon a successful irrigation scheme,
> for without water their lands are valueless, and starvation or extermination will
> be their fate.

Rept. of the Comm. of Ind. Aff., 1906.

16.     The United States and its agencies and officials have had a fiduciary relationship

with the Ute Indians since the Tribe's aboriginal lands were ceded to the United States by Mexico

under the 1848 Treaty of Guadalupe Hidalgo.  *See Ute Indians v. United States*, 45 Ct. Cl. 440,

442-3 (Ct. Cl. 1910).

17.     The present-day Uintah and Ouray Reservation was originally two separate Indian

reservations.  The first reservation, the Uintah Valley Reservation, was established by Executive

Order on October 3, 1861, confirmed by Congress in the Act of May 5, 1864, § 2, 13 Stat. 63, and

encompassed 2,039,040 acres in the Uinta Basin of Utah.  Under the 1861 Executive Order, the Uintah Valley Reservation included "the entire valley of the Uintah River within Utah territory, extending on both sides of the river to the crest of the first range of contiguous mountains on each side"  This land was "set apart for the permanent settlement and exclusive occupation of such of the different tribes of Indians of said territory as may be induced to inhabit the same."  Act of May 5, 1864, ch. 77, 13 Stat. 63.  "The present-day Ute Indian Tribe includes the descendants of the Indians who settled on the Uintah [Valley] Reservation."  *Hagen v. Utah*, 511 U.S. 1047 (1993).

18.     The second reservation, the Uncompahgre Reservation, was established pursuant to the Act of June 15, 1880 (ch. 223, 21 Stat. 1999), and the Executive Order of January 5, 1882, and it encompassed approximately 2,000,000 acres.  Similar the Uintah Valley Reservation, the Uncompahgre Reservation was reserved for the purpose of creating a permanent homeland for the Uncompahgre Utes.

19.     Together, the Uintah Valley Reservation and Uncompahgre Reservation are organized under the Indian Reorganization Act to form a single reservation known as the Uintah and Ouray Reservation (the "Reservation.").

20.     The Reservation is located in the Green River Basin in the northeast corner of Utah at the foot of the Uinta Mountains, on an arid and sparsely settled plateau.  All of the Reservation lies within the drainage of the Colorado River Basin and a multitude of streams flows through the Reservation: the Duchesne River and its tributaries, Rock Creek, Lake Fork River, Yellowstone River, Uinta River, and Whiterocks River are among the rivers that pass south from the Uinta Mountains through the western part of the Reservation to the Green River, which, together with its tributaries, including the White River, flows through the eastern part of the Reservation and then on to the mainstem of the Colorado River.

7

21.     The Reservation was established to provide a permanent homeland for the Ute Indians, and to enable the Tribe and its members to become self-sustaining through agricultural and other economic pursuits.

**B.     THE UTE INDIAN TRIBE'S RESERVED WATER RIGHTS AND RELATED RIGHTS AND RESOURCES**

**i.     The Act of March 1, 1899**

22.     In its 1899 Indian Appropriations Act, the United States Congress confirmed and declared the Ute Indian Tribe's rights to Reservation water resources.  The Act of March 1, 1899, 30 Stat. 941 ("1899 Act") authorized the Secretary of the Interior to grant rights of way for the construction of ditches and canals on or through the Reservation for the purpose of diverting and appropriating said waters, provided that:

> all such grants shall be subject at all times to the paramount rights of the Indians on said reservation to so much of said waters as may been appropriated, or may hereafter be appropriated or needed by them for agriculture and domestic purposes; and it shall be the duty of the Secretary of the Interior to proscribe such rules and regulations as he may deem necessary to secure to the Indians the quantity of water needed for their present and prospective wants, and to otherwise protect the rights and interests of the Indians and the Indian service.

23.     With the 1899 Act, Congress established the Ute Indian Tribe's water rights as "paramount" to that of any appropriator.  Congress provided that the Tribe has both present and future "paramount" rights to as much water as the Tribe wants or needs for agricultural and domestic purposes.

24.     Congress conferred upon the Secretary a fiduciary duty to secure and protect the amount of water necessary to satisfy the Tribe's "present and prospective wants."

25.     Congress's directive to the Secretary in the 1899 Act was non-discretionary, conferring a fiduciary duty to (a) *secure* the amount water to satisfy the Tribe's present and prospective wants and (b) *protect* the Tribe's rights and interests in its water resources.

26.     Upon information and belief, the Ute Indian Tribe is the only Indian tribe with a Congressional Act confirming the Tribe's unqualified "paramount" rights to its Reservation water resources for both present and future use.

### ii.     The 1906 Act and Related Acts Authorizing and Funding the Uintah Indian Irrigation Project

27.     The United States Congress acknowledged the duties and responsibility given to the Federal Government under the 1899 Act by enacting legislation in 1906 for the construction of irrigation systems to irrigate the lands of the Uncompahgre, Uintah, and White River Utes.  As the Hon. Joseph Howell of Utah, House of Representatives, stated in support of the legislation, "it is the solemn duty of the Government, in its role of guardian of the Indians, to relieve the situation[,]" and secure a water supply, "because [w]ithout water these lands are like those in any other portions of the West, which is to say, of little value; with water, however, they will yield rich returns . . . ."

28.     In the Act of June 21, 1906, the United States Congress authorized the construction of irrigation systems to irrigate "the allotted lands of the Uncompahgre, Uintah, and White River Utes in Utah."  The Congressional authorization stated:

> [t]hat such irrigation systems shall be constructed and completed and held and operated, and water therefor appropriated under the laws of the State of Utah, and the title thereto until otherwise provided by law shall be in the Secretary of the Interior in trust for the Indians, and he may sue and be sued in matters relating thereto[.]

29.     Through its special relationship with the Tribe and the establishment of the Reservation, the irrigation system constructed under the 1906 Act for the Indians is communal

property of the Tribe from which the Tribe itself and individual allottees and their successors receive a benefit, and title to the UIIP at all times has been and remains held by the United States as a trust asset of the Tribe.

30.   The Indian irrigation project authorized under the 1906 Act is now known as the Uintah Indian Irrigation Project (hereafter "UIIP" or the "Project").  The Project was to be designed and constructed to benefit the Ute Indian Tribe through the development of irrigated lands by the Uncompahgre, Uintah, and White River Utes.

31.   At the time the 1906 Act was passed by Congress, 103,265 acres had been allotted to the Indians in severalty.  Although the United States was to grant allotments to the Uncompahgre, Uintah, and White River Indians that provided irrigable lands for agricultural pursuits, subsequent reports by the Federal Government confirm that many of the Indians were not allotted lands that could be irrigated.  In fact, the Survey on Conditions of the Indians in the United States, published in the Senate hearings before the Sub-committee of the Committee on Indian Affairs on January 20, 1930, concluded that "the Indians were actually allotted some of the most worthless land on the reservation, while some of the very best land was opened to entry and has since been homesteaded [by non-Indians]."  As recounted, *inter alia*, in *Ute Indian Tribe of the Uintah and Ouray Reservation v. Utah*, 521 F. Supp. 1072, 1126-27 (D. Utah 1981), the United States acted to ensure that the desires of non-Indians on the Reservation and/or non-Indian irrigators under the UIIP were given precedence, thereby violating the United States' fiduciary obligations to the Ute Indian Tribe and its members.

32.   In the years following the 1906 Act, Congressional appropriations were made specifically for the development and construction of the UIIP.  In 1909, Congress appropriated

funds for constructing the irrigation system "to irrigate the allotted lands of the Uncompahgre, Uintah, and White River Utes in Utah, as provided by the [1906 Act]."

33.     In 1914, reporting to the Congressional Committee on Indian Affairs, the Secretary of the Interior also acknowledged the solemn duty of the Government under the principles laid down in the Act of 1899 to enforce and protect the Indian rights to water for their irrigation systems.

34.     No Act of Congress or judicial ruling has abrogated the trust status of the Tribe's water rights or the duties imposed upon the United States under the 1899 and 1906 Acts to preserve and protect the "paramount" rights of the Tribe and its members to waters from the rivers and streams bordering and running within the exterior boundaries of the Reservation in an amount sufficient to meet current and future needs and to establish a permanent homeland.

### iii.     The Tribe's *Winters* Reserved Water Rights

35.     In 1908, the United States Supreme Court ruled that, when the United States establishes an Indian reservation, it impliedly reserves the amount of water necessary to fulfill the purpose of the reservation.  *Winters v. United States*, 207 U.S. 564 (1908) (now known as the "Winters Doctrine").  The water rights reserved to the Tribe upon the establishment of the Uintah Valley and Uncompahgre Reservations are referred to hereafter as "*Winters* Reserved Water Rights," or simply "Reserved Water Rights."

36.     Pursuant to the *Winters* Doctrine, the amount of water necessary to fulfill the purpose of the reservation is impliedly reserved.  In the case of the Ute Indian Tribe, the Tribe's *Winters* Reserved Water Rights encompass the entire amount of water necessary to sustain a permanent homeland within the exterior boundaries of the Uintah and Ouray Reservation. Although the Reservation's purpose is relevant to the quantity of waters impliedly reserved,

*Winters* Reserved Water Rights are not limited in use to irrigation or any other specific purpose. *Arizona v. California*, 439 U.S. 419, 421 (1979); *Colville Confederated Tribes v. Walton*, 647 F.2d 42, 48 (9th Cir. 1981).

37.     The Tribe's *Winters* Reserved Water Rights, established with the creation of the Tribe's Reservation and prior to the allotment of land to individual Indians, are Tribal trust assets held by the United States, as trustee, for the benefit of the Tribe.

38.     With the establishment of the 1908 Winters Doctrine, the United States Supreme Court altered the previous understanding that Indian water rights had to be obtained in compliance with the state law of the particular state in which the particular reservation was located.   The Tribe's *Winters* Reserved Water Rights are not subject to the laws of the State of Utah, but are governed by federal laws.

39.     As explained by the Secretary of the Interior to the Senate Committee on Indian Affairs in his 1914 report to Congress, the principles laid down in the *Winters* doctrine are those more specifically provided for in the Act of March 1, 1899, and require the Government to enforce, protect, and preserve the Tribe's prior rights to water.

40.     Because the Tribe's statutory and *Winters* Reserved Water Rights vested upon the creation of the Tribe's reservation, the Tribe's Reserved Water Rights are "present perfected" rights recognized and protected in Article VIII of the 1922 Colorado River Compact.  *Arizona v. California*, 373 U.S. 546, 600 (1963).   Article VIII of the 1922 Colorado River Compact states that "[p]resent perfected rights to the beneficial use of waters of the Colorado River System are unimpaired by this compact."   Thus, the Tribe's statutory and reserved water rights exist separate from, independent of, and senior to the interstate apportionment framework set forth in the Colorado River Compact.

### iv.    The  Ute Indian Tribe's 1923 Federally-Decreed Reserved Water Rights

41.    In 1916, as conflicts mounted between the Ute Indians and their non-Indian neighbors over water allocations in the Lakefork, Yellowstone, Uinta, and Whiterocks Rivers, the United States filed suit in federal district court to protect the Tribe's water rights.  *United States v. Cedarview Irrigation Company et al.,* No. 4427 (D. Utah 1923), and *United States v. Dry Gulch Irrigation Company et al.,* No. 4418 (D. Utah 1923).  The federal district court established the quantity and priority of the Tribe's Reserved Water Rights under the UIIP within the Colorado River Basin for the Uinta-Whiterocks River sub-basin and the Lake Fork-Yellowstone River sub-basin, and prohibited non-Indian irrigators from interfering with Tribal Reserved Water Rights designated for distribution to the lands of the UIIP.

42.    The court issued two federal decrees affirming Tribal Reserved Water Rights for irrigation of 59,771.69 acres of tribal lands within the UIIP, with a total irrigation diversion duty of 3.0 acre-feet per year per acre.  The court assigned a period of use for these quantified water rights from March 1 to November 1 annually.  The decrees also awarded the Tribe year-round water diversions for domestic, culinary, and stock watering uses.

43.    In each of the two decrees, the federal district court concluded that the Tribe has "the first and an exclusive right under a priority date that antedates the third day of October, 1861" to divert waters from the subject Rivers.  In confirming a priority date for the use of the water that antedates October 3, 1861, the court recognized that the Tribe's adjudicated water rights are not subject to State-based water law, but are federal *Winters* Reserved Water Rights, subsequently acknowledged and recognized by the Department of Interior Solicitor.  Federal Defendants have failed to manage, administer, and use the Tribe's water rights as federally Reserved Water Rights in the exercise of its duty to preserve, protect, and develop these water rights.  This has created

continuing problems and prevented the Government from fulfilling its fiduciary duties as the trustee of the Tribe's federal Reserved Water Rights.

> **v.      The Decker Report**

44.      In 1960, E.L. Decker, a former employee of the Bureau of Reclamation that was later employed by the Tribe, surveyed the lands of the Reservation and produced a report quantifying the historically and presently irrigated Reservation lands, as well as future practicably irrigable lands, subsequently revised to correct for errors ("the Decker Report"). The report was subsequently submitted to the State Engineer as the Ute Indian Tribe's Book of Claims.

45.      The Decker Report (corrected) organized Reservation lands into seven different categories, based on their use status and source, characterizing them as follows:

**Group 1**: lands included in the Uintah Indian Irrigation Project that have a water right decreed by the Federal Court in 1923 from the Lake Fork and Uinta rivers.  Acreage: 59,222 (reduced by 549 acres from the 1923 Decree).

**Group 2**: lands included in the Uintah Indian Irrigation Project that have water rights originally certified by the State of Utah from the Duchesne River prior to the Supreme Court's decision in *Winters v. United States*.  Group 2 lands include lands within the townsites of Myton, Roosevelt, and Duchesne.  Acreage: 18,613.

**Group 3**: lands that are or can be served from the Duchesne River through the Uintah Indian Irrigation Project facilities.  These lands either have a supplemental water right certified by the State of Utah or do not have a water right certificate, but have been designated as irrigable. Acreage: 1,115.

**Group 4**: lands that have been found to be productive and economically feasible to irrigate from privately constructed ditch systems diverting from the Duchesne River or its tributaries above

Pahcease Canal.  Some of these ditches are now in operation, while others have not yet been constructed.  Acreage: 1,480.

**Group 5**: lands that have been found to be productive and economically feasible to irrigate, and were proposed to be served from the ultimate phase of the Central Utah Project.  Acreage: 29,118.

**Group 6**: lands lying east of the Green River for which water right applications have been filed with the State of Utah to be served from the White River.  Acreage: 5,544.

**Group 7**: lands lying east of the Green River that have been found to be productive and economically feasible to irrigate from privately constructed ditch systems diverting from various streams.  Acreage: 14,239.

46.    The total acreage identified in the Decker report, consisting of historical, present, and future practicably irrigable lands with an appurtenant Tribal *Winters* Reserved Water Right, was 129,331 acres, with a total volume of 549,685 acre feet per year.

47.    Decker made clear that, even where state certification was referenced, the water rights appurtenant to these Reservations lands were claimed under the *Winters* doctrine.

### C. THE FEDERAL DEFENDANTS' LOSSES OF, FAILURES TO PROCURE AND PROTECT, TRANSFERS OF, CONVERSIONS OF, AND WASTE AND MISMANAGEMENT OF THE UTE INDIAN TRIBE'S RESERVED WATER RIGHTS, WATER WORKS, AND RELATED RIGHTS

#### i.    Mismanagement of the UIIP and its Associated Tribal Water Rights

48.    In 2016, the UIIP, which was supposed to serve about 88,000 acres of allotted lands for the benefit of the Tribe and its members, only delivered Tribal irrigation water to approximately 61,000 acres of land, resulting in the annual waste and non-use of Tribal water rights for tribal lands and economic loss.

49.     This non-irrigated UIIP acreage is attributable to mismanagement of the UIIP and associated lands and water rights by Federal Defendants.  Such mismanagement includes, but is not limited to, shortcomings in the construction phase, the failure to provide storage, unlawful transfers of water rights under the color of the 1941 Act, deferred UIIP maintenance, and the current BIA designation of UIIP lands as either permanently or temporarily non-assessable, prohibiting the delivery of water to such lands.  Upon information and belief, and in addition to those specific examples of mismanagement identified herein, the BIA has adopted and implemented "informal operating practices" involving informal water exchanges and other arrangements with non-tribal member water users involving Tribal water rights and/or the UIIP.

a. <u>Incomplete Development and Construction of the Uintah Indian Irrigation Project</u>

50.     While the 1899 Act conferred upon the Secretary a duty to protect the Tribe's paramount rights to its Reservation water resources for present and future needs, the United States knew that simply requiring that the Tribe's water rights be secured and protected was not sufficient to support a homeland for the Indians whom the United States had forced onto the Reservation. The United States knew there must be a sustainable means of providing water to the Tribe, lest Tribal members continue to languish and die at the hands of their trustee.

51.   Pursuant to the 1906 Act authorizing construction of the UIIP, the Bureau of Indian Affairs designed an Indian irrigation system to irrigate about 88,000 acres of allotted land ("UIIP Lands"), via an extensive system of canals and ditches to convey water from three river drainages: the Strawberry-Duchesne, Lakefork-Yellowstone, and the Uintah-Whiterocks rivers.  In 1914, the Secretary of the Interior reported to Congress that construction had been completed on eighteen principal ditches to irrigate the 88,000 acres.

52.     In preparation for the Congressional authorization to construct an irrigation system for the Tribe, and prior to the 1908 *Winters* decision, the United States in 1905, through the BIA, applied to the Utah State Engineer for the appropriation of water from the State of Utah for the UIIP.  Some ten years later, the State issued water right certificates to the United States Indian Service, to hold the water rights in trust for the benefit of the Tribe.

53.     Proof of beneficial use of waters on the Reservation was only made by the Indian Service with the State Engineer, on behalf of the Tribe, for the Indian allotments and former allotments, which resulted in the State Engineer issuing certificates of proof for 78,950 acres.  On information and belief, no further effort was made by the Federal Government to conserve, preserve, and confirm the water rights for the other approximately 10,000 acres of allotted lands that were to receive water under the UIIP.  The future needs of the Tribe and its members for the waters of the Reservation for irrigation and other purposes were completely ignored.  The early efforts to establish the Reservation as a permanent homeland for the Tribe has never recovered from the Government's failure to preserve and protect the waters of the Reservation for the Tribe and its members.

54.     Upon information and belief, more than half of the trust lands under the UIIP are currently held in trust by the United States on behalf of either the Tribe or individual Indian allottees or their successors in interest.

55.     Construction continued through about 1922, at which time the UIIP was considered to be essentially completed, except for construction of a storage facility.  In 1956, a total of 78,086 acres were being assessed by the Indian Irrigation Service for water deliveries to farms, including both tribal trust lands and allottee lands.  There was an additional 15,297 acres of non-Indian water

rights that were served through contractual agreements with private irrigation companies in which the UIIP delivered water to such companies and private systems.

56.     Additionally, on information and belief, the BIA completely abandoned the Uncompahgre Band members who received allotments and remained on the Uncompahgre portion of the Reservation.  The Act of June 21, 1906, included authorization for the construction of irrigation systems to irrigate the allotted lands of the Uncompahgre Band members, who had ceded their aboriginal lands in Colorado and were settled on the Uncompahgre Reservation in Utah to establish a permanent homeland by becoming self-sufficient through an agricultural economy. Decker's Group 6 and 7 lands are located on the Uncompahgre portion of the current Reservation, lands that are located along the east side of the Green River and its tributaries, such as the White River.

57.     The Uncompahgre allottees practiced irrigation for many years in the early establishment of their reservation, with some assistance from the federal government to construct irrigation ditches with headings and small structures to irrigate land bordering the streams. On information and belief, there are 1,951 acres of historically irrigated lands under Group 6, and 264.74 acres of historically irrigated lands under Group 7 lands.  The government appropriated about $20,000 in 1937, and conducted activities for the construction of some canals, the clearing and leveling of irrigable lands, and installation of small pumping plants.  However, the estimated cost to complete the required project works at that time was $74,000 for the irrigated trust lands in this area.

58.     On information and belief, the BIA failed to complete the irrigation program for these Tribal allottees and completely failed to fulfill its trust responsibilities to them.   On information and belief, this resulted in the allottees' abandonment of the irrigation of their lands.

The respected Uncompahgre Elder, Chipeta, was interviewed by the Superintendent of the Uintah & Ouray School in 1916, at the request of the United States Commissioner of Indian Affairs, and Chipeta confirmed for him that representatives of the Federal Government had promised her

> that if I came to this country I would be given a home better than the home I was abandoning [in Colorado]. My people were made the same promise that they would be given good lands and that water would be placed on their lands. None of these promises have been kept. I and my people were located for the most part on White River, and on the bottoms of the lower Duchesne, and these lands are desert lands today. . . . I realize that the people in Washington have many things to do, and they have forgotten about us Uncompahgrees [sic]. We have lands it is true, but without water, these lands are of no value to us."

The Tribal Reserved Water Rights for Groups 6 and 7 lands continue to this day to be wasted from the failure of the federal government to keep its promise and provide for the development of historically irrigated and practicably irrigable lands on the Uncompahgre portion of the reservation, as the appurtenant Reserved Water Rights flow downstream for use by the non-Indians.

59.     Although numerous Indian allottees did not benefit from the UIIP throughout the early to mid-twentieth century, the United States nonetheless continued to assess Indian allottees for UIIP construction and maintenance charges each year since 1915. Then, when allottees became delinquent on UIIP assessments, no water was delivered to the Indian lands, and the indebtedness accumulated, which led to a loss of Indian-owned lands through the forced sale of these lands without any monetary benefit to the allottees. This ultimately resulted in a significant reduction in Indian-owned lands that were meant to be included in the UIIP.

    b.   Failure to Provide Storage Necessary to Support a Fully Functional UIIP

60.     At the time the UIIP was authorized, and at all times relevant thereafter, Federal Defendants were aware of non-Indian private irrigation activities to construct storage facilities in the Uinta Basin that would interfere with the natural flows of the Lakefork and Uinta Rivers—

rivers whose natural flows have always been insufficient to meet the irrigation needs of the Tribe and its members throughout the complete agricultural season.

61.     In the 1916 Bills of Complaint to adjudicate a portion of the Tribe's Reserved Water Rights, the United States acknowledged that insufficient natural flow exists in the Uinta-Whiterocks and Lake Fork-Yellowstone River Basins to properly irrigate Indian lands.  The United States attested to the court that

> [t]he water supply of said Uintah River, except when said river is at stages of high flow, is and at all times has been insufficient to supply the needs of the United States and said Indians for the irrigation of the irrigated lands . . . with the consequence that the waters of said river, *unless conserved by storage*, will become progressively less able to supply the needs of the United States and of said Indians. . . . (emphasis added).

Bill of Complaint of United States at 26, *United States v. Dry Gulch Irrigation Company*, Docket No. 4418 (1916).

62.     The United States also cited the Presidential Proclamation of July 14, 1905, setting aside 1,010,000 acres of Indian land as an addition to the Uintah Forest Reserve.  Under said Proclamation, the "United States…set apart" Reservation lands "at the head-waters of the streams…as forest reserve lands" so that "the water supply [for the] Indians would be maintained" upon unallotted lands being opened for entry by Non-Indians.

63.     The federal district court adopted the United States' position that storage was essential to preserve and protect the water supply for the irrigation needs of the Indians, and recognized that reservoirs would be required, and that the UIIP would construct storage to serve the tribal lands.  The court did so by providing for an eight-month period of use annually beginning on March 1st and running through November 1st—a period of use that extends the Tribe's ability to divert and use the waters from the designated rivers almost two months longer than water delivered by natural flow via the canals and ditches of the UIIP.

64.     The United States knew at the time of the 1916-1923 water rights adjudication that the water duty assigned by the federal court for purposes of irrigating the designated Indian trust lands, that is, 3.0 acre-feet per acre per year, was insufficient to satisfy the agricultural water needs of the Indian trust lands—resulting in either a failure to protect and preserve sufficient water supply for the Ute Indian Tribe's agricultural efforts to succeed, or the United States expected that storage would be constructed to supplement the deficient direct natural flow water duty.

65.     Numerous past and present studies have shown that a diversion duty of 4.0 acre-feet per acre per year (33% more than that issued in the federal decrees) is the amount of water actually needed to provide proper irrigation for economically beneficial agricultural pursuits. Upon information and belief, the insufficiency of the 3.0 acre feet per acre per year water duty was known by the United States at the time the 1923 decrees were issued.

66.     Several quantifications of tribal water shortages have been computed over the past century. Water shortages on these lands are frequent: on average, seven (7) to eight (8) years out of ten (10) years, the Tribe and its members experience water shortages.

67.     The Ute's Tribe's Reserved Water Rights that cannot be diverted to non-existent storage before the irrigation season begins and after the season ends (that is, March 1 to November 1) are wasted, lost, and flow downstream to be used by non-tribal, state-based water users and/or by non-Indian water users, including in the Lower Basin of the Colorado River, as surplus water, without any economic benefits or compensation to the Tribe.

68.     Well-documented water shortages support the conclusion that Federal Defendants' trust responsibility to the Tribe includes the obligation to provide for tribal water storage in order to both (1) preserve, protect, and develop the Reserved Water Rights awarded in the 1923 Decrees

and (2) supplement these decreed water rights, as needed, so that there is sufficient water available for full-season irrigation of all lands served by the UIIP.

69.     No tribal water storage for the lands under the Uintah Indian Irrigation Project exists today.  Defendant has failed to provide tribal storage for its 1923 federally-decreed Reserved Water Rights, resulting in substantial economic losses to the Tribe and its members.

70.     Storage, combined with natural flow, is the only way the Tribe can fully develop its Reservation lands and put its Reserved Water Rights to use.  Unfortunately, a review of federal support for the development of storage on the Reservation leads to the clear conclusion that Federal Defendants have engaged in a course of conduct that consistently places the non-Indian water user needs ahead of the needs of the Ute Indian Tribe.

71.     The need for tribal storage for the trust lands irrigated under the Uintah Indian Irrigation Project has been clearly and repeatedly documented for over 100 years, since the early 20th Century.  An extensive historical record supports the conclusion that the Federal Government, through both the BIA and the BOR, has long known and recognized the fact that both storage and natural flows are needed to fully develop and use the Tribe's Reserved Water Rights, and, in fact, that the Tribe's Reserved Water Rights and the trust resources upon which these Reserved Water Rights depend have suffered from poor Government management.

     c.   Deferred Maintenance and Disrepair of the UIIP

72.     From the construction of the Project to the present, the BIA has been the federal agency responsible for the operation, maintenance, and rehabilitation of the UIIP.

73.     Specific and comprehensive Federal regulations governing the BIA's operation and maintenance of the UIIP were promulgated prior to 1957 as Part 121, and subsequently renumbered as Part 199 on December 24, 1957, 22 Fed. Reg. 10479, 10637-38 (Dec. 24, 1957)

("1957 regulations").  These regulations applied specifically to the UIIP and provide the BIA with pervasive and comprehensive control of the UIIP.

74.    The 1957 regulations continued a system for the assessment of operation and maintenance fees payable by landowners within the UIIP.  The regulations provided that "Bills for the yearly assessment of construction and operation and maintenance charges will be issued each year for the record owner of land within the project," with an "annual per-acre charge for operation and maintenance…levied against the entire irrigable area of each farm unit or allotment to which irrigation water can be delivered from present constructed works."

75.    In addition to establishing a system for assessing operation and maintenance fees, the federal regulations reinforced Federal Defendants' pervasive and comprehensive control over the UIIP.  Section 199.20 of the regulations stated that "[n]o persons other than those specifically designated by the project engineer are authorized to regulate project structures or to interfere in any way with project-operated canals or any works appurtenance thereto or to the water flowing therein."  The term "project engineer" was in reference to the BIA engineer charged with implementing the regulations.

76.    The federal regulations also required the BIA to deliver water to "one point on the upper boundary of each farm unit on the project," and to "maintain the lateral system to said delivery point."   These requirements confirmed that Federal Defendants' pervasive, comprehensive, and exclusive control over UIIP operations extended up to the property boundaries of individual irrigators

77.    In 2008, the United States promulgated regulations governing the operation and maintenance of all irrigation projects administered by the BIA, including the UIIP.  The United

States' exclusive responsibilities relating to the operation of the UIIP, as reinforced by the prior federal regulations, remain in full force and effect in the 2008 regulations.

78.     On October 1, 2000, the United States and a private company known as the Uintah Indian Irrigation Project Operation and Maintenance Company ("O&M Company"), entered into a Cooperative Agreement, in which the O&M Company assumed responsibility over the day-to-day operation and maintenance of the UIIP.

79.     The O&M Company is not owned or in any way controlled by the Tribe.  It is a private company functioning as an agent of the Federal Government by assuming some of the responsibilities normally delegated to the BIA.

80.     The Cooperative Agreement expressly states that the BIA's trust responsibility toward the UIIP remains fully intact despite the O&M Company assuming day-to-day operation and maintenance tasks, and that the United States retains its legal ownership of the UIIP.

81.     Further, the Cooperative Agreement provides the BIA continued and substantial oversight authority over the O&M Company's activities.  For instance, under the Cooperative Agreement, the O&M Company is required to produce an Annual Operating Plan each year containing a comprehensive work and budgeting plan for the year.  This Annual Operating Plan must be approved by the BIA.

82.     The BIA also remains responsible for UIIP recordkeeping, billing, and collections of the annual O&M fees from UIIP water users, and for negotiating and executing carriage agreements with private irrigators using state-based water rights.

83.     Over the past several decades, as a direct result of inadequate maintenance and rehabilitation by the United States, the UIIP has fallen into a grave state of disrepair.

84.     In 1982, HKM Associates prepared a Rehabilitation and Betterment Plan for the UIIP that was submitted to the BIA.  In its Rehabilitation and Betterment Plan, HKM Associates concluded that 84% of UIIP structures were in need of rehabilitation.  HKM ASSOCIATES, UINTAH INDIAN IRRIGATION PROJECT REHABILITATION AND BETTERMENT PLAN at 12-13 (Sept. 1982).  HKM Associates further concluded that of the 651 miles of UIIP waterways, 387 miles required reconstruction, 20 miles required concrete lining, and 11 miles required installation of pipelines.  *Id*. at 13.  Brush removal was required on 260 miles of UIIP waterways.  *Id*.  HKM also found rehabilitation needs in operation and maintenance roads running along approximately 132 miles of UIIP canals, as well as the need to install approximately 288 lineal miles of fence along main canals in order to "control access to UIIP waterways."  *Id*.

85.     The HKM report noted substantial erosion on UIIP waterways, infestation of brush and trees in the bank areas of UIIP waterways, sections of UIIP canals damaged by livestock, and excessive water seepage.  *Id*. at 11.  These and other suboptimal conditions have diminished UIIP efficiency and prevented the UIIP from delivering water to a portion of UIIP Lands.

86.     Acting Deputy to the Assistant Secretary of Indian Affairs, Richard C. Whitesell, testified at a 1988 Congressional hearing on H.R. 5307 that rehabilitation of the Uintah Indian Irrigation Project was one of four "remaining issues" that needed to be resolved with regard to the Tribe's water rights and resource development issues.

87.     A report issued by the BIA in 2008 asserted:

> The Uintah [Indian] Irrigation Project has deferred maintenance needs in excess of $86.1 million to bring the aging, deteriorated infrastructure up to current standards. The majority of our diversion structures lack any safety features to keep personnel safe while operating gates and cleaning debris for the upstream side of the structures.  There is no fencing or gates to prevent the general public from getting on any of our structures of features.

U.S. Dept. of Interior, BIA, Western Region, "Operation and Maintenance Guidelines: Uintah Indian Irrigation Project, Uintah and Ouray Agency" (Dec. 23, 2008).

88.     The Tribe has yet to see the comprehensive rehabilitation of the UIIP promised by the Government.  The poor condition of the UIIP has resulted in the inability of the UIIP to deliver available water to irrigable lands within the Project.  The UIIP's disrepair has also been a contributing factor in UIIP lands being rendered temporarily or permanently non-assessable.

89.     One cause of wear and tear on the UIIP is the use of UIIP facilities to deliver a significant amount of water for secondary water users outside the UIIP pursuant to carriage agreements.

90.     Current carriage agreements executed and provided to the Tribe by the BIA for the use of UIIP facilities to deliver water outside of the UIIP show that the United States has neither reviewed, nor renegotiated, the carriage agreements in decades.  That is significant, in part, because some of the carriage agreements set a fixed annual per-acre rate for the operation and maintenance fees assessed to the recipient of the water.

91.     In addition, the United States has made little to no effort to reduce the excessive seepage in the UIIP canals that results in significant Indian Reserved Water Rights losses and waste while sorely needed for the Indian trust lands under the UIIP.

92.     Federal Defendants' failure to complete construction of the UIIP has prevented the Tribe from establishing a viable agricultural economy that can contribute to the purpose of the Reservation as a permanent homeland for the Tribe and its members.

### d.  Designation of UIIP Lands as Temporarily or Permanently Non-Assessable

93.  Since the time the BIA began operating a system to irrigate 78,950 acres of land, the BIA has designated a substantial portion of this designated acreages as either temporarily non-assessable ("TNA") or permanently non-assessable ("PNA").

94.   According to the BIA's 2008 National Irrigation Handbook, the primary reasons for designating lands as TNA or PNA are limiting factors such as topography, soil conditions, or the inability of the UIIP to deliver water.

95.  These TNA/PNA lands are lands that have been deemed by the BIA as either temporarily or permanently incapable of being irrigated under the UIIP, despite being included within the acreage that was initially designated by the BIA to be irrigated under the UIIP.

96.  These TNA/PNA designations have resulted in a reduction in irrigated trust acreage under the UIIP, which has an adverse economic impact on the Tribe and its members.  Further, as a result of these TNA/PNA designations, there is less funding available to maintain the UIIP, as the operation and maintenance fees assessed to landowners within the UIIP is based on the amount of presently assessable acreage within each landowner's parcel. 25 C.F.R. § 505.75.  Therefore, when land within the UIIP is deemed non-assessable, there becomes less funding available to operate and maintain the UIIP.  This, too, has had an adverse economic impact on the Tribe and its members.

97.  On information and belief, a significant portion of UIIP acreage designated TNA or PNA is directly attributable to the mismanagement of the UIIP by the United States, including, the United States' failure to sufficiently maintain and rehabilitate UIIP Lands and UIIP facilities.

98.  A disproportionately high portion of the UIIP Lands designated as TNA or PNA are Indian trust lands, owned either by the Tribe or tribal members.  While tribal and allotted lands

comprise over half of the UIIP Lands, on information and belief, the tribal and allotted lands comprise over 98% of the UIIP Lands that are currently in TNA status.  Similarly, on information and belief, tribal and allotted trust lands comprise over 93% of the UIIP lands that are currently in PNA status.

99.     Because poor UIIP maintenance and rehabilitation causes lands to become non-assessable, the disproportionately high representation of tribal and allotted trust lands within the UIIP designated as TNA or PNA supports the conclusion that the UIIP operation and maintenance fees have been used over the life of the UIIP to the disproportionate benefit of non-Indian fee landowners receiving Reserved Water Rights under the UIIP, as well as the delivery of water for non-Indian, secondary water rights holders through formal and informal carriage agreements with the BIA.

e.    Unlawful Secretarial Transfers of Water Rights

100.    In the Act of May 28, 1941, 55 Stat. 209, Congress authorized the Secretary to "transfer water rights, with the consent of the interested parties, to other lands under [the UIIP] and to make necessary contracts to effectuate such transfers."

101.    The intent of the Act was to preserve the water rights serving the UIIP "by transferring those rights to more desirable lands.  Water rights from Indian-owned poor lands would be transferred to better lands in Indian ownership, and similar rights as to non-Indian lands would be transferred to more desirable non-Indian lands."

102.    A Congressional House Report justified the need to transfer water rights within the UIIP, stating that Indian farmers within the UIIP were suffering from economic underdevelopment because certain lands within the UIIP were less suitable for farming, and the UIIP was in a "desperate economic situation."

103.    The 1941 Act contributes to Federal Defendants' comprehensive and pervasive control over the transfer of Tribal Reserved Water Rights under the UIIP, confirming the Secretary's exclusive control over not just the administration of the UIIP.

104.    The Ute Tribal Business Committee opposed the 1941 Act because they believed would be the confiscation of the Tribe's water rights for their Indian lands and its use for the Central Utah Project, creating a threat to the Tribe's economic well-being unless sufficient water rights to adequately cover all irrigable trust lands were retained.  The Tribal Business Committee therefore passed a resolution objecting to the water transfers, and asked the Secretary to take steps to protect Indian Reserved Water Rights.  The Business Committee's fear that the United States would not protect Tribe's water rights has been borne out over time through the present.

105.    On information and belief, the United States violated its trust obligations to the Indians and perverted the Congressional intent and authority under the 1941 Act by making false promises to Indian landowners and adversely influencing and pressuring Indian landowners to place tribal lands into a permanently non-assessable ("PNA") status, Class III, under the UIIP. The Government then transferred the Indian landowners' rights—i.e., the right to use Tribe's Reserved Water Rights assigned to their lands for irrigation purposes and other purposes—to other lands.  On information and belief, the United States told the Tribe and its members that if the Tribe and its members acquiesced in placing tribal lands into the PNA Class III land status, the Tribe and its members would be able to sell their water right or transfer it to other tribal lands.  Based on the United States' lack of full disclosure, the Tribe and its members understood that they could keep their tribal water rights indefinitely.

106.    On information and belief, the Government even leveraged its authority under the law to suspend or defer irrigation charges assessed against the Indian property under the UIIP to

threaten and compel the Indians to consent to the extinguishment and loss of their tribal water rights.

107.    However, on information and belief, once placed in PNA status, the United States transferred the use of some of the Tribe's Reserved Water Rights to lands not owned by the Tribe or its members.  On information and belief, neither the Tribe nor its members knowingly consented or entered into agreements for the transfer of tribal water off of Indian allotments and Indian trust lands (including the federally-decreed water rights designated for their lands), and such transfers eliminated the ability of the Tribe and its members to irrigate allotted and tribal trust lands. Further, the United States failed to fully disclose that, without appurtenant tribal water, the value of the Indian allotments and tribal lands without the Tribe's water rights would be significantly decreased after the Secretary's water rights' transfers, and, in fact, would be worthless.  The Government, however, knew and admitted at the time that the Tribe and its members lacked full knowledge and understanding of their rights.  The Indians who lost their right to use the Tribe's water to irrigate their lands under the UIIP were not only deceived by the Government, but were not justly compensated for their loss.  Many of the Indian lands placed into PNA Class III status, or into TNA status, were deemed incapable of supporting irrigation, either because the United States failed to complete construction of UIIP canals, ditches, and other water works to these Indian trust lands, or because the United States failed to make timely repairs and to rehabilitate UIIP water works so as to facilitate the delivery of water to these farm headgates.

108.    The Secretary transferred the Tribe's water rights from about 10,000 acres of trust lands placed into PNA Class III, non-irrigable lands under the UIIP, to other lands, some of which were non-Indian lands both on and off the Reservation, resulting in the loss of a significant amount of Tribe's Reserved Water Rights for the use of the Tribe and it members annually.  On information

and belief, this included water rights for some of the Tribe's aboriginal lands.  At all times, the United States was acting as the trustee of the Reserved Water Rights for the Tribe.

109.    The Secretarial transfers of the Tribe's water rights under the UIIP pursuant to the 1941 Act resulted in the Tribe's water rights being transferred from Indian lands to non-Indian lands under the UIIP and from Indian lands on the Reservation to non-Indian lands outside of the UIIP.

110.    On information and belief, the Indians were not compensated for the loss in the value of their lands due to the Secretary's water rights' transfers from their lands, and the unlawful water rights' transfers have resulted in the significant loss in irrigated lands under the UIIP, as well as the ability to use the Reserved Water Rights for other purposes.

111.    The Secretary of the Interior failed to keep the paramount rights of the Tribe to the waters of the streams on the Reservation in mind, as he was required to do, when transferring the Tribe's water rights for irrigation and other purposes to non-Indian lands on and off the Reservation.  In short, the United States failed to protect the rights and interests of the Indians to their current and future water needs.

f.    Inadequate Water Quality for Agricultural Production

112.    The egregious inadequacies in the Federal Defendants' management of the  UIIP arise not only from a lack of properly maintained land and infrastructure, but also from the inadequate quality of the water being delivered through the infrastructure.

113.    Since the conception of the UIIP, the Tribe has relied upon Federal Defendants to administer the UIIP in a manner that yields economic benefits commensurate with the Tribal water rights being delivered and consumed through the Project.  By managing the Tribe's Group

1 *Winters* Reserved Water Rights for irrigation purposes, the United States has knowingly placed the Tribe, its beneficiary, in this position of reliance.

114.    On information and belief, the water supplied by Federal Defendants for the UIIP is both polluted and high in salinity, making such water unsuitable for efficient agricultural cultivation.    The    2016    Utah    State    Water    Plan    for    the    Uintah    Basin, (https://water.utah.gov/Planning/SWP/Unitah/UintahBasin2016.pdf), lists the Lake Fork River, the Uinta River/Deep Creek, and the Duchesne River from Myton to the Green River as water bodies impaired by high concentrations of total dissolved solids (TDS).

115.    On information and belief, Federal Defendants have not taken measures to ensure that the Tribal water delivered to trust lands through the UIIP is suitable for irrigation, despite ample knowledge and data at its disposal on the water quality requirements for satisfactory crop cultivation.

116.    The poor water quality of the waters delivered and utilized under the UIIP has reduced the irrigability of the UIIP lands, reduced crop yields, and limited the Tribe in the types of crops it can grow, all resulting in economic losses to the Tribe and its members.

   g. <u>Midview Exchange Agreement</u>

117.    In 1967, Federal Defendants entered into an agreement with the Tribe and an organization of non-Indian, secondary water rights irrigators, known as the Moon Lake Water Users Association ("Association"), providing for water right exchanges and transfer of irrigation facilities (n/k/a the Midview Exchange Agreement or "Midview Exchange").  Under the Midview Exchange, the BIA transferred a portion of the Tribe's 1923 federally-decreed Reserved Water Rights in the Lake Fork River to the BOR "for the use and benefit of the Moon Lake Project."  As set forth in the 1923 Decrees, these *Winters* Reserved Water Rights have a priority date of October

3, 1861. The Midview Exchange guaranteed that the minimum Association acreage to be served by the Tribe's Lake Fork River rights "shall not be less than" the total acreage serving the UIIP from the Duchesne River, but "in no event less than 7,500 acres"—providing the Association with a minimum acreage of 1861 Reserved Water Rights regardless of whether the UIIP was irrigating fewer than 7,500 acres under the agreement.

118. In exchange for the right to use a portion the Tribe's *Winters* Reserved Water Rights in the Lake Fork River, BOR agreed to transfer to the BIA, for the use and benefit of the UIIP, two state-based water rights in the Duchesne River, with inferior priority dates of June 22, 1918, and August 3, 1922.

119. The Tribe's receipt of state-based water rights under the exchange is significant because, in contrast to *Winters* Reserved Water Rights, the state-based water rights that the Tribe was to receive under the Midview Exchange could be lost and forfeited through non-use under Utah state law.

120. As part of the agreement to transfer the Tribe's senior-priority, Reserved Water Rights for the use and benefit of the Association, BOR and the Association agreed to transfer the right, title, and interest in the Midview Dam and Reservoir, Duchesne Diversion Dam, Duchesne Feeder Canal, and Midview Lateral together with all facilities and property appurtenant thereto (collectively, the "Midview Property") to the BIA to operate and maintain "as part of the [UIIP]," including the making of necessary replacements. The Midview Exchange provided that "[s]uch transferred works shall become part of the project works of the Uintah [Indian Irrigation] Project." The Midview Property includes 655.50 acres underlying the Dam and Reservoir.

121. Because the Midview Property was to be transferred to the BIA as part of the UIIP—a tribal trust asset held by the United States in trust for the Tribe's benefit—the Tribe was

promised and understood that the Tribe would hold equitable title to the Midview Property.  The United States, however, has never transferred the Midview Property to the UIIP as a tribal trust asset.  The United States, therefore, has breached its contractual obligation under the Midview Exchange, violated its fiduciary duties to the Tribe, and violated federal law.

122.    Additionally, on information and belief, as a result of the BIA's decisions to designate Indian trust lands served under the Midview Exchange as temporarily or permanently non-assessable and, therefore, ineligible to receive water for some of their irrigated lands, about 1,500 acres of trust lands are no longer irrigated under the Midview Exchange.  Meanwhile, the Moon Lake Water Users Association continues to use the Tribe's Reserved Water Rights in the Lake Fork River to serve the 7,500-acre minimum set forth in the Midview Exchange.

123.    The Midview Exchange has been and continues to be an inequitable exchange for the Tribe and other trust land irrigators.  Federal Defendants have failed to address this inequity, which has resulted in, and continues to result in, substantial economic losses to the Tribe and other trust land irrigators.

124.    In 1968, the parties to the Midview Exchange signed a Transfer Agreement providing for the internal transfer of the Midview Property from the BOR to the BIA to become part of the UIIP, stating:

> Pursuant to Article 8 of the [Midview Exchange], the Bureau of Reclamation and the Moon Lake Water Users Association hereby transfer· to the Bureau of Indian Affairs the jurisdiction of the right, title, and interest in and to the Midview Dam and Reservoir, Duchesne Diversion Dam, Duchesne Feeder Canal, and Midview Lateral together with the facilities and property appurtenant thereto.

125.    Through the 1968 Transfer Agreement, the BIA expressly accepted jurisdiction over the Midview Property and agreed to "operate and maintain said facilities including necessary replacements as a part of the Uintah Indian Irrigation Project."

126.    Unbeknownst to the Tribe, the United States never completed the underlying paperwork to formally transfer the Midview Property from BOR to the BIA.  The Tribe did not learn of this omission until the BIA was asked to approve an easement for rights-of-way ("rights-of-way") to Duchesne County in 2014.

127.    The purpose of the rights-of-way to Duchesne County was for the "construction, maintenance, repair, inspection, protection, operation and removal" of a new culinary water pipeline known as the Victory Pipeline.  In 2014, the United States issued rights-of-way to Duchesne County to access lands within the Midview Property, notwithstanding the Tribe's objection to the rights-of-way which the Tribe had made known to the BIA.  The BIA neither obtained the Tribe's consent to the rights-of-way, nor ensured that the Tribe received just compensation for the rights-of-way.  The United States has refused to recognize, and in fact, has denied the trust status and the Tribe's beneficial ownership of the Midview Property.

128.    Because the Midview Exchange provided for the conveyance of title to federally decreed Tribal Reserved Water Rights in the Lake Fork River, the Midview Exchange is an illegal conveyance of tribal trust property under 25 U.S.C. § 177.  Yet, the parties to the Midview Exchange, including the BIA, continue to satisfy the terms of the Midview Exchange as if the Exchange created a legally valid agreement.

129.    In 2016, the Bureau of Indian Affairs, in response to a formal request by the tribal leadership, the Ute Tribal Business Committee, informed the tribal leadership that it would not hold the Midview Property as a tribal trust asset under the UIIP, as promised to the Tribe in the Midview Exchange, but instead, would continue to hold the property as government fee property. Efforts by the tribal leadership to convince the BIA otherwise have been unsuccessful.

130.    On information and belief, the UIIP remains burdened by its obligation to deliver water for irrigators in the Association through UIIP facilities at only the cost of operation and maintenance fees charged to the Indian users of the UIIP; on information and belief no additional costs for the carriage of water to non-Indian Association water users are charged to support the rehabilitation and betterment of the UIIP, which has documented significant deferred maintenance needs.

131.    In violation of the Midview Exchange, the BIA is now using water from the Midview Reservoir to irrigate lands other than those designated for irrigation under the Midview Exchange, in particular, lands under the Pahcease canal, part of the UIIP, which only have a direct flow right from the Duchesne River.   The BIA's diversion of water to other lands reduces the amount of stored Duchesne River water that the Tribe is entitled, under the Agreement, to use for purposes other than irrigation, resulting in economic loss to the Tribe.

        h.   <u>Failure to Recognize the Tribe's *Winters* Reserved Water Rights Following Transfer of the Duchesne City Water Right</u>

132.    The Tribe's Group 2 *Winters* Reserved Water Rights include the water rights that were initially certified through the State of Utah as Water Right Nos. 43-180 and 43-203 ("Duchesne Townsite Water Rights").

133.    The United States applied for the Duchesne Townsite Water Rights for the duel purposes of irrigating allotted lands on the Tribe's Reservation and providing domestic water supply for the Duchesne Townsite, one of three town sites that were established on the Reservation to facilitate tribal economic sustainability.   The intent of the United States in procuring these water rights was to hold these water rights in trust for the Ute Indian Tribe.

134.    The Duchesne Townsite Water Rights were cited by Decker as comprising a portion of the Tribe's Group 2 acreage with an 1861 *Winters* Reserved Water Rights, stating: "Although certified by the State, a water right for (Group 2) land is claimed under the 'Winter's Doctrine.'"

135.    In 2000, Congress enacted Public Law 106-370, which authorized and directed the Secretary of the Interior to "convey to Duchesne City, Utah, or a water district created by Duchesne City, all right, title, and interest of the United States in and to those water rights appropriated under the laws of the State of Utah by the Interior's United States Indian Service and identified as Water Rights Nos. 43-180 [] and 43-203…"

136.    In December 2001, the Bureau of Indian Affairs carried out that directive, transferring to Duchesne City by quitclaim deed the Tribal Reserved Water Rights.

137.    The water rights transferred to Duchesne City were included in Group 2 of the Decker Report and, as such, were quantified as Tribal *Winters* Reserved Water Rights under the 1965 Deferral Agreement.  Yet, the Secretary did not, nor made effort to, secure just compensation for the Tribe upon transferring this water right.  The only interest the Tribe received from this transfer that could even feasibly be construed as "compensation" came from the 2000 Act itself, which provided that the Secretary must require Duchesne City to allow the Tribe and its members to connect to the Duchesne City municipal water system without paying a connection or service fee.  However, simply providing for the Tribe's limited use of property that once belonged to the Tribe does not constitute just compensation for being divested of the property right in question.

       i.   Other Administrative Practices Inconsistent with the Trust Status of the UIIP

138.    Rather than work to rectify its shortcomings as a trustee, the United States has adopted a patterned course of conduct reflecting its failure and/or refusal to recognize the UIIP as a trust asset at all.

139.    In addition to conduct of the United States already raised in this Complaint demonstrating the United States' failure and/or refusal to recognize the UIIP as a trust asset, including transferring UIIP water rights to non-Reservation lands under the color of the 1941 Act and executing carriage agreements with non-Indian water users, the BIA regularly engages in what the BIA refers to as "informal operating practices," in which the BIA enters into informal agreements allowing non-Indian irrigation companies and other non-Indian irrigators to utilize UIIP water and infrastructure for their own benefit.

140.    On information and belief, the BIA has never consulted with the Tribe when conducting its "informal operating practices" affecting the UIIP.  Failing to involve its Tribal beneficiary in administering the UIIP for the benefit of non-Indians is inconsistent with the BIA's role as trustee with an unconditional duty of loyalty to the Ute Indian Tribe.

141.    The informality of these practices is, in itself, reflective of the United States' failure to recognize and appreciate the trustee-beneficiary relationship upon which the Tribe has been forced to rely.

142.    In addition, despite knowing that the 1923 federal water rights decrees provide an enforceable protection for the Tribe's Reserved Water Rights under the UIIP against secondary priority, state-based water users in the basin, the Secretary of the Interior has shirked its duty to protect and preserve the Tribal water in its operation the UIIP by annually providing the River River Commissioners with only the acres that are currently being cropped to determine the amount of water that will be delivered during each irrigation season.  The Secretary has done so with full knowledge that the state-based water users, in contrast, provides the River Commissioners with a list of all the certified acreages for which water rights are to be delivered to non-Indian lands with secondary priority water rights, without properly accounting for whether all the certified acreages

of the non-Indian lands remained under production.  This management strategy has significantly benefitted the non-Indian, secondary water rights holders under the UIIP (by ensuring that more water was available in the natural flow for the secondary water users), but it has significantly failed to benefit and protect the Tribe and its members under the UIIP.

> j.  Injuries Suffered by the Tribe as a result of the United States' Mismanagement of the UIIP and its Associated Tribal Water Rights

143.    As a result of the United States' historical and continuous mismanagement of the UIIP and its associated Tribal water rights, as exemplified through the foregoing subsections a-g, the Tribe has incurred substantial economic harms, including lost crop yields resulting from insufficient water delivery for the irrigation of trust lands, as well as other lost economic opportunities resulting from the United States' misuse and diminishment of the Tribe's water resources.

## ii.    Unfulfilled Federal Obligations Relating to the 1965 Deferral Agreement

144.    The purpose of the land classifications set forth in the 1960 Decker Report was to determine the full quantification of the Tribe's Reserved Water Rights from the Colorado River system and the effect on the development of the Central Utah Project ("CUP"), a major project to develop Utah's apportionment of water from the Colorado River system.  Construction of the CUP was authorized by Congress in the Colorado River Storage Project Act of 1956, with construction to be the responsibility of the BOR.

145.    The CUP was sponsored by the Central Utah Water Conservancy District ("CUWCD"), a political subdivision of the state of Utah.

146.    The central component of the CUP is the Bonneville Unit, a substantial trans-basin water delivery project designed to move water from various Reservation streams in the Uinta Basin

across the Wasatch Mountains to the Wasatch Front (a metropolitan region in Utah containing several contiguous cities, including Salt Lake City, Provo, Ogden, and others).

147.    The feasibility of the Bonneville Unit depended upon the diversion and transfer of water from the Uinta Basin, in particular, the Duchesne River, to the Bonneville Basin.  However, the State water targeted for transfer out of the Uinta Basin via the Bonneville Unit has a later priority date for its use than the Tribe's *Winters* Reserved Water Rights, including waters designated to serve the Group 5 lands in the Decker Report.

148.    The Federal Defendants and the CUWCD knew that the United States Congress would not fund the Bonneville Unit without the Ute Indian Tribe's agreement to defer the development of a portion of the Tribe's Group 5 lands.  Therefore, on September 20, 1965, the BIA, BOR, CUWCD, and Ute Indian Tribe entered into an agreement ("1965 Deferral Agreement") whereby the Tribe agreed to defer the use of a portion of its *Winters* Reserved Water Rights for the development of 15,542 acres of the 29,118 acres of Group 5 lands, as quantified in the Decker Report; this in turn allowed the State of Utah and the Department of Interior to secure funding for the Bonneville Unit of the CUP by certifying to Congress that there were uncontested water rights for the Bonneville Unit and it could proceed with construction without the Tribe's interference or adverse claims against the State and CUP.

149.    The parties to the 1965 Deferral Agreement understood and agreed that a substantial part of the quid pro quo for the Tribe's agreement to defer development of 15,542 acres of its Group 5 lands was the other parties' "full and complete recognition of the Tribe's Reserved Water Rights as quantified in the Decker report and described in the Book of Claims filed with the State Engineer, State of Utah, by [E.L. Decker on behalf of] the Ute Indian Tribe, *without resort to litigation*."  (emphasis added).  Construction of the Bonneville Unit, the largest unit of the CUP,

could only proceed because the Tribe had received promises under the 1965 Deferral Agreement from the United States and the State of Utah, through, the CUWCD, that the Tribe's *Winters* Reserved Water Rights from the Colorado River system would be those quantified for Groups 1-7 in the Decker Report, and that the Tribe's *Winters* Reserved Water Rights have priority dates consistent with the Winters Doctrine, and would not be adjudicated in any contested court proceeding in order to be recognized as binding, legally enforceable water rights.

150.    The binding quantification of the Tribe's Reserved Water Rights was essential to satisfy the United States' purpose for entering into the 1965 Deferral Agreement.  In order to create an enforceable agreement for the deferral of the development of a portion of the Tribe's Group 5 Reserved Water Rights, there first needed to be a legally enforceable Tribal property right, the use of which could be deferred.  Therefore, the quantification of the Tribe's Reserved Water Rights was a prerequisite to the 1965 Deferral Agreement.  This quantification was not merely consideration granted to the Tribe in exchange for the Tribe's deferral of its Group 5 Reserved Water Rights; it was necessary to ensure that the Tribe's had a legally recognizable and binding property right in the water.

151.    The Tribe's bargained-for consideration in the 1965 Deferral Agreement included the Defendants' promise to provide supplemental water and to address the water storage needs of the Tribe.  The Defendants agreed that the planned Upalco and Uintah Units of the CUP would provide the stored water and related infrastructure desperately needed by the Tribe for the delivery of its Reserved Water Rights under the UIIP.  In Section 10 of the 1965 Deferral Agreement, the Tribe was promised storage as part of the development of the Uintah Unit to provide supplemental water to the 34,152 acres of Uintah Indian Irrigation Project lands from the runoff waters of the

Uinta and Whiterocks rivers in Group 1.  The development of storage under the Uintah Unit was to be "programmed for early authorization and construction."

152.    The Tribe's participation in the 1965 Deferral Agreement was also dependent upon the Defendants' promise that the Ultimate Phase of the CUP would provide supplemental and full service water to the Tribe's lands comprising Groups 1-5 of the Decker Report.  In a 1988 Memorandum from Regional Solicitor William Robert McConkie to the Superintendent of the Uintah and Ouray Agency of the BIA, Solicitor McConkie stated that it was "the intent that the ultimate phase of the Central Utah Project would supply supplemental water and full service water, as applicable, to all Indian water right lands in Groups 1 through 5" (emphasis in original).  The parties understood that one indispensable component of the Ultimate Phase of the CUP was the construction of the Ute Indian Unit, which was to divert water from the Green River and transport it to supplement the water in the Upalco, Uintah, and Bonneville Units.  Construction of the Ute Indian Unit was the only way the Tribe's storage needs could be fully satisfied through the Uintah and Upalco Units.

153.    Paragraph 5 of the 1965 Deferral Agreement established a forty-year timeframe for the completion of the ultimate phase of the CUP, stating:

> If the ultimate phase of the Central Utah project is not completed sufficiently to supply said Indian water rights by the 1st day of January, 2005, equitable adjustment will be made in accordance with said reserved and perfected water rights or the tribe to permit the immediate Indian use of the water so reserved. It is agreed that the first day of January, 2005, shall be mutually considered as the maximum date of deferment and that all phases of the Central Utah project will in good faith be diligently pursued to satisfy all Indian water rights at the earliest possible date.

The terms "said Indian water rights" and "all Indian water rights" as used in Paragraph 5 of the 1965 Deferral Agreement refer to the full quantity of the Tribe's *Winters* Reserved Water Rights recognized by the Federal Defendants as a result of execution of the 1965 Deferral Agreement.

Thus, the 1965 Deferral Agreement contained a promise that the Central Utah Project would supply the full quantity of the Tribe's Groups 1-7 *Winters* Reserved Water Rights.

154.    The Tribe entered into the 1965 Deferral Agreement upon its good faith understanding that the Central Utah Project would result in the supply of the full quantity of the Tribe's Group 1-7 *Winters* Reserved Water Rights or, at the very least, the Tribe would have a right to an "equitable adjustment" providing an alternative means through which the United States would supply the full quantity of the Tribe's *Winters* Reserved Water Rights in the event the Central Utah Project did not supply such waters by January 1, 2005.

155.    The 1965 Deferral Agreement also contained specific promises relating to the BIA's management of the Tribe's Reserved Water Rights.  For example, in Paragraph 8 of the 1965 Deferral Agreement, the BIA promised to move the diversion points for the Wissiup, Leland, and Ouray School Canals upstream to the Duchesne Feeder Canal.  On information and belief, this promise was grounded the BIA's acknowledgement that these canals were supplying poor-quality and polluted water to irrigators under the UIIP.

156.    Upon execution of the 1965 Deferral Agreement, the United States and the State of Utah were in a position to seek Congressional funding for the Bonneville Unit by certifying to Congress that the State of Utah had an uncontested right to water in the Uinta Basin.

157.    With passage of the Colorado River Basin Project Act of 1968, Congress recognized the 1965 Deferral Agreement as a binding agreement.  The Act amended the Colorado River Storage Project Act of 1956 (*i.e.*, the Act which authorized the construction of the CUP) to account for the obligations under the 1965 Deferral Agreement, stating, in relevant part:

> That the planning report for the Ute Indian unit of the Central Utah Participating
> Project shall be completed on or before December 31, 1974, to enable the United
> States of America to meet the commitments heretofore made to the Ute Indian Tribe

43

of the Uintah and Ouray Indian Reservation under the Agreement dated September 20, 1965 (Contract No. 14-06-W-194).

158.     Further, in 1973, the Utah State Legislature passed a Concurrent Resolution in the 40th Legislature, signed by the Utah Governor, recognizing that the Central Utah Water Conservancy District had bound the State of Utah to the conditions and promises made to the Tribe under the 1965 Deferral Agreement, and sought Congressional funding for the Central Utah Project based on the Tribe's agreement to defer development of a portion of its water rights, thereby eliminating any water rights challenges that could be raised by the Tribe as the Bonneville Unit proceeded with construction.

159.     Had the Tribe's trustee carried out its end of the bargain in the 1965 Deferral Agreement, the Agreement would have yielded significant annual economic returns for the Tribe. Unfortunately, the Federal Defendants failed to follow through on the promises to supply water and storage to the Tribe through the systems and facilities of the CUP.

160.     The Upalco Unit, as planned, was to provide storage and related infrastructure for supplemental irrigation water on the Lake Fork River Basin to 25,070 acres of land under the Tribe's 1923 decreed Group 1 Reserved Water Rights, and full service irrigation water to 8,380 acres of Group 5 land, for a total of 33,450 acres.

161.     The Upalco Unit was never built.  Although Congress appropriated construction funds for the Upalco Unit in 1981, by 1986, the BOR had indefinitely postponed construction of the Upalco Unit citing increased costs and lack of demand for municipal and industrial water.  The United States never provided a more specific economic justification for abandoning the Upalco Unit.

162.     The Uintah Unit was to provide the greatest of the Central Utah Project benefits for the Tribe.  Original plans called for 64% of the nearly 50,000 AFY of annual storage supply

developed by the unit to be provided to the Tribe.  As envisioned early in the planning stages, the unit would feature two reservoirs: the 47,000 AF Uintah Reservoir and the 32,000 AF Whiterocks Reservoir. These reservoirs and related infrastructure would provide full service irrigation water to 5,496 acres of Group 1 lands and supplemental irrigation water to 34,152 acres of federally decreed Group 1 lands, for a total of 39,648 acres.

163.    Similar to the Upalco Unit, a long period of time elapsed between the Uintah Project's initial authorization and its pre-construction activities.  In the late 1970s, BOR finally undertook geophysical examinations of the proposed Uintah and Whiterocks dam sites, ultimately concluding that the proposed dam sites were unfeasible.

164.    Following the geophysical tests, BOR began to formulate the Uintah Unit as an "all-Indian" project and investigate alternative dam sites.  The revised plan called for elimination of the Uintah Reservoir and an expansion of the Whiterocks Reservoir to 76,000 AF. The reformulated project would only supply full and supplemental irrigation to Tribal Reserved Water Righted lands.

165.    BOR adjusted costs and benefits of the Uintah Unit to reflect the changes in the plans for the development of the Uintah Unit.  Costs were drastically increased while benefits were dramatically reduced.  In fact, the benefit-cost ratio dropped from over 1.2:1 to approximately 0.4:1.  It is unclear why costs and benefits varied so significantly.  However, it is clear that as an exclusively tribal project – that is, as a project for the delivery of the Tribe's Reserved Water Rights – BOR found poor economics, but when non-Indians were included as part of the project, the economics drastically improved.

166.    BOR nonetheless continued to plan for the Uintah Unit, acknowledging its commitment to fulfill the Tribe's irrigation water rights.  As explained in the 1980 Status Report on the Unit:

> [T]he 1978 plan and the three alternatives are all economically infeasible. However, the plan to provide strictly Indian development merits further consideration because of special circumstances involving the Ute Indians…Among the major considerations supporting the development of an Indian project are (1) a critical need for economic development to help alleviate serious socioeconomic problems on the Uintah and Ouray Indian Reservation and to help preserve traditional values, (2) the Ute Indian Tribe's claim of an inherent water right prior to non-Indian rights under…the Winters Doctrine, (3) a 1965 agreement between the United States Government and the Ute Indian Tribe which deferred tribal development of Indian water rights and thus allowed the construction of the Central Utah Project to proceed in return for development of Indian water by no later than the year 2005, and (4) a water compact between the State of Utah and the Ute Indian Tribe…

167.    Planning for the Uintah Unit continued into the 1980s.  However, eventually BOR decided to postpone the Uintah Unit indefinitely.

168.    The Federal Defendants also abandoned the Ute Indian Unit, which was to provide supplemental waters to the Bonneville, Upalco, and Uintah units in order to provide full service and irrigation water to fulfill the Tribe's Reserved Water Rights under the CUP.  In 1980, BOR issued a Concluding Report that effectively abandoned study of the Ute Indian Unit without providing any economic justification for the abandonment.

169.    The United States' "full and complete recognition" the Tribe's Groups 1-7 water rights under the 1965 Deferral Agreement, "without resort to litigation," is a recognition that the United States' trust duty to manage, protect, preserve, and develop the Tribe's water rights extends to the full scope of the Tribe's Groups 1-7 water rights.  Since execution of the 1965 Deferral Agreement, if not before, the United States has had a fiduciary obligation to develop the Tribe's Reserved Water Rights and to facilitate the Tribe's and tribal members' access to water and to

derive economic benefit from the Tribe's Reserved Water Rights. The United States has taken no steps toward fulfilling these trust obligations.

170.    The Federal Defendants' failure to satisfy the terms and conditions of the 1965 Deferral Agreement is not limited to its failure to meet its *quid pro quo* obligations to supply water to the lands identified in the Decker Report. Strikingly, Federal Defendants have failed to recognize the binding quantification of the Tribe's *Winters* Reserved Water Rights that was necessary for the Defendants to receive their intended benefits under the 1965 Deferral Agreement. For example, in August of 2018, the Tribe attempted to enter into an agreement allowing an oil and gas company on the Reservation to lease Tribal water for a period of less than seven years pursuant to 25 U.S.C. § 81(b). Agents within the Department of Interior and the BIA thwarted this economic opportunity by refusing to perform the ministerial task of instructing ditch riders to make water available to effectuate the transaction. To justify its interference with the Tribe's economically productive use of its Reserved Water Rights, the Department of Interior took the position that its recognition of a  binding quantification of the Tribe's water rights is reliant upon an approved compact or adjudication, in spite of the 1965 Deferral Agreement.

171.    The DOI's position is consistent with Federal Defendants' conduct from the execution of the 1965 Deferral Agreement to the present. Federal Defendants continuously fail to take any measures to protect the Tribe's vested property right in Reserved Water Rights appurtenant to 129,331 acres of Reservation land from being used by downstream water users at no compensation to the Tribe. In fact, Federal Defendants have sat idly by while the State of Utah has issued temporary water use permits for the use of conserved Tribal water, encroaching upon the Tribe's quantified water rights and the Tribe's administrative authority over its water rights.

172.    As a result of the United States' failure to satisfy its *quid pro quo* obligations under the 1965 Deferral Agreement and to otherwise acknowledge and comply with legally binding provisions of the 1965 Deferral Agreement, the Tribe has incurred substantial economic harm, including lost crop yields resulting from insufficient irrigation, as well as other lost economic opportunities resulting from the United States' misuse and diminishment of the Tribe's water resources.

### iii.    The Central Utah Project Completion Act of 1992 and the Promise of Uintah Basin Replacement Facilities

#### a.    Background

173.    In order to establish a more comprehensive legal foundation covering the use and development of the Tribe's now-quantified *Winters* Reserved Water Rights, the Tribe engaged in good faith water settlement negotiations following the execution of the 1965 Deferral Agreement.

174.    In the 1980s, both the Tribe and the State of Utah agreed upon a Ute Indian Water Compact ("proposed 1980 compact").   Among other provisions to facilitate development of the Tribe's *Winters* Reserved Water Rights, Article III of the proposed compact stated that the parties to the compact would put forth their "best efforts in the expeditious planning and development of water projects for all group 5 lands, or substitute lands, including the Uintah and Upalco Units, the Leland Bench Project, or other similar projects of the Central Utah Project" *without* relieving the United States of its responsibilities under the 1965 Deferral Agreement.

175.    Utah approved the proposed 1980 compact in 1980. Utah Code Ann., § 73-21-102. The Tribe approved the Compact in 1988 by Ordinance No. 88-03, Ratifying, Confirming and Approving Water Compact with the State of Utah and the United States.

176.    Knowing that it would fall short on its contractual promises to construct the Uintah, Upalco, and Ute Indian Units (i.e., the three units that were planned to benefit the Tribe), the

United States Congress declined ratifying the 1980 compact. Instead, Congress developed its own version of a Ute water compact that would relieve the United States of its unmet obligations under the 1965 Deferral Agreement to construct the Uintah, Upalco, and Ute Indian Units.

177.    In 1992, Congress passed the Central Utah Project Completion Act (P.L. 102-575) ("CUPCA"), and approved a proposed "1990 Revised Ute Water Compact" ("1990 Revised Compact"). One of the key revisions of the proposed 1990 Revised Compact was a provision stating that "the Tribe shall take from the Green River in lieu of other sources the 57,948 acre-foot depletion of water allocable to the Tribe's group 5 lands." This transfer of the Tribe's Group 5 water rights to the Green River was another measure designed to ensure sufficient water supply to support the CUP for the benefit of non-Indians in the Duchesne River Basin.

178.    Under the proposed 1990 Revised Compact, Congress acknowledged that the natural flows of the rivers is insufficient to meet the irrigation needs of the Tribe's Group 1 Lands, and Congress therefore provided the Tribe with an additional 0.4 acre-feet/per-acre/per-year of stored water to supplement the Tribe's decreed water rights for its Group 1 lands.

179.    The enforceability of the proposed 1990 Compact was conditioned upon re-ratification by both the State of Utah and the membership of the Ute Indian Tribe. The proposed 1990 Compact failed to adequately protect and preserve the Tribe's water rights, provide for Tribal storage and related infrastructure, or protect the Tribe's administrative authority over its waters. For these reasons, the Tribe's membership has never ratified the 1990 proposed Compact.

b.    Tribal Compensation under Title V of the CUPCA

180.    In Title V of CUPCA, Congress acknowledged the United States' failure to fulfill its obligations to the Tribe under the 1965 Deferral Agreement. The stated purpose of Title V of the CUPCA was to "(1) quantify the Tribe's reserved water rights; (2) allow increased beneficial

use of such water; and (3) put the Tribe in the same economic position it would have enjoyed had the features contemplated by the September 20, 1965 Agreement been constructed." Congress found there were "unresolved tribal claims arising out of an agreement dated September 20, 1965 [the 1965 Deferral Agreement], where the Tribe deferred development of a portion of its Reserved Water Rights for 15,242 acres of the Tribe's Group 5 Lands in order to facilitate the construction of the Bonneville Unit of the Central Utah Project."

181.    In Title V, Congress established a mechanism for compensating the Tribe, in part, for the Federal Government's failure to construct the promised storage facilities and related infrastructure that were intended to store Indian water and develop Tribal water supply that was scheduled for development through CUP facilities.

182.    There were two separate components of the compensation to which the Tribe was entitled under Title V of the CUPCA.  First, Section 502(a) of the CUPCA, titled "Bonneville Unit Tribal Credits," stated that:

> the Tribe shall receive from the United States 26 percent of the annual Bonneville Unit municipal and industrial capital repayment obligation attributable to thirty-five thousand five hundred acre-feet of water, which represents a portion of the Tribe's water rights that were to be supplied by storage from the Central Utah Project, but will not be supplied because the Upalco and Uintah units are not to be constructed.

183.    The amount of compensation provided to the Tribe pursuant to Section 502(a) is approximately $2 million per year.

184.    The purpose of the Bonneville Unit Tribal Credits was to compensate the Tribe for the United States' failure to construct the Upalco and the Uintah Units of the Central Utah Project. In entering into the 1965 Deferral Agreement, the Tribe understood that the Upalco and Uintah Units would provide both supplemental and full service irrigation water for the water-righted lands in the Decker Report in the Lake Fork and Uinta River Basins, including storage and related

infrastructure to supplement the Tribe's 1923 federally-decreed Group 1 water rights, as well as full service irrigation water and related infrastructure for the Tribe's Group 5 lands with water rights in the Uinta and Lakefork Rivers.  The third recital of the 1965 Deferral Agreement states:

> WHEREAS, there are approximately 36,450 acres of land served or to be served from the Duchesne River, Bonneville Unit; 33,450 acres of land served or to be served from the Lakefork River, Upalco Unit; and 39,648 acres of land served or to be served from the Uintah River, Uintah Unit…

185.     These acreages of the Upalco and Uintah Units, as provided by the third Whereas of the 1965 Deferral Agreement, include all of the Decker Report's Group 1 and Group 5 lands in the Lake Fork Basin and Uinta Basin.  In addition to providing full service irrigation water to 5,496 acres of Group 1 lands, the Uintah Unit was expected to provide supplemental irrigation water to 34,152 acres of Group 1 lands for a total of 39,648 acres. Also, the Upalco Unit was supposed to provide supplemental irrigation water to 25,070 acres of Group 1 lands, in addition to providing full service irrigation water to 8,380 acres of Group 5 lands, for a total of 33,450 acres.

186.     The compensation to which the Tribe is entitled under Section 502(a) is based on figures that significantly underestimate the value the Tribe would have received had the Upalco and Uintah Units been constructed as promised.  The United States' calculation was based on compensation for 35,500 acre-feet per year under Section 502(a), and, thus, underestimated the compensation by 22,161 acre-feet per year, a 62.4% increase in the volume of water upon which the compensation should have been based.

187.     Furthermore, the economic damages calculation accounted for only one component of the process required to provide supplemental and full service irrigation.  The compensation, as calculated by the United States, was based on the costs associated with storage, but failed to account for other indispensable components of the irrigation process, including costs associated with the diversion dam, conveyance system, distribution system, and drainage system.  The

Bonneville Unit Tribal Credits do not "put the Tribe in the same economic position it would have enjoyed had the features contemplated by the September 20, 1965, Agreement been constructed" because the United States failed to exercise diligence and negotiated in bad faith in determining compensation owed to the Tribe.

188.    Separate from the Bonneville Unit Tribal Credits, Sections 504, 505, and 506 of the CUPCA required that the Tribe receive $198.5 million for various purposes.  Section 504 of the CUPCA required the United States to pay $45 million for the development of a tribal farm and for improvements to existing UIIP facilities.  Section 505 of the CUPCA required the United States to pay $28.5 million for various improvements to reservoirs, stream habitat, and municipal water facilities for the Tribe to mitigate the adverse impacts that the CUP had on Tribal trust assets. Finally, Section 506 required the United States to pay $125 million to support a tribal economic development fund.

189.    Section 507 of the CUPCA provided for a "waiver" of the Tribe's contractual claims under the 1965 Deferral Agreement upon the Tribe's receipt of the funds identified in Sections 504, 505, and 506.  Section 507 stated:

> The Tribe shall waive, upon receipt of the section 504, 505, and 506 moneys, any and all claims relating to its water rights covered under the agreement of September 20, 1965, including claims by the Tribe that it retains the right to develop lands as set forth in the Ute Indian Compact and deferred in such agreement.  Nothing in this waiver of claims shall prevent the Tribe from enforcing rights granted to it under this Act or under the Compact.  To the extent necessary to effect a complete release of the claims, the United States concurs in such release.

190.    The "waiver" under Section 507 was meant to apply only to claims arising from the United States' failure to construct the Uintah, Upalco, and Ute Indian Units in the ultimate stage of the Central Utah Project.  However, any "waiver" under 507 was expressly contingent upon the Tribe's actual "receipt" of all funds to which it was entitled pursuant to Sections 504,

505, and 506.  The Tribe has yet to receive its total entitlement under these Sections, and, therefore, no "waiver" is yet in effect.

191.    First, upon information and belief, only $41,728,000.18 of the $45 million to which the Tribe is entitled under Section 504 have been appropriated by Congress.  Therefore, the Tribe is facially not in receipt of the full amount of its 504 funds, as is necessary to consummate the Section 507 "waiver."

192.    Even if the full amount under Section 504 had been appropriated by Congress, the Tribe still never received its funds under Section 504 and 505 because these funds were never properly transferred into trust, were taken out of trust, and/or were they never properly regarded as trust funds.  In fact, the United States asserted the position that these funds were *not* trust funds in defending against a civil action filed by the Ute Indian Tribe in 2006 seeking damages for, among other things, the United States failure to prudently invest its 504, 505, and 506 funds.  In order to avoid liability for underinvestment of Tribal trust funds, the United States asserted that its 504 and 505 funds were not trust funds, but "secretarial funds."

193.    Finally, the CUPCA makes clear that the existence of an enforceable compact protecting the Tribe's water rights must exist for an enforceable "waiver" to take effect.  Because the compact referred to in Section 507 has never been ratified by the Tribe and its members, there has been no "waiver" of claims under Section 507.

194.    To the dubious extent Section 507 of the CUPCA did divest the Tribe of contractual rights under the 1965 Deferral Agreement, labeling such divestiture a "waiver" is a misnomer, as "waiver" connotes a consensual act by the party giving up its rights.  Rather, to the extent Section 507 divests the Tribe of contractual rights, Congress has taken these rights from the Tribe.

195.    Even when viewed in conjunction with the "Bonneville Unit Tribal Credits," the funds identified under Sections 504, 505, and 506 do not justly compensate the Tribe for its contractual right to receive water and related infrastructure for the development of its Reserved Water Rights recognized under the Deferral Agreement.

196.    In addition, the $28.5 million under Section 505 was for mitigation measures required under federal laws governing the Bureau of Reclamation.  Therefore, these funds cannot accurately be characterized as "compensation" being given to the Tribe in exchange for its right to enforce the United States' obligations under the 1965 Deferral Agreement.  This widens the disparity between what was to be "waived" by the Tribe and what the Tribe would receive in exchange.

c.    Unmet Mitigation Obligations: Bottle Hollow Reservoir

197.    Section 505 of the CUPCA required the United States to pay $28.5 million for various improvements to reservoirs, stream habitat, and municipal water facilities for the Tribe. Of this $28.5 million sum, $500,000 was directed to be used toward cleanup of the contaminated Bottle Hollow Reservoir, an off-stream reservoir located within the tribal reservation and built as part of the CUP.  Title V, Section 505, obligated the United States to "secure minimum flow of water to the [Bottle Hollow] reservoir to make it a suitable habitat for a cold water fishery."

198.    The United States has never secured such a minimum flow of water to Bottle Hollow, but has left the reservoir to be supplied by return flow from Tribal Group 1 irrigation water rights, ruining the reservoir as a cold water fishery.   Under these conditions, the Bottle Hollow reservoir cannot function as a cold water fishery for the Tribe and its members.  Bottle Hollow reservoir was intended to be one source of mitigation by BOR for the environmental losses the Tribe incurred from the construction of the CUP.

199.    The United States has violated the Congressional mandate of Title V, Section 505. Although funds were appropriated for the United States to clean the contaminated Bottle Hollow Reservoir and to secure minimum flow thereto, the United States has never secured a tribal right to the water stored in the Bottle Hollow Reservoir.  Absent an additional, recognized Tribal water right for stored water in the Bottle Hollow Reservoir, "compensation" in the form of revitalizing the Bottle Hollow Reservoir is incomplete, and the United States has violated its duties to the Tribe under Title V.

        d.    <u>Uintah Basin Replacement Projects</u>

200.    The CUPCA altered the course of development of the CUP facilities that were planned to benefit the Ute Indian Tribe.  The Ute Indian Unit—promised to the Tribe and understood by the Tribe as the most beneficial unit to be included in the CUP facilities for the Tribe, and one of the reasons the Tribe agreed to the 1965 Deferral Agreement—was never built to provide supplemental waters to the Bonneville, Upalco, and Uintah Units for the benefit of the Tribe.  Instead, in CUPCA, Congress promised the development of "replacement projects" intended to satisfy the promise to provide some storage to the Tribe for its water rights.

201.    Under Title II of the CUPCA, Congress addressed the water storage needs in the Uinta Basin, including the tribal water storage needs, by authorizing the development of a series of canals and storage facilities to "increase efficiency, enhance beneficial uses, and achieve greater water conservation within the Uinta Basin."  This was referred to in CUPCA as the Uintah Basin Replacement Project.

202.    Continued funding for the Uintah Basin Replacement Project was subject to the condition set forth in Section 201(c) of the CUPCA, which stated that funding for the Uintah Basin Replacement Project, as well any other component of the CUP, would terminate five years after

the enactment of the CUPCA unless "(1) the Secretary executes a cost-sharing agreement with the District for construction of such project, and (2) the Secretary has requested, or the Congress has appropriated, construction funds for such project."

203.    On information and belief, on August 11, 1993, in order to satisfy the conditions to funding set forth in Section 201(c) of CUPCA, the Department of Interior entered into an Agreement with the CUWCD "For the Sharing of Costs Pursuant to Section 204 of the Central Utah Project Completion Act" ("1993 Cost-Sharing Agreement"). The Explanatory Recitals of the 1993 Cost-Sharing Agreement stated:

> Whereas, the Act amends the Act of April 11, 1956 (Pub. L. 84-485, 70 Stat. 105) to authorize additional appropriations for the completion of certain features of the Central Utah Project; and

> Whereas, Congress anticipates that the District will explore less costly replacement features for the Uintah and Upalco Units of the Central Utah Project which will prove more feasible and environmentally less damaging than features originally planned by the Bureau of Reclamation; and,

> Whereas, *the Secretary is required to ensure that replacement features planned, designed and constructed for the Uintah and Upalco Units of the Central Utah Project are consistent with the Secretary's trust responsibilities to the Ute Indian Tribe*; and

> Whereas under the Act, the Secretary is directed to retain responsibility for implementing the Act, and is authorized, under certain conditions, to contract with the District to plan, design, and construct certain features authorized in the Act.

(Emphasis added).

204.    "Replacement features" were defined in the Agreement to "mean Project features planned, designed, or constructed for the Uintah and Upalco Units of the Central Utah Project that were not originally planned, designed, or constructed by the Bureau of Reclamation and that are not identified in Section 203 of the Act."

205.    Through both CUPCA and the 1993 Cost-Sharing Agreement, the United States acknowledged Federal Defendants' continued trust obligation to supply waters necessary to fulfill

Tribal water rights through the CUP. Yet, once again, Federal Defendants failed to fulfill their fiduciary responsibilities to procure, preserve and protect the Tribe's right to use and develop its water rights.

206.    The replacement projects, as formulated by the Federal Defendants throughout the 1990s, were designed to disproportionately allocate benefits to non-Indians and burdens to the Tribe and its members. By way of example, the BOR planned for a reservoir located entirely on Tribal lands, but with roughly half the storage intended for non-Indians.

207.    Ultimately, the Uintah Basin Replacement Projects entailed both (i) stunningly disproportionate losses to the Ute Indian Tribe, and (ii) stunningly dismal benefits to the Tribe. Not only have the Federal Defendants abandoned the Ute Indian Tribe, they have also abandoned the Federal Government's effort to secure storage and related water works for the Tribe to use in developing and irrigating its irrigable lands with the Reserved Water Rights that were recognized by the United States and the State of Utah in the 1965 Deferral Agreement. Today, as the CUP nears completion, a sad and tragic irony has unfolded that should escape no one's attention: the Ute Indian Tribe, whose permanent homeland is in the Uinta Basin, has no storage facility and related water works from which to supply its Reserved Water Rights to its irrigable trust lands. At the same time, the construction of water storage facilities intended to benefit non-Indian water users in the Uinta Basin is nearing completion.

e.    <u>Injuries Suffered by the Tribe as a result of the United States' Unlawful Acts and Omissions Arising from or in Relation to the 1992 Central Utah Project Completion Act.</u>

208.    As a result of United States' unlawful acts and omissions arising from or in Relation to the 1992 Central Utah Project Completion Act, the Tribe has incurred substantial economic harm, including lost crop yields resulting from insufficient irrigation, as well as other lost

economic opportunities resulting from the United States' misuse and diminishment of the Tribe's water resources. The Tribe's Reserved Water Rights is of lesser value because not a single storage unit, whether for supplemental irrigation in the entire Reservation or for all Group 5 lands in the Duchesne, Lake Fork/Yellowstone and Uinta/Whiterocks basins was constructed. In addition, none of the irrigation facilities for the Tribe and its members' use, such as canals, pumping stations, drainage system distribution system and on farm irrigation systems, were ever constructed.

## V.  <u>STATEMENT OF CLAIMS</u>

### FIRST CLAIM FOR RELIEF
**(Declaratory and Enforcement Relief: Quantity of Tribal Reserved Water Rights of the Ute Indian Tribe)**

209.   The Ute Indian Tribe incorporates by reference and repeats the allegations of Paragraphs 1-208 of this Complaint.

210.   Upon establishing the Ute Indian Tribe's Reservation, the United States reserved for the benefit of the Tribe and its members the amount of water necessary to secure a permanent homeland on the Reservation.

211.   The Tribe's *Winters* Reserved Water Rights were quantified on the basis of practicably irrigable acreage of the Reservation in the 1960 Decker Report.

212.   As a condition precedent of the Tribe's deferral of a portion of its Group 5 *Winters* Reserved Water Rights, the United States agreed to give full and complete recognition to the entire quantity of Tribe's *Winters* Reserved Water appurtenant to the acreage comprising Groups 1-7 in the Decker Report, "without resort to litigation."   By including the phrase "without resort to litiga*tion*," the BIA committed the United States to recognizing and protecting the Tribe's Reserved Water Rights appurtenant to the practicably irrigable acreage within the exterior

boundaries of the Reservation and relinquished its right to dispute or deny this quantification of the Tribe's Reserved Water Rights.

213.    Providing legally enforceable recognition of this quantification of the Tribe's *Winters* Reserved Water Rights was not a concession to the Tribe, but a prerequisite and necessary condition for effectuating a legally enforceable deferral of the Tribe's vested property rights to its Tribal water so that the United States could obtain funding to proceeds with the construction of the Bonneville Unit of the Central Utah Project.

214.    In recognizing the Tribe's Reserved Water Rights in Groups 1-7, the United States accepted the Decker Report as the basis for quantification of the Tribe's vested *Winters* Reserved Water Rights.

215.    Nonetheless, under existing circumstances alleged herein, in which officers and agents within the Department of Interior have failed to recognize the 1965 Deferral Agreement as a binding quantification of the Tribe's *Winters* Reserved Water Rights, an actual controversy exists as to the quantification of the Tribe's *Winters* Reserved Water Rights.

216.    The Tribe is entitled to the benefit of its bargain under the 1965 Deferral Agreement, that is, to (*i*) a declaration from this Court that the 1965 Deferral Agreement is a binding quantification of the Tribe's *Winters* Reserved Water Rights appurtenant to 129,331 acres, for a total volume of 549,685 acre-feet per year, as quantified in the Decker Report (as corrected), in lieu of an adjudication or compact quantifying the Tribe's Reserved Water Rights; (*ii*) a declaration that the 1965 Deferral Agreement would be void *ab initio* but for its effect as a binding quantification of the Tribe's *Winters* Reserved Water Rights; (*iii*) a declaration that the United States has a trust obligation to protect, preserve, and develop the full quantity of the Tribe's *Winters* Reserved Water Rights, and (*iv*) appropriate judicial enforcement under 28 U.S.C. § 2202.

## SECOND CLAIM FOR RELIEF

### (Declaratory and Enforcement Relief: Tribal Jurisdiction over Tribal Reserved Water Rights)

217.    The Ute Indian Tribe incorporates by reference and repeats the allegations of Paragraphs 1-216 of this Complaint.

218.    In recognizing the Tribe's Reserved Water Rights in Groups 1-7 under the 1965 Deferral Agreement, the United States accepted the Decker Report as the basis for quantification of the Tribe's *Winters* Reserved Water Rights.

219.    Nonetheless, under existing circumstances alleged herein, in which agents and officials of the Department of the Interior have failed to recognize the 1965 Deferral Agreement as a binding quantification of the Tribe's *Winters* Reserved Water Rights, has failed to take measures to prevent the State of Utah from exceeding its jurisdictional limits by issuing water permits for the use of conserved Tribal water, and has directly interfered with the Tribe's marketing of its Reserved Water Rights, an actual controversy exists as to the Tribe's governmental authority over its *Winters* Reserved Water Rights.

220.    The Tribe therefore is entitled to (*i*) a declaration from this Court that the Tribe has administrative, regulatory, legislative, and adjudicatory jurisdiction over its *Winters* Reserved Water Rights, unless otherwise provided under federal law, (*ii*) a declaration from this Court confirming the authority of the Tribe to encumber its *Winters* Reserved Water Rights, including through lease agreements, for periods of under seven years without Secretarial approval pursuant to 25 U.S.C. § 81(b), and (*iii*) appropriate judicial enforcement under 28 U.S.C. § 2202.

### THIRD CLAIM FOR RELIEF
### (Declaratory and Enforcement Relief: Trust Status of the UIIP)

221.    The Ute Indian Tribe incorporates by reference and repeats the allegations of Paragraphs 1-220 of this Complaint.

222.    The 1906 Act states in no uncertain terms that the UIIP is an asset to be owned in trust by the Secretary for the benefit of the Tribe.

223.    The water rights diverted into and distributed through the UIIP are unequivocally *Winters* Reserved Water Rights pursuant to the two 1923 federal court decreed quantifying the Tribe's Group 1 Reserved Water Rights.

224.    Yet, an actual controversy exists because the Federal Defendants have utilized their administrative authority over the UIIP in a manner inconsistent with the status of the UIIP.   By way of example, Federal Defendants have entered into carriage agreements with non-Indian, state-based water users, and have adopted "informal operating procedures" for the UIIP to provide benefits for non-Indian water users, all without consulting with the Tribe as the beneficial owner of the UIIP.

225.    The Tribe is entitled to (*i*) a declaration from this Court that the UIIP is a trust asset, for which Federal Defendants serve as trustees and the Tribe is the beneficiary; and (*ii*) appropriate judicial enforcement under 28 U.S.C. § 2202.

### FOURTH CLAIM FOR RELIEF

### (Declaratory and Enforcement Relief: 1965 Deferral Agreement as a Fully Binding and Operational Agreement)

226.    The Ute Indian Tribe incorporates by reference and repeats the allegations of Paragraphs 1 – 225 of this Complaint.

227.     The 1965 Deferral Agreement was and remains a valid contract among the Federal Defendants, the Central Utah Water Conservancy District, and the Tribe.

228.     Although Section 507 of the Central Utah Project Completion Act provided for the Tribe's "waiver" of claims relating to the United States' failure to construct the Uintah, Upalco, and Ute Indian Units of the Central Utah Project, any such waiver was expressly contingent upon both the Tribe's "receipt of the section 504, 505, and 506 moneys," and ratification of the Congressionally-revised Ute Indian Compact of 1990.  CUPCA, Title V, Section 503(a).

229.     There has been no "receipt" of the 504, 505, and 506 moneys for the purpose of effectuating the Section 507 "waiver" because (a) Congress has not appropriated the full amount to which the Tribe is entitled under Section 504, and (b) the funds under Sections 504 and 505 have not been properly placed into trust for the benefit of the Tribe, nor have they been treated as trust funds by the Federal Defendants.  In addition, neither the State of Utah nor the Ute Indian Tribe has ratified the Congressionally-revised Ute Indian Compact of 1990.  Accordingly, there has been no effective "waiver" under Section 507 of the CUPCA.

230.     Even if, in the strictest hypothetical terms, the Section 507 "waiver" was in effect, such "waiver" is limited to the Tribe's contract-based claims arising from the Federal Defendants' failure to construct the Uintah, Upalco, and Ute Indian Units in the ultimate phase of the Central Utah Project.

231.     An actual controversy exists because, in spite of the foregoing, Federal Defendants have continuously failed to perform under the 1965 Deferral Agreement.

232.     The Tribe is entitled to (*i*) a declaration that the 1965 Deferral Agreement as a whole remains a valid and binding agreement among all parties thereto, and (*ii*) appropriate judicial enforcement under 28 U.S.C. § 2202.

233.    In the event this Court finds, over the Tribe's objections, that the Section 507 "waiver" is in effect, the Tribe is entitled to a declaration that said "waiver" is limited to contract-based claims arising from the Federal Defendants' failure to construct the Uintah, Upalco, and Ute Indian Units in the Central Utah Project and does not impact the right of the Tribe to assert contractual rights under the 1965 Deferral Agreement not directly based on the Federal Defendants' failure to construct these three units.

## FIFTH CLAIM FOR RELIEF

### (Declaratory and Enforcement Relief: Federal Defendants' Ongoing Statutory, Contractual, and Trust Obligation to Secure and Develop the Tribe's Reserved Water Rights)

234.    The Ute Indian Tribe incorporates by reference and repeats the allegations of Paragraphs 1-233 of this Complaint.

235.    Federal Defendants have a trust obligation to protect, preserve, and develop the Tribe's *Winters* Reserved Water Rights for the benefit of the Tribe and its members.

236.    In promising to recognize the Tribe's Reserved Water Rights serving the irrigable acreage comprising Groups 1-7 in the Decker Report, with a priority date of 1861 for Groups 1-5, without resort to litigation, the signatories to the 1965 Deferral Agreement promised to recognize the full scope of the Tribe's *Winters* Reserved Water Rights quantified under the Decker Report.

237.    This promise not only established a contractual obligation, but also provided further definition to Federal Defendants' fiduciary obligations toward the Tribe and its members, including those fiduciary obligations originally established in the 1899 Act that required the Secretary to secure and protect the Tribe's paramount water rights for present and future uses.

238.    Nonetheless, as alleged in this complaint, an actual controversy exists because the United States has abandoned the Ute Indian Tribe and has abandoned the Federal Government's effort to secure storage and related water works for the Tribe to use in developing and irrigating

its irrigable lands with the Reserved Water Rights that were recognized by the United States and the State of Utah in the 1965 Deferral Agreement.

239.    An actual controversy also exists because Federal Defendants have failed to take measures to prevent *Winters* Reserved Water Rights, to which the Tribe retains a vested property right despite non-use, from being used by downstream water users at no compensation to the Tribe, resulting in substantial lost economic opportunities for the Tribe and its members.

240.    Finally, an actual controversy exists because the Federal Defendants have not used federally administered infrastructure along the Colorado River Basin to satisfy the Tribe's present and future uses of its senior priority, present perfected, *Winters* Reserved Water Rights, as required under the 1928 Boulder Canyon Project Act and the 1956 Colorado River Storage Project Act.

241.    The Tribe is entitled to (*i*) a declaration from this Court that, irrespective of the status of the 1965 Deferral Agreement, Federal Defendants have an ongoing statutory, contractual and trust obligation to develop the full amount of the Tribe's *Winters* Reserved Water Rights for the benefit of the Tribe and its members, (ii) a declaration that the Secretary of the Interior is required under the 1928 Boulder Canyon Project Act and the 1956 Colorado River Storage Project Act  to utilize federally-administered infrastructure to secure the Tribe's present perfected water rights for present and future uses; and (*iii*) appropriate judicial enforcement under 28 U.S.C. § 2202.

## SIXTH CLAIM FOR RELIEF
**(Declaratory and Enforcement Relief: Storage and Supplementation of the Tribe's 1923 Decreed Water Rights)**

242.    The Ute Indian Tribe incorporates by reference and repeats the allegations of Paragraphs 1-241 of this Complaint.

243.     Regardless of the status of the 1965 Deferral Agreement, the Tribe has fully quantified *Winters* Reserved Water Rights in the Lake Fork and Uinta Rivers that were adjudicated in 1923.

244.     The Tribe's 1923 decreed natural flow water rights are insufficient for irrigation without access to storage facilities enabling the Tribe to store Tribal water during periods when water available through natural flow is insufficient to satisfy the Tribe's irrigation needs, so that such stored Tribal water can be used for irrigation during periods when natural flow is not enough.

245.     As alleged in this Complaint, an actual controversy exists because Federal Defendants have failed to provide storage facilities necessary to enable the Tribe and its members to utilize the Tribe's 1923-decreed water rights for proper and efficient crop irrigation throughout the entire irrigation season, a violation of their statutory and trust obligations to enforce, protect, and preserve the Ute Indian Tribe's paramount rights to water.

246.     The Tribe is entitled to (*i*) a declaration from this Court that, irrespective of the status of the 1965 Deferral Agreement, Federal Defendants have an ongoing trust obligation to supply storage of the Tribe's 1923 decreed water rights so that said water rights are sufficient for irrigation purposes throughout the irrigation season, and (*ii*) appropriate judicial enforcement under 28 U.S.C. § 2202.

## SEVENTH CLAIM FOR RELIEF
### (Declaratory and Enforcement Relief: Right to Quality Water)

247.     The Ute Indian Tribe incorporates by reference and repeats the allegations of Paragraphs 1 – 246 of this Complaint.

248.     By implication, Tribal *Winters* Reserved Water Rights include a right to a certain quality of water where necessary to satisfy the purpose of the reservation.

249.    In the 1899 Act, Congress conferred upon the Secretary an enforceable trust duty to secure and protect the paramount water rights of the Ute Indian Tribe as necessary to satisfy the present and future needs of the Tribe.

250.    In the 1906 Act, Congress conferred upon the Secretary the duty to administer the UIIP in a manner that utilized the Ute Indian Tribe's Reserved Water Rights in a manner that maximizes agricultural gains for the benefit of the Tribe and its members.

251.    The Tribe has 1923 federally-decreed *Winters* Reserved Water Rights that are channeled through the UIIP for the benefit of the Tribe and its members.

252.    An actual controversy exists because the Secretary has failed to ensure that the Tribal water that is distributed through the UIIP and delivered to UIIP lands within the Uintah and Ouray Reservation is of an adequate quality for efficient crop production, and the delivery of low quality water has hampered economic returns.

253.    The Tribe is entitled to (*i*) a declaration that the Tribe's *Winters* Reserved Water Rights include a right to a quality of water sufficient to meet the Tribe's needs, (*ii*) a declaration that the United States has an ongoing fiduciary obligation to administer, manage, and supply water of an adequate quality to meet the Tribe's needs as they arise, including a fiduciary obligation to ensure that the Tribe's Reserved Water Rights distributed through the UIIP is of an adequate quality to maximize agricultural returns, and (*iii*)  appropriate judicial enforcement under 28 U.S.C. § 2202.

### EIGHTH CLAIM FOR RELIEF
### (Declaratory and Enforcement Relief: Midview Exchange Agreement)

254.    The Ute Indian Tribe incorporates by reference and repeats the allegations of Paragraphs 1-253 of this Complaint.

255.    Under the Midview Exchange Agreement, the Tribe was to be given beneficial ownership of the Midview Dam and Reservoir, Duchesne Diversion Dam, Duchesne Feeder Canal, and Midview Lateral, together will all facilities and property appurtenant thereto ("Midview Property"). The Midview Property was to be administered by the BIA as part of the UIIP, a trust asset.  The Midview Property was never formally transferred into trust for benefit of the Tribe.

256.    Federal statute 25 U.S.C. § 177 provides that "No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution."  The United States Supreme Court has found that the "obvious purpose" of this statute is "to prevent unfair, improvident or improper disposition by Indians of lands owned or possessed by them to other parties, except the United States, without the consent of Congress." *Federal Power Commission v. Tuscarora Indian Nation*, 362 U.S. 99, 119 (1960). Indian reserved water rights are appurtenant to Reservation lands and therefore fall within the purview of 25 U.S.C. § 177.

257.    An actual controversy exists because since the execution of the Midview Exchange Agreement, the BOR and BIA have acted in a manner that is inconsistent with the Tribe's beneficial ownership of the Midview Property and the status of the Midview Property as part of the UIIP.  Such conduct includes, without limitation, issuing Duchesne County rights-of-way for the Victory Pipeline without obtaining Tribal consent, using water from the Midview Reservoir to irrigate lands other than those designated for irrigation under the Midview Exchange, and failing to place title of the Midview Property into trust for the benefit of the Tribe.

258. The Tribe is entitled to a decree requiring specific performance under the Midview Exchange on the part of the BOR and BIA, including, without limitation, the transfer of the Midview Property into trust for the benefit of the Tribe as part of the UIIP.

259. In the alternative, the Tribe is entitled (*i*) to a declaration from this Court that the Midview Exchange Agreement is invalid pursuant to 25 U.S.C. § 177 and, as such, does not provide any legal right for the BOR to take any portion of the Tribe's Reserved Water Rights, and (*ii*) appropriate judicial enforcement under 28 U.S.C. § 2202.

**NINTH CLAIM FOR RELIEF**
**(Declaratory and Enforcement Relief: Tribal Storage in the Uintah Basin Replacement Projects)**

260. The Ute Indian Tribe incorporates by reference and repeats the allegations of Paragraphs 1-259 of this Complaint.

261. Pursuant to Title II of the CUPCA, the 1993 Cost-Sharing Agreement between DOI and CUWCD, and the Federal Defendants' fiduciary responsibilities to the Tribe, Defendants are required to address storage needs for the Tribe's Group 1 and Group 5 Reserved Water Rights in developing and constructing the Uintah Basin Replacement Projects.

262. An actual controversy exists because the DOI has repudiated its statutory, contractual, and trust obligations by developing and constructing the Uintah Basin Replacement Projects without making any provision whatsoever to address the Tribe's well-acknowledged, yet abandoned storage needs.

263. The Tribe is entitled to (*i*) a declaration from this Court that the continued development and construction of the Uintah Basin Replacement Projects in a manner that fails to address the Tribe's Group 1 and Group 5 storage needs constitutes a violation of the CUPCA, the

1993 Cost-Sharing Agreement, and the Federal Defendants' trust obligations to the Tribe and its members, and (*ii*) appropriate judicial enforcement under 28 U.S.C. § 2202.

## TENTH CLAIM FOR RELIEF
### (Declaratory and Enforcement Relief:  Obligations Relating to the Bottle Hollow Reservoir)

264.    Ute Indian Tribe incorporates by reference and repeats the allegations of Paragraphs 1-263 of this Complaint.

265.    Section 505(c) of the CUPCA appropriated federal funds for the specific purpose of decontaminating the Bottle Hollow Reservoir and securing a minimum flow of water to Bottle Hollow Reservoir to make it a "suitable habitat for a cold-water fishery."  Congress's intent in including this provision was to instruct Federal Defendants of certain specific measures that must be taken to mitigate the adverse environmental impacts that the CUP had and would continue to have on the Ute Indian Tribe.

266.    Section 505(c) of the CUPCA not only established a statutory obligation on the part of Federal Defendants, but also provided further definition to Federal Defendants' fiduciary obligations toward the Tribe and its members.

267.    Nonetheless, an actual controversy exists because Federal Defendants have not secured a water right to Bottle Hollow for the benefit of the Tribe, as required under Section 505(c) of the CUPCA and Federal Defendants' fiduciary obligations.

268.    The Tribe is entitled to (*i*) a declaration from this Court Federal Defendants have an ongoing statutory and fiduciary obligation to secure water rights in the Bottle Hollow reservoir sufficient to enable the Bottle Hollow Reservoir to be used as a cold water fishery, and (*ii*) appropriate judicial enforcement under 28 U.S.C. § 2202.

## ELEVENTH CLAIM FOR RELIEF
### (Failure to Provide Accounting of Trust Corpus)

269.    The Ute Indian Tribe incorporates by reference and repeats the allegations of Paragraphs 1-268 of this Complaint.

270.    Both the UIIP and the Tribe's Reserved Water Rights are held by the United States in trust for the benefit of the Ute Indian Tribe and its members.

271.    Pursuant to Federal Defendants' trust responsibility toward the Tribe and its members, as further defined by the statutes, regulations, and contacts identified in this Complaint, Federal Defendants have a trust obligation to keep the beneficiaries apprised of the disposition of the trust corpus, including information showing how Federal Defendants have exercised their statutory authority over the management and administration of both monetary and non-monetary trust assets.

272.    In spite of this duty, Federal Defendants have not provided an historical accounting apprising the Tribe of its activities impacting the trust corpus of its Reserved Water Rights, nor have Federal Defendants provided an historical accounting of its administration - including repair, maintenance, and rehabilitation - of the UIIP.  No accounting had been provided as of the date this Complaint was filed.

273.    The Tribe, as beneficiary, remains entitled to each historical accounting requested in the Prayer for Relief herein and appropriate judicial enforcement under 28 U.S.C. § 2202.

## TWELVTH CLAIM FOR RELIEF:
### (Violation of the Tribe's and Members' Right to Equal Protection Guaranteed under the Due Process Clause of the Fifth Amendment of the United States Constitution)

274.    The Ute Indian Tribe incorporates by reference and repeats the allegations of Paragraphs 1-273 of this Complaint.

275.    The Fifth Amendment of the United States precludes Federal Defendants from depriving the Tribe and its members of "life, liberty, or property, without due process of law." The Tribe and its members are entitled to equal protection under the law as part of the Fifth Amendment's guarantee of due process. *Family Division Trial Lawyers of Superior Court-D.C., Inc. v. Moultrie*, 725 F.2d 695, 697 n. 1 (D.C. Cir. 1984) (citing *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954)).

276.    Federal Defendants have adopted a systematic and continuous practice of administering their delegated authority in a manner that favors non-Indian water users in the Uinta Basin to the detriment of the Tribe and its members, resulting in the diminishment of the Tribe's Reserved Water Rights on the impermissible basis of race, national origin, and religion.

277.    Federal Defendants' discriminatory practices violate the Constitutional rights of the Tribe and its members.

WHEREFORE, THE UTE INDIAN TRIBE REQUESTS:

1.    A declaration that (*i*) the 1965 Deferral Agreement is a binding quantification of the Tribe's *Winters* Reserved Water Rights appurtenant to 129,331 acres, for a total volume of 549,685 acre-feet per year, as quantified in the Decker Report (as corrected), in lieu of an adjudication or compact quantifying the Tribe's Reserved Water Rights; (*ii*) the 1965 Deferral Agreement would be void *ab initio* but for its effect as a binding quantification of the Tribe's *Winters* Reserved Water Rights; (*iii*) the United States has a trust obligation to protect, preserve, and develop the full scope of the Tribe's *Winters* Reserved Water Rights, and (*iv*) appropriate judicial enforcement under 28 U.S.C. § 2202.

2.    A declaration that the Ute Indian Tribe has exclusive administrative, regulatory, legislative, and adjudicatory jurisdiction over its *Winters* Reserved Water Rights, unless otherwise

provided under federal law, along with any appropriate judicial enforcement under 28 U.S.C. § 2202.

3.      A declaration that the UIIP is a Tribal trust asset for which Federal Defendants serve as trustee, along with any appropriate judicial enforcement under 28 U.S.C. § 2202.

4.      A declaration that a declaration that the 1965 Deferral Agreement as a whole remains a valid and binding agreement among all parties thereto, along with appropriate judicial enforcement under 28 U.S.C. § 2202; or, in the alternative, a declaration that the so-called "waiver" is limited to contract-based claims arising from the Federal Defendants' failure to construct the Uintah, Upalco, and Ute Indian Units in the Central Utah Project and does not impact the right of the Tribe to assert contractual rights under the 1965 Deferral Agreement not directly based on the Federal Defendants' failure to construct these three units.

5.      A declaration that the Federal Defendants have an ongoing statutory, contractual and trust obligation to develop the full quantity of the Tribe's *Winters* Reserved Water Rights for the benefit of the Tribe and its members, along with any appropriate judicial enforcement under 28 U.S.C. § 2202, or, in the alternative,

6.      A declaration that, irrespective of the status of the 1965 Deferral Agreement, Federal Defendants have an ongoing trust obligation to supply storage of the Tribe's 1923 decreed water rights so that said water delivery is sufficient for irrigation purposes throughout the irrigation season, along with any appropriate judicial enforcement under 28 U.S.C. § 2202.

7.      A declaration that the Tribe's *Winters* Reserved Water Rights include a right to a quality of water sufficient to meet the Tribe's needs, and a declaration that the United States has an ongoing fiduciary obligation to supply water of an adequate quality to meet the Tribe's needs as they arise, including a fiduciary obligation to ensure that the Tribe's Reserved Water Rights

channeled through the UIIP is of an adequate quality to maximize agricultural returns, along with any appropriate judicial enforcement under 28 U.S.C. § 2202

8.      A decree requiring specific performance under the Midview Exchange on the part of the BOR and BIA, including, without limitation, the transfer of the Midview Property into trust for the benefit of the Tribe as part of the UIIP; or, in the alternative, a declaration from this Court that the Midview Exchange Agreement is invalid pursuant to 25 U.S.C. § 177 and, as such, does not provide any legal right for the BOR to take any portion of the Tribe's Reserved Water Rights, along with appropriate judicial enforcement under 28 U.S.C. § 2202.

9.      A declaration that it is contrary to federal law and Federal Defendants' fiduciary obligations to the Tribe to continue development and construction of the Uintah Basin Replacement Projects without including Tribal storage rights and facilities sufficient to meet the storage needs of the Tribe's Group 1 and Group 5 Reserved Water Rights, along with any appropriate judicial enforcement under 28 U.S.C. § 2202.

10.     A declaration that the Federal Defendants have an ongoing statutory and trust obligation to secure, for the benefit of the Tribe, water rights to the Bottle Hollow Reservoir sufficient to enable the Bottle Hollow Reservoir to be used as a cold water fishery, along with any appropriate judicial enforcement under 28 U.S.C. § 2202.

11.     A decree ordering Federal Defendants to provide a full and complete historical accounting, up to the present, of trust funds received from operation and maintenance fee assessments, carriage agreements, leases, and all other additional sources related to the Uintah Indian Irrigation Project, including all funds within the purview of Section 203(f) of the 1992 Central Utah Project Completion Act, and with such accounting to include records and other

information necessary for Plaintiff to ascertain the source, how such funds were used, and the beneficiaries of such expenditures,

12.     A decree order Federal Defendants to provide a full and complete historical accounting, up to the present, of deferred UIIP maintenance, rehabilitation, and repair, including, without limitation, an accounting of the nature of the UIIP's maintenance needs, when the UIIP's maintenance needs were discovered, what steps were taken to address the UIIP's maintenance needs, and what justifications have been provided for the onset and accumulation of deferred maintenance.

13.     A decree ordering Defendants to provide a full and complete historical accounting, up to the present, of TNA/PNA designations of UIIP Lands, including, without limitation:

    a.   An exhaustive list of designations of UIIP Lands as either TNA or PNA, including any instances of TNA UIIP Lands being re-designated as either PNA or Presently Assessable ("PA");

    b.  The ownership status of UIIP Lands so designated;

    c.  The basis for such designations; and

    d.  The date upon which such designations took place.

14.     A decree ordering the BIA to provide a full and complete historical accounting, up to the present, of all "informal operational practices," as referred to herein, implemented by the BIA and involving the Tribe's Reserved Water Rights or the UIIP, including, without limitation, any informal water exchanges involving the Tribe's Reserved Water Rights or the UIIP.

15.     A decree ordering Defendants to provide a full and complete historical accounting, up to the present, of Secretarial transfers of water rights within and outside the UIIP since the passage of the 1941 Act, including, without limitation:

    a.   An exhaustive account of water rights transfers performed by the Secretary or his/her delegates pursuant to the 1941 Act;

    b.   The ownership status of UIIP Lands impacted by such transfers;

    c.   The ownership status of lands receiving water rights under such transfers, as well as whether the lands which have received water rights as the result of such transfers are UIIP Lands;

    d.   The date upon which each transfer took place; and

    e.   Documentation evidencing written consent of UIIP Landowners and any compensation paid to UIIP Landowners.

16.    A decree ordering Federal Defendants to provide a full and complete historical accounting, up to the present, of annual Operating Plans that have been submitted to the BIA for the UIIP O&M Company.

17.    A decree ordering Federal Defendants to provide a full and complete historical accounting, up to the present, of all mitigation measures performed for the benefit of the Tribe as required under the 1992 CUPCA.

18.    A decree ordering Federal Defendants to provide a full and complete accounting, up to the present, of funds appropriated for the development of the Uintah Basin Replacement Projects, including what, if any, funds appropriated for this purpose reverted back to the Treasury and the basis for such reversion.

19.    A decree ordering Federal Defendants to provide a full and complete historical accounting, up to the present, of carriage agreements for the use of UIIP facilities for the transportation of non-Tribal water, including, without limitation, identifying what such agreements exist or did exist at any time since the UIIP was constructed; what, if any, amendments to these

carriage agreements have taken place; and what assessments have been made by Federal Defendants relating to the impact of said carriage agreements on the efficiency with which the UIIP is capable of delivering Tribal water to landowners within the UIIP.

20.     A decree enjoining Federal Defendants from continuing their practice of partial treatment toward non-Indian water users in the Uinta Basin in violation of the Fifth Amendment rights guaranteed to the Tribe and its members.

21.     Appropriate judicial enforcement orders under 28 U.S.C. § 2202.

22.     An order awarding costs, fees and attorney fees to the extent permitted by law.

23.     Such other and further relief as the Court shall deem just and proper.

Dated: January 22, 2019.

FREDERICKS PEEBLES & MORGAN LLP

*/s/ Frances C. Bassett*

Frances C. Bassett, *Pro Hac Vice*
Michael W. Holditch, *Pro Hac Vice*
Joanne Harmon Curry, *Pro Hac Vice*
Thomas W. Fredericks, *Pro Hac Vice*
Jeremy J. Patterson, *Pro Hac Vice*
1900 Plaza Drive
Louisville, CO 80027
Phone: 303.673.9600
Facsimile: 303.673.9155
Email: fbassett@ndnlaw.com
Email: mholditch@ndnlaw.com
Email: jcurry@ndnlaw.com
Email: tfredericks@ndnlaw.com
Email: jpatterson@ndnlaw.com

*/s/ Rollie E. Wilson*

Rollie E. Wilson (D.C. Bar No. 1008022)
Fredericks Peebles & Morgan LLP
401 9th St., N.W.
Washington, D.C. 20004
Phone: 202.450.4887
Facsimile: 202.450.5106
Email: rwilson@ndnlaw.com
*Attorneys for Plaintiff*