IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**Ute Indian Tribe of the Uintah and Ouray Indian Reservation**,

                     Plaintiff,

     v.

**United States Department of Interior,** *et al.,*

                    Defendants.

Case No. 1:18-cv-547-RMC

**UNITED STATES' MOTION TO DISMISS**
**AND SUPPORTING STATEMENT OF POINTS AND AUTHORITIES**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

FACTUAL AND OTHER BACKGROUND ........................................................................2

I.      The Irrigation Project & Midview Exchange ...............................................3

II.     The Central Utah Project .............................................................................5

III.    The Deferral Agreement & Central Unit Project Completion Act of 1992 (CUPCA)...6

IV.    Prior Settlement and Release of Claims.....................................................11

V.     The Tribe's Present Complaint ...................................................................13

LEGAL STANDARDS .........................................................................................................13

I.      Standard of Review .....................................................................................13

ARGUMENT ........................................................................................................................16

I.      District Courts Lack Jurisdiction Over the Tribe's First, Second, Fifth, Eighth, and Tenth Claims for Adjudication and Quantification of Water Rights ...........................16

    A. The McCarran Amendment Does Not Authorize Private Suits to Adjudicate Water Rights Between the Tribe and the United States............................................................17

    B. The United States Cannot be Compelled to Quantify Water Rights............................18

II.     The Tribe's First through Eleventh Claims Fail to Identify a Cause of Action............19

III.    The Amended Complaint's Third, Fifth, Sixth, Seventh, Ninth, Tenth, and Eleventh Claims Fail to Identify Any Enforceable Trust Duty and, Even if They Had, an Adequate Remedy Would Exist in the Court of Federal Claims ................................21

    A. The Tribe has Failed to Identify any Statute or Regulation that Created a Mandatory Statutory Trust Duty...........................................................................................22

    B. The Court of Federal Claims Would Provide an Adequate Remedy for Breach of Any Enforceable Trust Duties the Tribe has Identified ......................................................27

IV.    The Tribe's Third and Eleventh Claims Were Expressly Waived and Released in the 2012 Settlement Agreement.........................................................................................31

V.     The Tribe First, Second, Fourth, and Fifth Claims under the Deferral Agreement were Expressly Waived and Released in § 507 of CUPCA ..................................................32

VI.    The Court Lacks Jurisdiction and the Tribe Fails to State a Claim for the Eighth Claim Related to the Midview Exchange Agreement ............................................................33

VII.   The Court Lacks Jurisdiction Over the Tribe's First, Second, Fourth, and Fifth Claims Regarding the Deferral Agreement .............................................................................35

VIII.  The Tribe Fails to State a Claim for Violation of the Equal Protection Guarantee ......37

    A. The Tribe Fails to Allege Discriminatory Intent.........................................................38

B. The Tribe Lacks Standing to Assert the Equal Protection Guarantee on Its Members' Behalf ............................................................................................................................41

CONCLUSION...........................................................................................................................42

# TABLE OF AUTHORITIES

## Federal Cases

*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995)........................................... 41

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592 (1982)........................ 42

Amber Res. Co. v. United States, 538 F.3d 1358 (Fed. Cir. 2008) ............................................... 35

*Arizona v. California*, 439 U.S. 419 (1979) (per curium), *amended*, 466 U.S. 144 (1984) .......... 6

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................................ passim

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)...................................................................... 14

*Bennett v. Ridge*, 321 F. Supp. 2d 49 (D.D.C. 2004)................................................................. 14

*Bennett v. Spear*, 520 U.S. 154 (1997)....................................................................................... 21

*Bill Barrett Corp. v. U.S. Dep't of Interior*, 601 F. Supp. 2d 331 (D.D.C. 2009) ................ 35, 36

*Brown v. Board of Educ.*, 349 U.S. 294 (1955) ........................................................................ 41

*Bublitz v. Brownlee*, 309 F. Supp. 2d 1 (D.D.C. 2004).............................................................. 30

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)......................................................................... 15

*Christopher Vill. L.P. v. United States*, 360 F.3d 1319 (Fed. Cir. 2004)................................... 30

*Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice*, 846 F.3d 1235 (D.C. Cir. 2017) ................................................................................................ 28

*Commodity Futures Trading Comm'n v. Nahas*, 738 F.2d 487 (D.C. Cir. 1984) ........................ 14

*Consol. Edison Co. of New York v. U.S., Dep't of Energy*, 247 F.3d 1378 (Fed. Cir. 2001)........ 28

*Cooper Hosp. / Univ. Med. Ctr.. v. Burwell*, 179 F. Supp. 3d 31 (D.D.C. 2016)........................ 39

*Creek Nation v. United States*, 318 U.S. 629 (1943) ................................................................. 19

*Daniels v. United States*, No. 17-1598 C, 2018 WL 1664476 (Fed. Cl. Apr. 6, 2018) ............... 24

*Dep't of Energy v. Ohio*, 503 U.S. 607 (1992) ......................................................................... 14

*Desert Sunlight 250, LLC v. Lew*, 169 F. Supp. 3d 91 (D.D.C. 2016) ....................................... 30

*Dugan v. Rank*, 372 U.S. 609 (1963)................................................................................... 17, 18

*El Paso Nat. Gas Co. v. United States*, 774 F. Supp. 2d 40 (D.D.C. 2011), *aff'd*, 750 F.3d 863 (D.C. Cir. 2014)........................................................................................................ 23

*Federal Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99 (1960) ................................ 34

*Floyd v. District of Columbia*, 129 F.3d 152 (D.C. Cir. 1997).................................................. 19

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13 (D.C. Cir. 2006)........... 20, 21

*Garcia v. Vilsack*, 563 F.3d 519 (D.C. Cir. 2009) ..................................................................... 29

*Gardner v. Stager*, 103 F.3d 886 (9th Cir. 1996) ..................................................................... 17

*Gila River Pima-Maricopa Indian Cmty. v. United States*, 684 F.2d 852 (Ct. Cl. 1982)............. 26

*Gonzalez v. Dep't of Labor*, 609 F.3d 451 (D.C. Cir. 2010)..................................................... 31

*Greenhill v. Spellings*, 482 F.3d 569 (D.C. Cir. 2007) .............................................................. 30

*Grey v. United States*, 21 Cl. Ct. 285 (1990), *aff'd* 935 F.2d 281 (Fed. Cir. 1991), *cert. denied*, 502 U.S. 1057 (1992) ..................................................................................... 24, 25, 27, 33

*Haase v. Sessions*, 835 F.2d 902 (D.D.C. 1987)........................................................................ 14

*Halldorson v. Sandi Grp*, 934 F.Supp.2d 147 (D.D.C. 2013) .............................................. 15, 31

*Heckler v. Chaney*, 470 U.S. 821 (1985) .................................................................................. 19

*Henkel v. United States,* 237 U.S. 43 (1915) ........................................................................... 34

*Hopi Tribe v. United States*, 782 F.3d 662 (Fed. Cir. 2015)................................................ passim

*Impro Prods., Inc. v. Block*, 722 F.2d 845 (D.C. Cir. 1983) ........................................ 21

*In re Cheney*, 406 F.3d 723 (D.C. Cir. 2005) ................................................................. 20

*Inter Tribal Council of Arizona, Inc. v. Babbitt*, 51 F.3d 199 (9th Cir. 1995) ............... 22

*John v. United States*, 247 F.3d 1032 (9th Cir. 2001) ............................................... 6, 29

*Johnson v. Zerbst*, 304 U.S. 458 (1938) ....................................................................... 31

*Kahawaiolaa v. Norton,* 386 F.3d 1271 (9th Cir. 2004), *cert. denied,* 545 U.S. 1114 (2005) ..... 38

*Keydata Corp. v. United States,* 504 F.2d 1115 (Ct. Cl. 1974) ..................................... 31

*Klamath Claims Comm. v. United States*, 541 Fed. Appx 974 (Fed. Cir. 2013) .......................... 15

*Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994) ....................... 13, 14

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ........................................................... 41

*Martinez v. Gonzales*, No. 13-cv-922, 2014 WL 12650983 (D.N.M. June 30, 2014) ................. 24

*McCleskey v. Kemp*, 753 F.2d 877 (11th Cir. 1985) ...................................................... 38

*McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178 (1936) ...................................... 14

*Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857 (D.C. Cir. 2008) ....................................... 15

*Menominee Tribe v. United States*, 726 F.2d 718 (Fed. Cir. 1984) ................................ 36

*Merritt-Champman & Scott Corp. v. United States*, 458 F.2d 42 (Ct. Cl. 1972) (en banc) (per curiam) ................................................................................................................. 31

*N. Slope Borough v. Andrus*, 642 F.2d 589 (D.C. Cir. 1980) ........................................ 25

*Narragansett Indian Tribe v. National Indian Gaming Comm'n*, 158 F.3d 1335 (D.C. Cir. 1998) ...................................................................................................................................... 38

*New Vision Photography Program v. District of Columbia,* 54 F. Supp.3d 12 (D.D.C. 2014) .... 15

*Niagara Mohawk Power Corp. v. Fed. Power Comm'n*, 202 F.2d 190 (D.C. Cir. 1952), *aff'd*, 347 U.S. 239, 247 n.10 (1954) ................................................................................... 6

*Peckham v. United States*, 61 Fed. Cl. 102 (2004) ....................................................... 31

*Prudential Ins. Co. of Am. v. United States*, 801 F.2d 1295 (Fed. Cir. 1986) .............. 31

*Rasul v. Bush*, 542 U.S. 466 (2004) ............................................................................. 14

*Rogers v. Johnson-Norman*, 466 F. Supp. 2d 162 (D.D.C. 2006) ............................... 15

*Samish Indian Nation v. United States*, 657 F.3d 1330 (Fed.Cir.2011), *vacated in part on other grounds*, 133 S. Ct. 423 (2012) ............................................................................ 25

*Schilling v. Rogers*, 363 U.S. 667 (1960) .................................................................... 20

*Sendra Corp. v. Magaw*, 111 F.3d 162 (D.C.Cir.1997) ................................................ 21

*Sharp v. Weinberger*, 798 F.2d 1521 (D.C. Cir. 1986) ........................................... 35, 36

*Shoshone Bannock Tribes v. Reno*, 56 F.3d 1476 (D.C. Cir. 1995) .................... 19, 28, 30

*Sissel v. U.S. Dep't of Health & Human Servs.*, 760 F.3d 1 (D.C. Cir. 2014) ............... 2

*Solem v. Bartlett*, 465 U.S. 463 (1984) ........................................................................... 3

*Spannaus v. U.S. Dep't of Justice*, 824 F.2d 52 (D.C. Cir.1987) ................................. 36

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) ....................................... 13

*Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urban Dev.,* 480 F.3d 1116 (Fed. Cir. 2007) ..................................................................................................................... 29

*Swift & Co. v. United States*, 276 U.S. 311 (1928) ...................................................... 19

*Telecare Corp. v. Leavitt*, 409 F.3d 1345 (Fed. Cir. 2005) .................................... 28, 29

*Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178 (D.C. Cir. 2006) ............................ 20, 30

*United States v. Batchelder*, 442 U.S. 114 (1979) ........................................................ 19

*United States v. Dist. Court for Eagle Cty*, 401 U.S. 520 (1971) .................................................. 17

*United States v. Jicarilla Apache Nation*, 564 U.S. 162 (2011)............................................. 22, 40

*United States v. King*, 395 U.S. 1 (1969)...................................................................................... 13

*United States v. Mitchell*, 445 U.S. 535 (1980) ..................................................................... 25, 28

*United States v. Mitchell*, 463 U.S. 206 (1983).......................................................... 22, 27, 28, 40

*United States v. Monzel*, 641 F.3d 528 (D.C. Cir. 2011) ............................................................. 18

*United States v. Navajo Nation,* 537 U.S. 488 (2003) .................................................................. 23

*United States v. San Jacinto Tin Co.*, 125 U.S. 273 (1888)......................................................... 19

*United States v. Sherwood*, 312 U.S. 584 (1941)......................................................................... 13

*United States v. William Cramp & Sons Ship & Engine Bldg. Co.*, 206 U.S. 118 (1907) ........... 31

*Ute Distribution Corp. v. Interior*, 584 F.3d 1275 (10th Cir. 2009); *cert. denied,* 560 U.S. 905
  (2010) ........................................................................................................................................ 6

*Ute Indian Tribe of the Uintah & Ouray Indian Reservation v. United States*, No. 1:18-cv-546
  (D.D.C.) (Lamberth, J.) ............................................................................................................. 1

*Ute Indian Tribe of the Uintah & Ouray Indian Reservation v. United States*, No. 18-357 L (Fed.
  Cl.) (Hodges, J.) ......................................................................................................................... 1

*Ute Indian Tribe of the Uintah & Ouray Indian Reservation v. United States*, No. 18-359 L (Fed.
  Cl.) (Hodges, J) .......................................................................................................................... 1

*Van Ravenswaay v. Napolitano*, 613 F. Supp. 2d 1 (D.D.C. 2009)............................................. 20

*Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252 (1977) ......................... 38

*Warth v. Seldin*, 422 U.S. 490 (1975)......................................................................................... 41

*Washington v. Davis*, 426 U.S. 229 (1976).................................................................................. 38

*White Mountain Apache Tribe v. United States*, 11 Cl. Ct. 614 (1987), *aff'd* 31 F.3d 1176 (Fed
  Cir. 1994), *cert. denied*, 511 U.S. 1030 (1994)....................................................................... 26

*Winters v. United States*, 207 U.S. 564 (1908) ............................................................................. 6

*Wolfchild v. United States*, 731 F.3d 1280 (Fed. Cir. 2013)................................................... 24, 25

**State Cases**

*In re Drainage Area of Uintah Basin and the Lower Green River Basin*...................................... 6

*In the Matter of the General Determination of all the Rights to the Use of Water, Both Surface
  and Underground, Within the Drainage Area of the Uinta Basin in Utah*, Dist. Ct. for
  Duchesne County, State of Utah, Civil No. 56080056 CV................................................... 17

**Federal Statutes**

25 U.S.C. § 175.......................................................................................................................... 22

28 U.S.C. § 1361.................................................................................................................... 23, 24

28 U.S.C. § 1362.......................................................................................................................... 23

28 U.S.C. § 2401................................................................................................................ 25, 41, 43

28 U.S.C. § 516.......................................................................................................................... 22

43 U.S.C. § 666.......................................................................................................................... 20

5 U.S.C. § 551............................................................................................................................ 25

Act of August 10, 1972, Pub. L. No. 92-370, 86 Stat. 525.......................................................... 7

Act of February 8, 1887, ch. 119, 24 Stat. 390 (1887) (codified as 25 U.S.C. §§ 381 et seq) ..... 29

Act of June 15, 1880, 21 Stat. 199 ........................................................................... 29
Act of June 19, 1902, 32 Stat. 744 ........................................................................... 30
Act of March 1, 1899, 30 Stat. 924 ........................................................................... 29
Act of March 3, 1905, 33 Stat. 1048 ......................................................................... 30
Act of May 14, 1920, 41 Stat. 599 ........................................................................... 30
Act of May 28, 1941, Pub. L. No. 77-83, 55 Stat. 209 (1941) ................................ 6, 31
Act of May 29, 1908, Pub. L. No. 60-156, 35 Stat. 444 (1908) ............................... 5, 30
Act of May 5, 1864, 13 Stat. 63 ............................................................................... 29
Act of October 31, 1988, Pub. L. No. 100-563, 102 Stat. 2826 .................................. 7
Act of September 2, 1964, Pub. L. No. 88-568, 78 Stat. 852 ...................................... 6
Act to Settle Private Land Claims in California, 9 Stat. 631 (1851) ........................... 28
Administrative Procedure Act, 5 U.S.C. § 702 ............................................... 21, 23, 24
Administrative Procedure Act, 5 U.S.C. § 704 ......................................... 21, 24, 33, 34
Colorado River Basin Project Act, Pub. L. No. 90-537, 82 Stat. 885 (1968) ........... 7, 9
Colorado River Storage Project Act, Pub. L. No. 84-485, 70 Stat. 105 (1956) ............ 6
Colorado River Storage Project Act's, 43 U.S.C. § 620 ............................................. 31
Declaratory Judgment Act, 28 U.S.C. § 2202 ........................................................... 24
Indian Department Appropriations Act of 1906, Pub. L. No. 59-258, 34 Stat. 325 (1906) .. passim
Indian Non-Intercourse Act, 25 U.S.C. § 177 ....................................................... 31, 40
Indian Tucker Act, 28 U.S.C. § 1505 ....................................................................... 34
Leavitt Act, 25 U.S.C. § 389 .................................................................................... 30
Little Tucker Act, 28 U.S.C. § 1346 ................................................................... 41, 43
Reclamation Act of 1902, 32 Stat. 388 .................................................................... 30
Reclamation Projects Authorization and Adjustment Act of 1992, Pub. L. No. 102-575, 106 Stat. 4600 ......................................................................................................... passim
Tucker Act, 28 U.S.C. § 1491 ....................................................................... 33, 34, 35, 41
Ute Partition and Termination Act, Pub. L. No. 83-671, 68 Stat. 868 (1954) .............. 8

**State Statutes**

UTAH CODE ANN. §§ 73-22-101–73-22-105 (2018) ...................................................... 9
UTAH CODE ANN. §§ 73-4-1–73-4-24 (LexisNexis 2016) ............................................. 6

**Proposed Legislation**

IRRIGATE Act, S. 438, 114th Cong. (2016) .............................................................. 4

**Rules**

Fed. R. Civ. P. 12 ............................................................................................... passim
Fed. R. Civ. P. 56 .................................................................................................... 19
Fed. R. Evid. 201 .................................................................................................... 18

**Federal Regulations**

22 Fed. Reg. 10479 (Dec. 24, 1957) ........................................................................ 31
25 C.F.R. Part 171 ............................................................................................. 31, 33

25 C.F.R. Part 199 (C.F.R. 1966 ed.) .......................................................................... 31

42 Fed. Reg. 30361 (June 14, 1977) ........................................................................... 31

73 Fed. Reg. 11,028 (2008) ........................................................................................ 31

C.F.R. Part 191 ........................................................................................................... 31

**Legislative Reports**

*Adjustment of Irrigation Charges, Uintah Indian Project, Utah*, H.R. Rep. No. 77-370 (1941) ... 4

COMM. ON ENERGY AND NAT. RES., RECLAMATION PROJECTS AUTHORIZATION AND ADJUSTMENT ACT OF 1992, S. REP. NO. 102-267 (1992) .......................................................... 8, 10

U.S. GOV'T ACCOUNTABILITY OFF. GAO-06-314, INDIAN IRRIGATION PROJECTS: NUMEROUS ISSUES NEED TO BE ADDRESSED TO IMPROVE PROJECT MANAGEMENT AND FINANCIAL SUSTAINABILITY 1-2 (2006), https://www.gao.gov/products/GAO-06-314 (last visited Mar. 15, 2019) ..................................................................................................................... 4

*Ute Indian Water Settlement Act of 1988: Hearing on H.R. 5307 Before the H. Comm. on Interior and Insular Affairs*, 100th Cong. (1988) (Statement of Rep. Howard Nielson) 7, 10, 37

**Other Authorities**

5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE (3D ED. 2004) ...................................................................................................................... 15

Executive Order of October 3, 1861, 1 Kapp. 900 ...................................................... 24

Executive Order or January 5, 1882, 1 Kapp. 901 ...................................................... 24

**Case Materials**

Amended Complaint, ECF No. 18, *Ute Indian Tribe of the Uintah & Ouray Indian Reservation v. United States*, No. 18-359 L (Fed. Cl.) (Hodges, J.) ............................................ 28

Complaint, *Ute Indian Tribe of the Uintah and Ouray Reservation v. United States*, No. 06-866 L (Fed. Cl. December 19, 2006) ............................................................................... 11

Corrected Response Brief for Appellee, *Ute Distribution Corp. v.Sec'y of Interior*, 584 F.3d 1275 (10th Cir. 2009), No. 08-4147, 2009 WL 674440 ............................................ 7

Joint Stipulation of Dismissal with Prejudice, *Ute Indian Tribe of the Uintah and Ouray Reservation v. United States*, No. 06-866 L (Fed. Cl.) (June 1, 2012) ...................... 11

## **UNITED STATES' MOTION TO DISMISS**

Federal Defendants the United States Department of the Interior, David Bernhardt, in his official capacity as Acting Secretary of the Interior, Bureau of Reclamation ("BOR"), and the Bureau of Indian Affairs ("BIA") (collectively, "United States" or "Federal Defendants") respectfully move to dismiss Plaintiff Ute Indian Tribe of the Uintah and Ouray Indian Reservation's ("Tribe") amended complaint filed in this matter (ECF No. 25) for lack of jurisdiction and failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure.  In the alternative, and only with respect to the argument that a 2012 Settlement Agreement waived and released some claims, Federal Defendants move for summary judgment under Rule 56.  Each claim is subject to dismissal on various grounds, as detailed in the Memorandum in Support of the United States' Motion to Dismiss.

## MEMORANDUM IN SUPPORT OF UNITED STATES' MOTION TO DISMISS

## INTRODUCTION

This case involves water management in northeastern Utah.  Plaintiff Ute Indian Tribe's twelve-claim complaint touches on the Tribe's purported water rights, the Bureau of Reclamation's Central Utah Project (the largest and most complex water resource development project in the State), and the Uintah Indian Irrigation Project ("Irrigation Project"), a century-old, multi-purpose water management project involving an extensive irrigation system for Indians and non-Indians alike.  The Tribe alleges that the Department of the Interior has breached fiduciary, statutory, or contractual duties owed to the Tribe with respect to its water rights and in management of the Central Utah Project and Irrigation Project.  None of the claims are new or even based on recent events.  The Tribe nonetheless filed this suit and a companion case in the Court of Federal Claims.[1]

The Amended Complaint's twelve claims should be dismissed for numerous deficiencies including lack of jurisdiction, waiver and release, failure to identify a viable cause of action, failure to identify a mandatory duty, and standing.  In the alternative, with respect to those claims previously waived and released by a 2012 Settlement Agreement, summary judgment should be granted in favor of Federal Defendants.

---

[1] *See Ute Indian Tribe of the Uintah & Ouray Indian Reservation v. United States*, No. 18-359 L (Fed. Cl.) (Hodges, J).  In addition, Plaintiff filed two other cases relating to what the Tribe refers to as the Uncompahgre Reservation: *Ute Indian Tribe of the Uintah & Ouray Indian Reservation v. United States*, No. 18-357 L (Fed. Cl.) (Hodges, J.); and *Ute Indian Tribe of the Uintah & Ouray Indian Reservation v. United States*, No. 1:18-cv-546 (D.D.C.) (Lamberth, J.)

# FACTUAL AND OTHER BACKGROUND[2]



---

[2] Given the stage of proceedings, we rely upon the factual (as opposed to legal) allegations in the Amended Complaint unless they are shown to be false by judicially noticeable documents. *See e.g., Sissel v. U.S. Dep't of Health & Human Servs.*, 760 F.3d 1, 4 (D.C. Cir. 2014). The United States does not intend to admit any of the allegations.

I.      **The Irrigation Project & Midview Exchange**

Plaintiff is a federally recognized Indian Tribe, made up of three bands of Ute people (the Uintah Band, the Whiteriver Band, and the Uncompahgre Band), with a reservation—the Uintah and Ouray Indian Reservation—in the northeastern Utah's Uintah Basin.  Am. Compl. ¶ 2.  As shown on the map above, several rivers run through the Reservation, which is located on an arid plateau.[3]  Am. Compl. ¶ 20.

Beginning in the early 1900s, the United States allotted[4] approximately 100,000 acres of irrigable lands to individual Ute Indians and later commenced construction of irrigation systems for 78,950 acres of those lands pursuant to the Indian Department Appropriation Act of June 21, 1906 ("1906 Act"), which authorized the appropriations and construction of the Uintah Indian Irrigation Project.  *See* Indian Department Appropriations Act of 1906, Pub. L. No. 59-258, 34 Stat. 325, 375-76 (1906); *see also Am.* Compl. ¶¶ 31, 32.  The 1906 Act appropriated funds for several Indian tribes, including for allottees who were members of the Ute Indian Tribe, but it was also intended to benefit non-Indians by providing irrigation systems to be used by "any person, association, or corporation under and upon compliance with the provisions of the laws of the State of Utah."  *Id.*

Under the authority of the 1906 Act, the United States Indian Irrigation Service, subsequently part of the Bureau of Indian Affairs, constructed an extensive system of canals and ditches to convey water from the drainages of the Strawberry-Duchesne rivers (west and northwest of Duchesne on the map above), Lake Fork-Yellowstone rivers (northwest of

---

[3] We include the map only to illustrate the river and reservoir system.  We do not concede that the map accurately represents the current reservation boundaries.

[4] For purposes of this motion, the term "allotted" refers to Congress's past practice of "dividing," or "allotting," communal Indian lands into individualized parcels for private ownership by tribal members, then known as "allottees."  *See Solem v. Bartlett*, 465 U.S. 463, 467 (1984).

Roosevelt), and the Uinta-Whiterocks rivers (north of Roosevelt), all of which flow through at least some portion of the Uintah and Ouray Reservation.  *See* Am. Compl. ¶ 51.  Congress, in authorizing the Bureau of Indian Affairs to recoup all costs associated with operating and maintaining its irrigation systems, intended that the irrigators served by the irrigation projects repay and fund construction, operation, and maintenance.  *See* Act of May 29, 1908, Pub. L. No. 60-156, 35 Stat. 444, 450 (1908).  Over time, however, low annual operations and maintenance fees resulted in insufficient funding for projects and maintenance.  *See* U.S. GOV'T ACCOUNTABILITY OFF. GAO-06-314, INDIAN IRRIGATION PROJECTS: NUMEROUS ISSUES NEED TO BE ADDRESSED TO IMPROVE PROJECT MANAGEMENT AND FINANCIAL SUSTAINABILITY 1-2 (2006), https://www.gao.gov/products/GAO-06-314 (last visited Mar. 15, 2019).  Thus, in 1941, Congress authorized the cancellation of more than $300,000 in unpaid construction assessments and operation and maintenance charges, and, among other provisions, authorized the Secretary of the Interior to transfer water rights, with the consent of the interested parties, to other Irrigation Project lands and to make necessary contracts to effectuate the transfer(s).  *See* Act of May 28, 1941, Pub. L. No. 77-83, §§ 1–2, 55 Stat. 209 (1941).[5]

In 1967, the United States, the Moon Lake Water Users Association, and the Ute Tribe signed the Midview Exchange Agreement.  *See* Midview Exchange Agreement, attached hereto as Exhibit B.  The Agreement's principal purpose was an exchange of water between Indian

---

[5] The Tribe contends that it opposed the 1941 Act, never consenting to transfers which they perceive as unlawful.  Am. Compl. ¶¶ 109-111.  However, the Act's purpose was to provide financial relief to both Indian and non-Indian landowners and to make the Irrigation Project financially sustainable by shifting resources to more productive lands. *Adjustment of Irrigation Charges, Uintah Indian Project, Utah*, H.R. Rep. No. 77-370 at 3-4 (1941).  In recent years, a number of bills have been brought before Congress to appropriate funds for this funding shortfall and the resulting deferred maintenance.  *See, e.g.,* IRRIGATE Act, S. 438, 114th Cong. (2016); S. REP. NO. 115-258 on S. 2975 (2018) (energy and water development appropriations).

lands served by the Lake Fork River, on one hand, and the Moon Lake Water Users' lands higher up the Lake Fork drainage, on the other. *Id.*, ¶¶ 6-8. The key provisions authorized property transfers between the Bureaus of Indian Affairs and Reclamation, with title to remain in the United States. *Id.* ¶ 8. The Agreement did not authorize the Midview Property to be transferred to the Tribe.

## II.   The Central Utah Project

Separate from the Irrigation Project, is the Central Utah Project, first authorized by Congress in 1956. *See* Colorado River Storage Project Act, Pub. L. No. 84-485, 70 Stat. 105 (1956). The Project's history, like the Project itself, is complex.[6] Most simply stated, the Central Utah Project's aim is the collection and distribution of water in the Uintah Basin, including for irrigation. To accomplish this, the Project was divided into six units. The Vernal Unit (near Vernal in northeastern Utah) and Jensen Unit (in Uintah County, Utah) have been completed. The Bonneville Unit, the Project's largest, has several systems fully constructed and collects and distributes water in both the Uintah Basin and central Utah's Bonneville Basin. The remaining units were the Upalco, Uintah, and Ute Indian Units. These units were never built. The latter two are important here because they would have included reservoirs to supply water (from the Uintah and Whiterocks and Green Rivers, respectively) to, among other users, individual Indian lands.

---

[6] Additional authorizations for the Colorado River Storage Project Act, which included the Central Utah Project, occurred with the Act of September 2, 1964, Pub. L. No. 88-568, 78 Stat. 852; Colorado River Basin Project Act, Pub. L. No. 90-537, 82 Stat. 885 (1968); the Act of August 10, 1972, Pub. L. No. 92-370, 86 Stat. 525; and the Act of October 31, 1988, Pub. L. No. 100-563, 102 Stat. 2826.

### III.    The Deferral Agreement & Central Unit Project Completion Act of 1992 (CUPCA)

Of course, to make use of water in the Central Utah Project one must hold water rights.

By the time Congress originally authorized the Project in 1956, the State of Utah had ordered a

general adjudication of all water rights in the Uinta Basin.  *See In re Drainage Area of Uintah

Basin and the Lower Green River Basin*, attached hereto as Exhibit G; *see also* UTAH CODE ANN.

§§ 73-4-1–73-4-24 (LexisNexis 2016) (governs water right adjudications, defines the overall

process and procedures for allocation of water and adjudication of conflicting claims).  In the

following years, the Affiliated Ute Citizens[7] and the Ute Tribe jointly hired E.L. Decker to

identify Tribal and Affiliated Ute water rights.  Am. Compl. ¶ 44.  The completed Decker Report

organized lands into seven groups.  Am. Compl. ¶ 45.  Except for lands it designated as "Group

1" within the Irrigation Project (those already subject to judicial decree), the Decker Report

generally asserted *Winters*[8] reserved water rights based upon, and tabulated by, practically

---

[7] In 1954, Congress enacted the "Ute Partition and Termination Act", Pub. L. No. 83-671, § 6, 68
Stat. 868, which provided for the partition and distribution of the assets of the Ute Tribe of the
Uintah and Ouray Reservation between the mixed and full-blood members.  *See Ute Distribution
Corp. v. Interior,* 584 F.3d 1275, 1276-79 (10th Cir. 2009); *cert. denied,* 560 U.S. 905 (2010), for
the history of the partition.  Under the Act, the mixed-blood members organized the Affiliated
Ute Citizens as an unincorporated association which, as authorized by the statute, created the Ute
Distribution Corp. to jointly manage the distribution of assets to individual mixed-blood
members.

[8] In *Winters v. United States*, the Supreme Court held that the establishment of an Indian
reservation impliedly reserved the amount of water necessary to fulfill the purposes of the
reservation.  207 U.S. 564, 576–77 (1908).  *Winters* doctrine rights may be used for any lawful
purpose on the reservation and "gives the United States the power to exclude others from
subsequently diverting waters that feed the reservation."  *Hopi Tribe v. United States*, 782 F.3d
662, 669 (Fed. Cir. 2015); *see also Arizona v. California*, 439 U.S. 419, 421–22 (1979) (per
curium), *amended*, 466 U.S. 144 (1984).  Water rights, including those held under the *Winters*
doctrine, vest "only a usufructuary interest in water, not an ownership interest."  *See John v.
United States*, 247 F.3d 1032, 1041 (9th Cir. 2001).  It does not give a tribe ownership of any
particular molecules of water, either on the reservation or up- or downstream of the reservation.
*Niagara Mohawk Power Corp. v. Fed. Power Comm'n*, 202 F.2d 190, 198 (D.C. Cir. 1952),
*aff'd*, 347 U.S. 239, 247 n.10 (1954).  For purposes of this motion, the Court should assume that

irrigable acreage.  *Id.*  This tabulation included previously quantified water rights and

unquantified "potential water rights."  *Id.*  The Decker Report based its tabulation on more than

just lands held in trust for the Tribe as part of the Reservation.  *Id.*  And, contrary to its present

allegations, the Tribe acknowledged in 2009 that the "identification of [practicably irrigable

acreage] on the Reservation has remained virtually unchanged since Mr. Decker first identified

those lands for the Tribe and the [Affiliated Ute Citizens]."  Compare Corrected Response Brief

for Appellee, *Ute Distribution Corp. v.Sec'y of Interior*, 584 F.3d 1275 (10th Cir. 2009), No. 08-

4147, 2009 WL 674440 and Am. Compl. ¶¶ 209-216.  The Tribe implemented Mr. Decker's

recommendations in 1965.

Also in 1965, the United States, the Central Utah Water Conservancy District, and the

Ute Tribe signed what is called the "Deferral Agreement."  *See* Deferral Agreement, attached

hereto as Exhibit A.  The Agreement, among other things, deferred irrigation development for

15,242 acres of the Decker Report's "Group 5" lands—those to be served by the Duchesne River

and not presently under irrigation, but identified as productive and economically feasible to

irrigate—from the Central Utah Project's initial phase (as part of the Bonneville Unit) to the

ultimate phase (then planned to be the Uintah Unit).  *See* Am. Compl. ¶¶ 8, 144; Ex. A (Deferral

Agreement), ¶¶ 3-5.[9]  These Group 5 lands were not part of the Uintah Indian Irrigation Project.

---

the Tribe only has a right to use a determined amount of water necessary to fulfill the purposes of
the reservation.
[9] For Group 5 lands, the Decker Report recommended that the Tribe forgo its right to divert
water from the streams running through those land and accept substitute water delivered from the
Green River through Central Utah Project facilities.  The Green River-based diversion became
known as the Ute Indian Unit, for which Congress authorized a feasibility study in 1968.
Colorado River Basin Project Act, Pub. L. No. 90-537, 82 Stat. 885 (1968).  The Deferral
Agreement was not, as the Tribe now claims, a one-sided bargain.  Am. Compl. ¶¶ 144-172, 209-
220, 226-233.  It provided benefits to the Tribe by recognizing that, upon the establishment of
the reservation in 1861, water rights were perfected sufficient to meet the needs of all practicably
irrigable land on the reservation.  *See* Ex. A (Deferral Agreement), ¶ 9; *see also Ute Indian Water*

Instead, under the Deferral Agreement, the Tribe deferred water use and development on Group 5 lands to ensure roughly 60,000 acre-feet of water per year for the Central Utah Project's Bonneville Unit, which then allowed the Secretary to certify to Congress that construction on the Bonneville Unit could proceed.  The Deferral Agreement also established January 1, 2005, as the "maximum date of deferment and that all phases of the Central Utah [P]roject will in good faith be diligently pursued to satisfy all Indian water rights at the earliest possible date." *Id.* ¶ 5.

Over the following decades, some of the Deferral Agreement's provisions were not fulfilled, including construction of the Uintah Unit.  Am. Compl. ¶¶ 155, 161, 167.  Congress acknowledged that the Upalco and Uintah Units had not been constructed "in part because the Bureau [of Reclamation] was unable to find adequate and economically feasible reservoir sites." Reclamation Projects Authorization and Adjustment Act of 1992, Pub. L. No. 102-575, § 501(a)(3), 106 Stat. 4600, 4651–52.  Similarly, the separately-planned Ute Indian Unit was never authorized by Congress.  *Id.*; *see also* COMM. ON ENERGY AND NAT. RES., RECLAMATION PROJECTS AUTHORIZATION AND ADJUSTMENT ACT OF 1992, S. REP. NO. 102-267, at 98 (1992) (describing Upalco Unit as "indefinitely postponed," Uintah Unit as "inactive," and Ute Indian Unit as having "never been authorized").

Congress, however, addressed the unfulfilled portions of the Deferral Agreement.  In the Ute Indian Rights Settlement, found in Title V of the Central Utah Project Completion Act of 1992 ("CUPCA"), Congress intended to "once and for all" settle any claims under the Deferral Agreement and other historical claims, including any related to the separate Upalco Unit.  *See* Reclamation Projects Authorization and Adjustment Act of 1992, Pub. L. No. 102-575 §§ 501–

---

*Settlement Act of 1988: Hearing on H.R. 5307 Before the H. Comm. on Interior and Insular Affairs*, 100th Cong. 24 (1988) (Statement of Rep. Howard Nielson) ("1988 H.R. Hrg.").

07, 106 Stat. 4600, 4650–55 (1992). The purpose of the Act and the incorporated Revised Ute Indian Compact of 1990 ("1990 Compact")[10] was to quantify the Ute Tribe's reserved water rights, allow increased beneficial use of water, and to provide economic benefits to the Tribe to replace those that would have resulted from the Deferral Agreement's planned projects. *Id*. § 501(b), 106 Stat. at 4651.

Under Title V, Congress provided funding to complete various projects, as well as substantial federal funds in lieu of the Deferral Agreement's promised storage projects. *Id*. § 502, 106 Stat. at 4651–52. As it relates to the 15,242 acres of Group 5 lands in the Deferral Agreement and as compensation for unmet terms, Congress established annual payments (approximately $2.1 million per year) to the Tribe in perpetuity from Bonneville Unit operation and maintenance repayments made by the irrigators.[11] *See id*. In exchange for quantifying the Tribe's reserved water rights, allowing increased beneficial use of water, and putting the Tribe in the same economic position it would have enjoyed under the Deferral Agreement, the Ute Indian

---

[10] Congress ratified the 1990 Compact in Section 503 of CUPCA, subject to re-ratification by the Tribe and the State of Utah. *See* 106 Stat. 4652. While there have been negotiations among the Tribe, the State, and the United States to revise portions of the 1990 Compact, there has been no final agreement. The 2018 Session of the Utah State Legislature enacted Section 73-21-101, UTAH CODE ANN. §§ 73-22-101–73-22-105 (2018), which ratified the 1990 Compact on behalf of the State. The Tribe, however, has not re-ratified the 1990 Compact post-CUPCA.

[11] Other provisions define the purpose and scope of the 1990 Compact and the water rights conferred thereunder, §503, 106 Stat. at 4652-53, authorize the appropriation of $45 million to permit tribal development of farming operations, §504, 106 Stat. at 4653, authorize the appropriation of $28.5 million to be made available to the Secretary to carry out a number of reservoir, stream, habitat and road improvements in cooperation with the Tribe, §505, 106 Stat. at 4653-54 and authorize and direct the Secretary to establish a tribal development fund, §506, 106 Stat. at 4654-55, as part of the overall settlement.

Rights Settlement waived and released any and all historical claims which the Tribe may have

had, including claims arising out of the Deferral Agreement.[12]

It is well documented that CUPCA was a compromise agreement among the Tribe, the

State of Utah, the water district, and the federal government to settle potential claims under the

Deferral Agreement.  *Ute Indian Water Settlement Act of 1988: Hearing on H.R. 5307 Before the*

*H. Comm. on Interior and Insular Affairs*, 100th Cong. 24 (1988) (Statement of Rep. Howard

Nielson).  For example, as it relates to the Tribe's allegations that the United States failed to

secure storage and related water works, Am. Compl. ¶¶ 209-225, 226-241, the Tribe proposed an

agricultural commitment in Section 504 to identify approximately 7,000 acres for farming

operations, "in lieu of constructing the Upalco and Uintah Units."  *See* S. REP. NO. 102-267, at

123-124 (1992); *see also* § 504, 106 Stat. at 4653.  In 1990, the Tribe's then and current

chairman also testified in support of the Ute Indian Rights Settlement.  *See* Exhibit F (Testimony

of Luke Duncan) at 225.  The findings and purpose provisions of Title V addressed unresolved

claims from the Deferral Agreement and Congressional intent not only to quantify the Tribe's

reserved water rights but also "put the Tribe in the same economic position it would have

---

[12] (a) GENERAL AUTHORITY.—The Tribe is authorized to waive and release claims concerning or related to water rights as described below.

(b) DESCRIPTION OF CLAIMS.—The Tribe shall waive, upon receipt of the section 504, 505, and 506 moneys, any and all claims relating to its water rights covered under the agreement of September 20, 1965, including claims by the Tribe that it retains the right to develop lands as set forth in the Ute Indian Compact and deferred in such agreement. Nothing in this waiver of claims shall prevent the Tribe from enforcing rights granted to it under this Act or under the Compact. To the extent necessary to effect a complete release of the claims, the United States concurs in such release.

§ 507, 106 Stat. at 4655.  *See also* S. REP. NO. 102-267, at 124 ("Since the purpose of the settlement is to resolve, once and for all, those outstanding matters, it is appropriate . . . that a comprehensive waiver be undertaken by the Tribe.")

enjoyed had the features contemplated by the [Deferral Agreement] been constructed."  § 501(a)-(b), 106 Stat. at 4650–51.[13]

## IV.   Prior Settlement and Release of Claims

In 2006, the Tribe filed an action against the United States in the Court of Federal Claims seeking money damages and an accounting for alleged mismanagement of its trust funds and non-monetary trust assets.  *See generally* Complaint, *Ute Indian Tribe of the Uintah and Ouray Reservation v. United States*, No. 06-866 L (Fed. Cl. December 19, 2006), attached hereto as Exhibit H; *see id.*, e.g., ¶¶ 54–58, 63–67.  Ultimately, the 2006 lawsuit was resolved when the Tribe and the United States executed a settlement agreement on March 8, 2012 (the "Settlement Agreement").  A true and correct copy of the Settlement Agreement is attached hereto as Exhibit D; *see also* Joint Stipulation of Dismissal with Prejudice, *Ute Indian Tribe of the Uintah and Ouray Reservation v. United States,* No. 06-866 L (Fed. Cl.) (June 1, 2012).

Under the relevant terms of the Settlement Agreement, and in exchange for $125 million, the Tribe:

> waive[d], release[d], and covenant[ed] not to sue in any administrative or judicial forum on any and all claims, causes of action, obligations, and/or liabilities of any kind or nature whatsoever, known or unknown, regardless of legal theory, for any damages or any equitable or specific relief, that are based on harms or violations occurring before the date of the execution of this Settlement Agreement by both Parties and that relate to the United States' management or accounting of Plaintiff's trust funds or Plaintiff's non-monetary trust assets or resources.

---

[13] Although the Tribe now challenges the computation of the Bonneville Unit Credits paid annually to the Tribe under §502, Am. Compl. ¶¶ 182-187, the proposed formula was expressly acknowledged and accepted by Chairman Duncan in his testimony before Congress.  Ex. F at 216.

Ex. D (Settlement Agreement), ¶¶ 2, 4.  The Settlement Agreement explains that this waiver

included, but was not limited to, any claims or allegations that the United States "failed to

preserve, protect, safeguard, or maintain [the Tribe]'s non-monetary trust assets or resources,"

"failed to manage [the Tribe]'s non-monetary trust assets or resources appropriately," "failed to

prevent trespass on [the Tribe]'s nonmonetary trust assets or resources," "improperly or

inappropriately transferred, sold, encumbered, allotted, managed, or used Plaintiff's non-

monetary trust assets or resources," and "failed to deposit monies into trust funds or disburse

monies from trust funds in a proper and timely manner." *Id*. ¶ 4.[14]

In addition, pursuant to the Settlement Agreement, the Tribe agreed that it "accept[ed] as

accurate the balances of all of Plaintiff's trust fund accounts[15], as those balances are stated in the

most recent periodic Statements of Performance" provided by the United States on January 31,

2012.  *Id*. ¶¶ 7-8.  The Tribe also agreed that the United States had satisfied any accounting

requirements up to the date of the Settlement Agreement and that the United States would satisfy

---

[14] The Settlement Agreement also provided for exceptions to the Tribe's release and waiver.  *See* Ex. D, ¶ 6.  Some exceptions included the Tribe's ability to assert claims for alleged harms caused after the execution of the Settlement Agreement and the Tribe's water rights.

[15] The Settlement Agreement defined "trust funds" to

> include but are not limited to any monies that have been received by Plaintiff in compensation for or as a result of the settlement of Plaintiff's pre-1946 claims brought before the Indian Claims Commission ("ICC"); the monies in any Tribal-related accounts; any proceeds-of-labor accounts; any Tribal-Individual Indian Money ("Tribal-related IIM") or special deposit accounts; any Indian Money-Proceeds of Labor ("IMPL") accounts; any Treasury accounts; any legislative settlement or award accounts; and any judgment accounts, regardless of whether the above-described accounts are principal or interest accounts, whether they were established pursuant to Federal legislation, and whether they are or were maintained, managed, invested, or controlled by either the Department of the Interior ("Interior") or the Department of the Treasury ("Treasury").

Ex. D, at 4 n.1.

any future "duty and responsibility to account for and report to [the Tribe] . . . through . . . compliance with applicable provisions of the United States Constitution, treaties, and federal statutes and regulations." *Id.* ¶¶ 8–11.

## V.   The Tribe's Present Complaint

In response to our original motion to dismiss, the Tribe filed an amended complaint on January 22, 2019.  The Amended Complaint now includes twelve claims for relief each subject to dismissal on various grounds as attached hereto in Exhibit C.

## LEGAL STANDARDS

## I.   Standard of Review

The United States moves to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of jurisdiction and 12(b)(6) for failure to state a claim.  In the alternative, and only in regard to our argument that the 2012 Settlement Agreement waived and released certain claims, the United States seeks summary judgment under Rule 56.

A threshold issue in every federal case is whether the court maintains jurisdiction.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–96 (1998).  Federal jurisdiction exists only where authorized by statute or the Constitution.  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  Jurisdiction must be established before the Court may proceed to the merits of a case.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. at 88-89.  In suits against the United States, an express waiver of sovereign immunity is a prerequisite to subject matter jurisdiction.  *United States v. Sherwood*, 312 U.S. 584, 586 (1941), *United States v. King*, 395 U.S. 1, 4 (1969).  Federal Rule of Civil Procedure 12(b)(1) also provides for dismissal if the court lacks subject matter jurisdiction over a claim.  A party seeking federal court jurisdiction bears the burden of demonstrating that jurisdiction exists.  *McNutt v. Gen. Motors Acceptance*

*Corp. of Ind.*, 298 U.S. 178, 189 (1936); *Commodity Futures Trading Comm'n v. Nahas*, 738

F.2d 487, 492 n.9 (D.C. Cir. 1984).  The Supreme Court presumes that federal courts lack

jurisdiction unless the contrary appears affirmatively from the record.  *See Dep't of Energy v.*

*Ohio*, 503 U.S. 607, 615 (1992).

As courts of limited jurisdiction, federal courts may only decide cases after the party

asserting jurisdiction demonstrates that the dispute falls within the court's Constitutional and

statutory jurisdiction.  *Rasul v. Bush*, 542 U.S. 466, 489 (2004) (quoting *Kokkonen v. Guardian*

*Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)) (federal courts "possess only that power

authorized by Constitution and statute")).  "[I]n deciding a Rule 12(b)(1) motion, it is well

established in this Circuit that a court is not limited to the allegations in the complaint but may

consider material outside of the pleadings in its effort to determine whether the court has

jurisdiction in the case."  *Bennett v. Ridge*, 321 F. Supp. 2d 49, 52 (D.D.C. 2004); *see also Haase*

*v. Sessions*, 835 F.2d 902, 905–906 (D.D.C. 1987) (holding that a court's consideration of

materials outside the pleadings in deciding a 12(b)(1) motion does not require that the court treat

the motion as one for summary judgment).

To survive a Rule 12(b)(6) motion to dismiss, a "complaint must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)).  While a court "must take all of the factual allegations in the complaint as true," it is

"not bound to accept as true a legal conclusion couched as a factual allegation."  *Id.* (quoting

*Twombly*, 550 U.S. at 555).  In addressing a 12(b)(6) motion, courts may consider "matters

incorporated by reference or integral to the claim, items subject to judicial notice, matters of

public record, orders, items appearing in the record of the case, and exhibits attached to the

complaint whose authenticity is unquestioned."  *Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857, 867

n* (D.C. Cir. 2008) (quoting 5A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (3d ed. 2004).

Under Rule 201 a court may also take judicial notice an adjudicative fact "not subject to reasonable dispute" if the fact is "generally known," or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Without triggering conversion to a Rule 56 motion, a court may take judicial notice of publically available records, reports of administrative bodies, and records of prior litigation. *New Vision Photography Program v. District of Columbia,* 54 F. Supp.3d 12, 23 (D.D.C. 2014). Tribal resolutions have been found to be in that category of publicly available records whose accuracy cannot be reasonably questioned.  *Klamath Claims Comm. v. United States*, 541 Fed. Appx 974, 979 n.8 (Fed. Cir. 2013) (denying motion to strike tribal resolutions appended to United States' brief).

In addition, and even where not referred to or attached to the complaint, a Court may also consider relevant settlement agreements where the parties do not dispute their validity.  *See Rogers v. Johnson-Norman*, 466 F. Supp. 2d 162, 170 n.5 (D.D.C. 2006); *see also Halldorson v. Sandi Grp*, 934 F.Supp.2d 147, 152 (D.D.C. 2013).  In the alternative, however, summary judgment is appropriate if the record before the court establishes "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). To avoid summary judgment, the opposing party must identify specific facts establishing a genuine and material factual dispute for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

## ARGUMENT

The Complaint should be dismissed for numerous reasons.  First, the Court lacks jurisdiction over the Tribe's first, second, fifth, eighth and tenth claims under the McCarran Amendment and because the United States cannot be compelled to quantify water rights. Second, the Tribe's non-constitutional claims should be dismissed for failure to state a claim upon which relief can be granted because the Complaint identifies no valid cause of action and because the statute of limitations has lapsed for all but the Tribe's third, tenth, and eleventh claims.  Third, to the extent the Tribe is seeking to enforce a breach of trust in its third, fifth, sixth, seventh, ninth, tenth, and eleventh claims, the Tribe has failed to identify any enforceable trust duty.  Fourth, the Tribe's third and eleventh claims were waived and released by the 2012 Settlement Agreement.  Fifth, upon receipt of monies identified in §§ 504-506 of CUPCA, the Tribe's first, second, fourth, and fifth claims under the Deferral Agreement were waived and released by § 507 of that statute.  Sixth, the Tribe cannot seek specific performance or declaratory relief against the federal government for time barred claims related to the Midview Exchange and Deferral Agreements.  Finally, the Tribe's constitutional claim under the Equal Protection Guarantee should be dismissed as time-barred and because the Tribe (as a sovereign government) lacks standing and has also failed to allege discriminatory intent.

I.    **District Courts Lack Jurisdiction Over the Tribe's First, Second, Fifth, Eighth, and Tenth Claims for Adjudication and Quantification of Water Rights**

The federal district courts lack jurisdiction to adjudicate water rights between the Tribe and the United States or to compel the Attorney General to quantify the Tribe's water rights

(which is not a government action subject to mandamus).  The Tribe's first, second, fifth, eighth, and tenth claims should be dismissed to the extent they relate to water rights quantification.[16]

### A.  The McCarran Amendment Does Not Authorize Private Suits to Adjudicate Water Rights Between the Tribe and the United States

The Tribe broadly claims that the United States has trust duties "to protect, preserve, and develop" the Tribe's *Winters* (or paramount) water rights.  Am. Compl. ¶¶ 1, 216, 235, 245.  But the claim, and the others relating to water rights, cannot proceed in this Court because the McCarran Amendment withholds the United States' consent to be sued in actions involving water rights unless the action involves joinder of the United States as a defendant in general stream adjudications in which the rights of all competing claimants are adjudicated.  *See Dugan v. Rank*, 372 U.S. 609, 618-19 (1963); *see also* 43 U.S.C. § 666(a); *United States v. Dist. Court for Eagle Cty*, 401 U.S. 520, 525 (1971), *Gardner v. Stager*, 103 F.3d 886, 888 (9th Cir. 1996). This case, of course, is not a general stream adjudication, and the McCarran Amendment therefore preserves the United States' sovereign immunity.  Moreover, the State of Utah is currently engaged in an ongoing general adjudication of water rights within the Uinta Basin to which the United States is a party.  *See In the Matter of the General Determination of all the Rights to the Use of Water, Both Surface and Underground, Within the Drainage Area of the Uinta Basin in Utah*, Dist. Ct. for Duchesne County, State of Utah, Civil No. 56080056 CV.

Perhaps recognizing the United States' limited waiver of sovereign immunity, the Amended Complaint adds paragraphs referencing the waiver in the Administrative Procedure Act (5 U.S.C. § 702) and the "sue and be sued" provision in the statute authorizing the Irrigation Project, Indian Department Appropriations Act of 1906, Pub. L. No. 59-258, 34 Stat. 325, 375

---

[16] To the extent the Tribe's fourth claim seeks to quantify the Tribe's reserved water rights, it too would be subject to dismissal on these grounds.

(1906).  Neither provides a valid jurisdictional basis for the Tribe's water rights claims (claims one, two, five, eight, and ten).  The APA withholds judicial authority to grant relief in situations where another waiver impliedly forbids the relief sought.  5 U.S.C. § 702 ("Nothing herein . . . confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought."); *accord* § 704 (making APA relief unavailable where an adequate remedy is available in another court).  The McCarran Amendment withholds consent from suit in circumstances such as those presented here.  *Dugan*, 372 U.S. at 618-19.  Similarly, the "sue and be sued" provision in the Irrigation Project's authorizing statute, even if read as a waiver of sovereign immunity, only relates to the Irrigation Project, not water rights generally.  *See* 34 Stat. at 375 ("Provided, That such irrigation systems shall be constructed and completed and held and operated, . . . and [the Secretary of the Interior] may sue and be sued in matters relating thereto.").  The Tribe's water rights related claims are not authorized under the McCarran Amendment and the Court lacks jurisdiction.  This Court should therefore dismiss the Tribe's first, second, fifth, eighth, and tenth claims.

### B.  The United States Cannot be Compelled to Quantify Water Rights

Alternatively, the Court lacks jurisdiction over the Tribe's first, second, fifth, eighth, and tenth claims because the United States cannot be compelled to quantify water rights.  Such relief in the form of mandamus is only available where a plaintiff can demonstrate a clear, undisputed duty to act and there is no other adequate remedy.  *See United States v. Monzel*, 641 F.3d 528, 534 (D.C. Cir. 2011).  Here, the Tribe points to no clear, undisputed duty, and, even it had, an adequate remedy would exist in the form of a general stream adjudication under the McCarran Amendment.

To the extent that the Amended Complaint can be interpreted to contend that the United States has failed in an alleged duty to institute *judicial* proceedings to quantify (through an adjudication) Plaintiff's *Winters* rights, such claims must similarly be dismissed.  Conduct of litigation on behalf of the United States "is reserved to officers of the Department of Justice, under the direction of the Attorney General."  28 U.S.C. § 516; *see also* 25 U.S.C. § 175.  The Supreme Court has "recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."  *Heckler v. Chaney*, 470 U.S. 821, 831 (1985) (citing *United States v. Batchelder*, 442 U.S. 114, 123-24 (1979)).  It is well established that the commencement and conduct of litigation by the Attorney General traditionally has been regarded as being committed to that officer's discretion.  *See, e.g.*, *Swift & Co. v. United States*, 276 U.S. 311, 331-32 (1928); *United States v. San Jacinto Tin Co.*, 125 U.S. 273, 279 (1888); *see also Creek Nation v. United States*, 318 U.S. 629, 639 (1943) (discussing the Secretary of the Interior's discretion to handle Indian affairs).  This is also true in the particular context of whether the United States has a duty to file water rights claims on behalf of Indian Tribes. *Shoshone Bannock Tribes v. Reno*, 56 F.3d 1476, 1481 (D.C. Cir. 1995).  The Tribe's first, second, fifth, eighth, and tenth claims should be dismissed.

## II.      The Tribe's First through Eleventh Claims Fail to Identify a Cause of Action

Claims one through eleven should be dismissed because the Tribe has not identified a cause of action for those claims.  To proceed in federal court on a claim against the United States, a plaintiff must identify a waiver of sovereign immunity, a grant of subject matter jurisdiction, and a cause of action.  *See Floyd v. District of Columbia*, 129 F.3d 152, 155 (D.C. Cir. 1997).  Here, the Tribe has asserted a waiver of sovereign immunity under 5 U.S.C. § 702

and Public Law 59-258, and subject matter jurisdiction under 28 U.S.C. §§ 1362 and 1361.  *See*

Am. Compl. ¶¶ 7, 8, 9, 11, 12.  But the Amended Complaint has not identified a cause of action

for claims one through eleven.  Each of these claims cites to the Declaratory Judgment Act, 28

U.S.C. § 2202.  *See, e.g.,* Am. Compl. ¶ 216.  But the Declaratory Judgment Act does not

provide an independent cause of action.  *Van Ravenswaay v. Napolitano*, 613 F. Supp. 2d 1, 6

(D.D.C. 2009) (citing *Schilling v. Rogers*, 363 U.S. 667, 677 (1960)).  The Act "presupposes the

existence of a judicially remediable right."  *Schilling*, 363 U.S. at 677; see 28 U.S.C. § 2202

(authorizing further relief based upon an existing declaratory judgment).  The Amended

Complaint references 28 U.S.C. § 1361.  *See* Am. Compl. ¶ 9.  But the only claim that seeks to

compel agency action is the eleventh, and it identifies no mandatory statutory duty, as is required

for a mandamus claim.  *Id.* ¶¶ 269–273; Request for Relief ¶¶ 13–19); *see also In re Cheney*, 406

F.3d 723, 729 (D.C. Cir. 2005).  Because the Complaint does not identify any cause of action

from claims one through eleven, all eleven should be dismissed for failure to state a claim.

Certainly, one commonly-asserted cause of action (though the Tribe does not assert it

here) is Section 704 of the Administrative Procedure Act (5 U.S.C. § 704).  *See Trudeau v. Fed.*

*Trade Comm'n*, 456 F.3d 178, 185 (D.C. Cir. 2006).  But the APA's cause of action is limited to

challenges to "final agency action for which there is no other adequate remedy in a court."  *See* 5

U.S.C. §§ 702, 704; *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 18 (D.C.

Cir. 2006).

The APA's cause of action would not be applicable here because the Tribe does not

attempt to identify any government action that could be subject to judicial review.  The APA

defines "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief,

or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13).  Whether there has

been a *final* agency action for purposes of an APA claim is a "threshold" question; if a party fails

to point to a final agency action, the claim fails to state a claim pursuant to Rule 12(b)(6). *Fund*

*for Animals, Inc.*, 460 F.3d at 18 n.4; *see also Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)

(defining what makes an agency action "final").  The closest the Tribe comes to identifying a

final agency action are its references to the Deferral Agreement and Midview Exchange

Agreement.  *See, e.g.,* Am. Compl. ¶¶ 212, 257.  But, even assuming those were valid final

agency actions, those actions occurred well outside the applicable six-year statute of limitations

and the Tribe's challenges thereto (*see* claims one, two, four, five, and eight) would be time-

barred.  *See* 28 U.S.C. § 2401(a); *Sendra Corp. v. Magaw*, 111 F.3d 162, 165 (D.C.Cir.1997);

*Impro Prods., Inc. v. Block*, 722 F.2d 845, 850–51 (D.C. Cir. 1983) (right of action accrues on

the date of the agency action); *see also* Am. Compl. ¶124 (parties to Midview Exchange signed

transfer agreement in 1968), ¶ 153 (Paragraph 5 of 1965 Deferral Agreement establishing forty-

year time frame to complete Central Utah Project), ¶ 161 (1986 indefinite postponement to

Upalco Unit); ¶¶ 167-168 (Ute Indian Unit "abandoned" in 1980 Bureau of Reclamation report).

Similarly allegations under the 1923 decree (claim six) fail to identify any government action

that occurred within the last six years.  *See, e.g.,* Am. Compl. ¶¶ 244-246.

### III.   The Amended Complaint's Third, Fifth, Sixth, Seventh, Ninth, Tenth, and Eleventh Claims Fail to Identify Any Enforceable Trust Duty and, Even if They Had, an Adequate Remedy Would Exist in the Court of Federal Claims

The federal district courts lack jurisdiction to enforce trust duties without a mandatory

statutory duty.  The Tribe's third, fifth, six, seventh, ninth, tenth, and eleventh claims should be

dismissed because the Amended Complaint fails to identify a mandatory statutory duty.  And

even if the Tribe had identified enforceable trust duties, the claims alleging breach of those

duties could not be brought in this Court because an adequate remedy is available in the Court of Federal Claims.

> A.     **The Tribe has Failed to Identify any Statute or Regulation that Creates a Mandatory Statutory Trust Duty**

The Tribe's third, fifth, sixth, seventh, ninth, tenth, and eleventh claims allege that the United States has acted contrary to some "trust obligation" in its management of water rights or water projects. *See* Am. Compl. ¶¶ 222–24, 236-240, 245, 249–252, 261–263, 265–67, 271–72. But the Tribe has failed to state a claim upon which relief can be granted because it has failed to identify any statute or regulation that contains the alleged trust obligations.[17]

While there is "a general trust relationship between the United States and the Indian people," that general trust relationship does not, by itself, create legally enforceable obligations for the United States. *United States v. Mitchell*, 463 U.S. 206, 225 (1983); *see also United States v. Jicarilla Apache Nation*, 564 U.S. 162, 173 (2011). Instead, the United States "incurs specific fiduciary duties" only "when it manages or operates Indian lands or resources"—for example, when it manages forest lands that are leased for harvest or holds tribal assets for investment. *Inter Tribal Council of Arizona, Inc. v. Babbitt*, 51 F.3d 199, 203 (9th Cir. 1995) (citing *Mitchell*, 463 U.S. at 226); *see also Jicarilla*, 564 U.S. at 178. Even then, however, "[t]he trust obligations of the United States to the Indian tribes are established and governed by statute rather than the common law . . . ." *Jicarilla*, 564 U.S. at 165.

In order to bring a claim for breach of trust, "a Tribe must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed

---

[17] The Tribe has not invoked the APA for these breach of trust claims, and they therefore fail, as addressed above, to state a claim for the separate reason of failing to identify any private right of action. *See El Paso Natural Gas Company v. United States of America,* 750 F. 3d 863, 871 (D.C. Cir. 2014).

faithfully to perform those duties." *United States v. Navajo Nation,* 537 U.S. 488, 506 (2003)

(citation omitted). "The analysis [under this first hurdle] must train on specific rights-creating or

duty-imposing statutory or regulatory prescriptions." *El Paso Nat. Gas Co. v. United States*, 774

F. Supp. 2d 40, 51–52 (D.D.C. 2011), *aff'd*, 750 F.3d 863 (D.C. Cir. 2014). "[A]n Indian tribe

must identify statute or regulations that both impose a specific obligation on the United States

and 'bear the hallmarks of a conventional fiduciary relationship.'" *Hopi Tribe v. United States*,

782 F.3d 662, 667 (Fed. Cir. 2015) (citation omitted) (quoting *United States v. Navajo Nation*,

556 U.S. 287, 301 (2009) (*Navajo II*)). "[A] statute or regulation that recites a general trust

relationship between the United States and the Indian People is not enough to establish any

particular trust duty." *Hopi Tribe*, 782 F.3d at 667 (citation omitted).

Here, the Tribe's third, fifth, sixth, seventh, ninth, tenth, and eleventh claims allege that

the United States has breached fiduciary duties by failing to provide an accounting and, more

broadly, failing to enforce, preserve, protect, secure, and develop reserved water rights.[18]  The

problem, however, is that, of the twenty-two alleged sources of fiduciary obligations, not a single

one amounts to an enforceable trust obligation under the Supreme Court precedent discussed

above.  *See* Am. Compl. ¶ 8 (listing alleged sources).  Two of the twenty-two can be

immediately disposed of because they are sources other than the Constitution or a statute or

regulation.  *See* Am. Compl. ¶ 8(l), (n).  Most of the remaining twenty do not even relate to

accounting, irrigation, or water rights at all, let alone create the alleged fiduciary obligations that

---

[18] This latter allegation is articulated in several ways: failure to provide for water storage (Claim 5, ¶¶ 237-240; Claim 9, ¶ 262); failure to secure sufficient water rights (Claim 6, ¶ 245; Claim 7, ¶ 252; Claim 10, ¶¶ 266-267); and failure to maintain the Irrigation Project to enable efficient delivery (Claim 3 ¶ 224).  To the extent the Tribe is arguing that the duty in question arose in a contract, this would be insufficient because the United States' trust responsibilities are governed by statute and regulation, not contract.

form the bases of the Tribe's trust claims.  For ease of reference, we list the alleged sources in

the same order as the Complaint and briefly explain why each is insufficient:

- The Treaty of Guadalupe Hidalgo of 1848 does not suffice because Congress previously passed legislation to resolve any claims under that Treaty, requiring that any claims be brought within two years of enactment.  *See Daniels v. United States*, No. 17-1598 C, 2018 WL 1664476 at *7 (Fed. Cl. Apr. 6, 2018) (referencing Act to Settle Private Land Claims in California, 9 Stat. 631 (1851)).  The Treaty itself ceded lands in what had been Mexico to the United States.  *See Martinez v. Gonzales*, No. 13-cv-922, 2014 WL 12650983 at *3 (D.N.M. June 30, 2014).

- The Executive Order of October 3, 1861, established the Uintah Valley Reservation, but says nothing about water rights or irrigation.  *See* 1 Kapp. 900.

- The Act of May 5, 1864, directs the Secretary of the Interior to survey and apportion Indian lands in Utah for sale, and appropriated money $30,000 for the Commission of Indian Affairs to expend on agricultural improvements in the Uintah Valley.  *See* 13 Stat. 63.  Neither discretionary authorizations to act nor appropriations such as these create fiduciary duties.  *See Wolfchild v. United States*, 731 F.3d 1280, 1292 (Fed. Cir. 2013); *Hopi*, 782 F.3d at 670.

- The Act of June 15, 1880, only references irrigation in requiring commissioners who were to negotiate with the Indians to report on the acreage of allotted lands that were tillable without irrigation and the amount irrigation that may be required.  *See* 21 Stat. 199.

- The Executive Order or January 5, 1882, established what was known as the Uncompahgre Reservation, but says nothing about water rights or irrigation.  *See* 1 Kapp. 901.

- The Act of February 8, 1887 (25 U.S.C. §§ 381 et seq) does not provide grounds for a suit alleging breach of a statutorily-created trust duty.  *See Grey v. United States*, 21 Cl. Ct. 285, 293-294 (1990), *aff'd* 935 F.2d 281 (Fed. Cir. 1991), *cert. denied*, 502 U.S. 1057 (1992).

- The Act of March 1, 1899, appropriated money to, among other things (and in the Secretary's discretion), "construct ditches and reservoirs, purchase and use irrigation tools and appliances, and purchase water rights on Indian reservations," and authorized the Secretary, "in his discretion, to grant rights of way for the construction and maintenance of dams, ditches, and canals through the Uintah Indian Reservation in Utah, for the purposes of diverting and appropriating waters of the streams in said reservation for useful purposes."  *See* 30 Stat. 924, 940, 941.  Neither discretionary authorizations to

act nor appropriations such as these create enforceable trust duties. *See Wolfchild*, 731 F.3d at 1292; *Hopi*, 782 F.3d at 670.

- The Reclamation Act of 1902 (32 Stat. 388) only provides for authority to purchase or condemn lands for irrigation purposes. 32 Stat. 388; *See also Grey*, 21 Cl. Ct. at 295–96.

- The Act of June 19, 1902, required that allotments made to the Indians of the Uintah Indian Reservation be allotments on agricultural lands, but delineates no Secretarial responsibilities for agriculture or irrigation. *See* 32 Stat. 744.

- The Act of March 3, 1905 (33 Stat. 1048, 1069–70) and amendment thereto in the Act of May 14, 1920 (41 Stat. 599, 599-600) relate to grazing on the Uintah Reservation and the opening of unallotted lands for public entry; they say nothing of irrigation other than to provide that the Secretary "*may* also set apart and reserve a reservoir site or other lands necessary to preserve and protect water supply for Indians or for general agricultural development, and *may* confirm such rights to water theron as have already accrued." 33 Stat. at 1070. Discretionary authorizations do not create any enforceable trust duties. *See Wolfchild*, 731 F.3d at 1292.

- The Department of Interior Appropriation Acts of June 21, 1906 (Pub. L. No. 59-258) and March 3, 1909 (35 Stat. 811), merely set aside money for constructing the irrigation system and do not create enforceable trust duties. *See Hopi*, 782 F.3d at 670; *Samish Indian Nation v. United States*, 657 F.3d 1330, 1336 (Fed.Cir.2011), *vacated in part on other grounds*, 133 S. Ct. 423 (2012). The 1906 Act states that the Irrigation Project is to be held in trust for Tribe. *See* Pub. L. No. 59-258 ("the title thereto until otherwise provided by law shall be in the Secretary of the Interior in trust for the Indians"). But bare "in trust" language is not sufficient to establish a fiduciary duty to manage, develop, protect or fund resources and infrastructure on the Irrigation Project. *See United States v. Mitchell,* 445 U.S. 535, 541-542 (1980); *Hopi Tribe v. United States*, 782 F.3d at 665; *see also N. Slope Borough v. Andrus*, 642 F.2d 589, 612 (D.C. Cir. 1980) ("Without an unambiguous provision by Congress that clearly outlines a federal trust responsibility, courts must appreciate that whatever fiduciary obligation otherwise exists, it is a limited one only.")

- The 1936 Leavitt Act, 25 U.S.C. §§ 389, 389a-e, does not create fiduciary duties. *See Grey*, 21 Cl. Ct. at 294 n.11.

- The Act of May 28, 1941 (55 Stat. 209) clarified the Secretary's authority under the 1936 Leavitt Act with respect to the Irrigation Project. The statute addresses cancelation, deferment, and adjustment of irrigation charges. The Act also authorizes the Secretary to transfer water rights or contract for operation and maintenance. It does not delineate any management duties.

- The 1956 Colorado River Storage Project Act's (43 U.S.C. §§ 620–620o) only reference to Indian lands is to those of the Navajo Nation, *id.* § 620e, and only references Ute Tribe-specific project units in terms of prioritizing planning reports, *id.* § 620a.

- The 25 U.S.C. § 177, which addresses conveyances of land or interests in land between Indians and non-Indians, does not set forth any specific, mandatory fiduciary duties with respect to the United States.  It is also referenced in the 1992 Reclamation Projects Authorization and Adjustments Act, Pub. L. No. 102-575, 106 Stat. 4600, as not applying to any water rights in the 1990 Compact.

- The Interior regulations cited as 22 Fed. Reg. 10479, 10,637–38 (Dec. 24, 1957), were found at 25 C.F.R. Part 199 (C.F.R. 1966 ed.) but were replaced in 42 Fed. Reg. 30361 (June 14, 1977) and consolidated into 25 C.F.R. Part 191.

- The Interior regulations in 25 C.F.R. Part 171 do not create an enforceable trust duty. Even in the more-recent amendments to Part 171, the Department of the Interior was clear that it does not have a trust obligation to operate and maintain irrigation projects. *See* Final Rule, 73 Fed. Reg. 11,028, 11,031 (2008).

- The 1992 Reclamation Projects Authorization and Adjustments Act, Pub. L. No. 102-575, 106 Stat. 4600, confirms that the Secretary retains any trust responsibilities that may exist for the Irrigation Project (§ 203(f)(2)), though it does not delineate what those responsibilities may be.  The Act also authorizes the Secretary to enter agreements with third-parties to operate, maintain, rehabilitate, and construct some or all of the irrigation project facilities (§ 203(f)(1)(B)).

- The Equal Protection and Due Process Clauses do not delineate specific duties with respect to the management of Indian water rights, irrigation, or any other Indian resources.

The Tribe would also fail if it is alleging that the sources collectively create a system of comprehensive federal control to trigger jurisdiction.  For one, the United States does not have a general trust duty to provide, develop, or fund agricultural infrastructure.  *See White Mountain Apache Tribe v. United States*, 11 Cl. Ct. 614, 630 (1987), *aff'd* 31 F.3d 1176 (Fed Cir. 1994), *cert. denied*, 511 U.S. 1030 (1994); *Gila River Pima-Maricopa Indian Cmty. v. United States*, 684 F.2d 852, 865 (Ct. Cl. 1982).  The fact that the United States has some role in (or even control over) irrigation is irrelevant because "[t]he Federal Government's liability cannot be

premised on control alone." *Navajo II*, 556 U.S. at 301.  But, in any event, the disparate statutes

and regulations the Tribe identifies "do not give the kind of 'full responsibility' and 'elaborate

control' over water resources that the Supreme Court found to support a fiduciary relationship

regarding timber resources in *Mitchell II* . . . ."  *Hopi*, 782 F.3d at 671.

In *Mitchell II*, the Supreme Court based its conclusion on the "pervasive" role the

Department of the Interior played in "virtually every aspect of forest management including the

size of sales, contract procedures, advertisements and methods of billing, deposits and bonding

requirements, administrative fee deductions, procedures for sales by minors, allowable heights of

stumps, tree marking and scaling rules, base and top diameters of trees for cutting, and the

percentage of trees to be left as a seed source."  463 U.S. at 219–20.  "The regulatory scheme

was designed to assure that the Indians receive the benefit of whatever profit [the forest] is

capable of yielding."  *Id.* at 221–22 (citation and internal quotations omitted).

Here, the Tribe has presented nothing even close to that with regard to water rights and

irrigation.  Indeed, another court addressing the issue has held, applying the *Mitchell II* analysis,

that 25 C.F.R. Part 171 does not create the same type of comprehensive responsibility for the

delivery and apportionment of water as do the statutes and regulations covering the preservation

and sale of timber on allotted lands.  *Grey*, 21 Cl. Ct. at 293-94.

### B.    The Court of Federal Claims Would Provide an Adequate Remedy for Breach of Any Enforceable Trust Duties the Tribe Had Identified

Even if the Tribe had identified enforceable trust duties, the claims alleging breach of

those duties could not be brought in this Court.  The APA's cause of action applies only where

there is "no other adequate remedy" available in another court.  5 U.S.C. § 704; *Citizens for*

*Responsibility & Ethics in Washington v. U.S. Dep't of Justice*, 846 F.3d 1235, 1244–45 (D.C.

Cir. 2017). Here, however, an adequate remedy would be available in the Court of Federal

Claims.

The Tribe's third, fifth, sixth, seventh, ninth, tenth, and eleventh claims are all based on

the same basic premise: the United States is violating its fiduciary obligations to the Tribe by

failing to manage the Irrigation Project and the Tribe's water rights in a way that accomplishes

the Tribe's interest of developing water rights through infrastructure. But, assuming the Tribe is

correct on the alleged duties (as detailed above, it is not)—and assuming other threshold

requirements for justiciability are met—the Tribe would have a remedy available to it in the

Court of Federal Claims in the form of a suit under the Tucker Act, 28 U.S.C. § 1491, alleging

breach of money-mandating fiduciary duties. *See Mitchell II*, 463 U.S. at 212–219, *Navajo II*,

556 U.S. at 290–291. Claims for money damages in the Court of Federal Claims under the

Tucker Act (or Indian Tucker Act[19] as the case may be) "is presumptively an 'adequate remedy'

for § 704 purposes." *Telecare Corp. v. Leavitt*, 409 F.3d 1345, 1349 (Fed. Cir. 2005); *but see*

*Kidwell v. Dep't of Army*, 56 F.3d 279, 284-85 (D.C. Cir. 1995). It is the Tribe's burden to

demonstrate the remedies available in the Court of Federal Claims are not adequate. *Consol.*

*Edison Co. of New York v. U.S., Dep't of Energy*, 247 F.3d 1378, 1383 (Fed. Cir. 2001). The

Tribe cannot meet that burden here. Indeed, the Tribe filed such a suit (the "CFC Action") the

day before it filed the present one. *See* Amended Complaint, ECF No. 18, *Ute Indian Tribe of*

*the Uintah & Ouray Indian Reservation v. United States*, No. 18-359 L (Fed. Cl.) (Hodges, J.),

attached hereto as Exhibit E. The factual allegations in the CFC Action are substantially similar

---

[19] 28 U.S.C. § 1505, or the Indian Tucker Act, was intended to give "tribal claimant [] the same access to the Court of Claims provided to individual claimants by [the Tucker Act, 28 U.S.C. § 1491], and the United States is entitled to the same defenses at law and in equity under both statutes." *U.S. v. Mitchell*, 445 U.S. 535, 540 (1980); *see also Mitchell II*, 463 U.S. at 212 n.8.

to those in this case (if not identical in many portions), all culminating with the idea that the

United States has violated fiduciary, statutory, and contractual duties owed to the Tribe in its

protection of the Tribe's water rights and management of the Irrigation Project.  *See generally id.*

The chief difference between the lawsuits is that the CFC Action seeks monetary damages for

past harm, while this lawsuit seeks prospective relief.

The Court of Federal Claims clearly could provide an adequate remedy on the breach of

trust claims by granting retrospective monetary relief for the alleged breaches of fiduciary duty.[20]

*See* 28 U.S.C. §§ 1491(a)(1), 1505; *Consol. Edison*, 247 F.3d at 1384–85.  But the same is true

for any prospective relief.  Any determination in the Court of Federal Claims will naturally

require that court to opine on the very declaratory questions of law that the Tribe has presented

to this Court.  If those questions were resolved in the Tribe's favor, mutual collateral estoppel

would resolve those questions going forward.  *See Telecare Corp.*, 409 F.3d at 1350 ("a final

decision in [an] [Indian] Tucker Act case . . . will finally resolve the issue and as a practical

matter make repeated suits unnecessary").

It is insufficient for the Tribe to try to differentiate its two suits by pointing out that the

case in this Court does not seek money damages.  *See* Am. Compl. ¶ 11.  In considering this

issue, this Court "must look beyond the form of the pleadings to the substance of the claim[s]."

*Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urban Dev.,* 480 F.3d 1116, 1124 (Fed.

Cir. 2007); *see Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) (stating that an "alternative

---

[20] The United States does not concede that the claims are viable under the Tucker Act as presently
plead because, among other reasons, the Tribe has not identified any money-mandating duties,
*see United States v. Navajo Nation*, 556 U.S. 287, 301 (2009).  Indeed, we will be moving to
dismiss the Tribe's Amended Complaint in the companion Court of Federal Claims case.  The
point is that, if the claims were viable, the Court of Federal Claims could provide an adequate
remedy, thereby making the APA's cause of action unavailable in district court.

remedy need not provide relief identical to relief under the APA, so long as it offers relief of the 'same genre'"); *Kidwell*, 56 F.3d at 284 ("[W]e look to the complaint's substance, not merely its form.").

> Where [, as here,] the equitable relief lacks considerable value independent of any future potential for monetary relief, or when the equitable relief requested in the complaint is negligible in comparison with the potential monetary recovery, the complaint will be deemed one for damages.

*Bublitz v. Brownlee*, 309 F. Supp. 2d 1, 7 (D.D.C. 2004) (internal citations and quotation marks omitted).

Nor can the Tribe use any declaratory relief sought in this Court for a future case in the Court of Federal Claims. The Federal Circuit has expressly ruled that district courts do not have jurisdiction to entertain "predicate" lawsuits, i.e. lawsuits brought to establish rights for later money damages suits in the Court of Claims. *See Christopher Vill. L.P. v. United States*, 360 F.3d 1319, 1329 (Fed. Cir. 2004). The Tribe's third, fifth, sixth, seventh, ninth, tenth, and eleventh claims should therefore be dismissed for failure to identify a cause of action.[21]

---

[21] There is some disagreement in the D.C. Circuit as to whether dismissal would be proper under Rule 12(b)(1) or Rule 12(b)(6). Specifically, it appears cases in the D.C. Circuit have generally dismissed actions involving the Tucker Act under Rule 12(b)(1)—as jurisdictional—because Court of Claims jurisdiction is exclusive where the claims "explicitly or in essence seek money damages in excess of $10,000." *Greenhill v. Spellings*, 482 F.3d 569, 573 (D.C. Cir. 2007); *see also Desert Sunlight 250, LLC v. Lew,* 169 F. Supp. 3d 91, 98 (D.D.C. 2016). Nevertheless, in *Trudeau v. Federal Trade Commission*, the D.C. Circuit held that a district court had erred (albeit, harmlessly) in dismissing an action under 12(b)(1) where there was no "final agency action." 456 F.3d 178, 187 (D.C. Cir. 2006). According to *Trudeau*, section 702's waiver of sovereign immunity "is not limited to APA cases—and hence that [waiver] applies regardless of whether the elements of an APA cause of action [under section 704] are satisfied." *Id.* Thus, where a party fails to identify a final agency action, the claims fail for failure to state a claim rather than for want of jurisdiction. Whether this holding extends to cases where a party fails to meet 704's requirement that "no other adequate remedy" is available is not clear.

IV.     **The Tribe's Third and Eleventh Claims Were Expressly Waived and Released in the 2012 Settlement Agreement**

The Tribe's third claim (breach of trust relating to management of the Irrigation Project) and eleventh claim (failure to provide an accounting) should be dismissed because they were expressly waived and released in the 2012 Settlement Agreement. A settlement, for enforcement purposes, has the same attributes as a contract. *Gonzalez v. Dep't of Labor*, 609 F.3d 451, 457 (D.C. Cir. 2010). Settlements to which the government is a party are interpreted according to federal law. *Prudential Ins. Co. of Am. v. United States*, 801 F.2d 1295, 1298 (Fed. Cir. 1986); *Keydata Corp. v. United States,* 504 F.2d 1115, 1123 (Ct. Cl. 1974). If the language of a settlement clearly bars future claims, the plain language governs. *Halldorson v. Sandi Grp.*, 934 F. Supp. 2d 147, 153 (D.D.C. 2013). Indeed, it is axiomatic that binding settlement agreements, stipulations, and stipulated judgments are enforceable in subsequent actions to bar re-litigation of the compromised or resolved claims. *See, e.g., Peckham v. United States*, 61 Fed. Cl. 102, 109 (2004). Waiver is the "intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). Any exclusions from a waiver or release must be clear, explicit, and "manifest" in the agreement itself. *United States v. William Cramp & Sons Ship & Engine Bldg. Co.*, 206 U.S. 118, 128 (1907); *Merritt-Champman & Scott Corp. v. United States*, 458 F.2d 42, 44–45 (Ct. Cl. 1972) (en banc) (per curiam).

Here, in exchange for $125 million, the Tribe "waived and released any and all claims . . . known or unknown" based on harms or violations occurring before March 8, 2012 that relate to the United States' "management or accounting of [the Tribe]'s trust funds or . . . non-monetary trust assets or resources." Ex. D (Settlement Agreement) ¶ 4. This waiver covers claims three and eleventh in the Amended Complaint.

With respect to the third claim, the Tribe alleges that fiduciary duties attach to the United States' management of the Irrigation Project.  Am. Compl, ¶¶ 72-92, 224.  The United States disagrees with that legal conclusion.  But, even if the Tribe were correct, it would mean that alleged trust-violating mismanagement of the Irrigation Project would be covered by the terms of the 2012 Settlement Agreement.  The Tribe's third claim was waived and released by Paragraph 4 of the Settlement Agreement because all allegations that the Federal Defendants have mismanagement, deferred maintenance, or otherwise failed to complete the Irrigation Project are based on known harms or violations occurring before March 8, 2012.  *See* Am. Compl. ¶¶ 143-148.  The Tribe's third claim and allegations that the United States breached its trust duties to the Tribe through carriage agreements and "informal operating procedures" fall squarely within that category.  *Compare* Am. Compl, ¶¶ 72-92, 138-142, 224 *with* Ex. D (Settlement Agreement, ¶ 4).

The Tribe similarly waived and released its eleventh claim for a historical accounting related to administration of the Irrigation Project.   *See* Am. Compl. ¶¶ 269-273.  Paragraph 4 of the 2012 Settlement Agreement unambiguously waived and released historical claims relating to the United States' accounting of the Tribe's trust funds and non-monetary trust assets or resources.  *See* Ex. D ¶ 4.

Accordingly, the Tribe's third and eleventh claims should be dismissed pursuant to Rule 12(b)(6) or—in the alternative—summary judgment should be granted to the Federal Defendants under Rule 56.

## V.      The Tribe's First, Second, Fourth, and Fifth Claims under the Deferral Agreement were Expressly Waived and Released in § 507 of CUPCA

The Tribe's first, second, fourth, and fifth claims all relate to pre-October 30, 1992 breaches of the Deferral Agreement and therefore fall under the scope of CUPCA's § 507 waiver and release of claims.  *See* Am. Compl. ¶¶ 209-220, 226-241.  Congress expressly provided in

CUPCA that the Tribe would waive and release, upon receipt of §§ 504-506 monies, "any and all claims relating to its water rights" including the "right to develop lands" covered by the 1965 Deferral Agreement.  *See* Pub. L. No. 102-575, §507, 106 Stat. 4600, 4655.  The Ute Indian Rights Settlement and §§ 504-506 monies were intended to compensate the Tribe in lieu of performance of the Deferral Agreement.  106 Stat. at 4651-55; *accord Grey*, 21 Cl. Ct. at 298 (Salt River Water Rights Settlement Act extinguished claims against the United States for damages for deprivation of water rights through its implementation but Congress recognized a cause of action for claims arising out of the Settlement Act).  In 2006 lawsuit, the Tribe acknowledged that payment of the funds identified in §§ 504-506 had been made.  *See* Ex. H ¶¶ 15-18, 36.  The Tribe further acknowledged that these CUPCA payments were "designed to redress certain of the Tribe's claims arising from the failure of the United States to construct specified water projects required by various agreements between the Tribe and the United States."  *Id*. ¶15.  The waiver of claims in CUPCA § 507 was therefore triggered and the Tribe's first, second, fourth, and fifth claims under the Deferral Agreement have been waived and released.  Those claims should be dismissed pursuant to 12(b)(6).

**VI.     The Court Lacks Jurisdiction and the Tribe Fails to State a Claim for the Eighth Claim Related to the Midview Exchange Agreement**

The Tribe's eighth claim alleges that, under the Midview Exchange Agreement, the Tribe was given beneficial ownership of the Midview Property, and that the Federal Defendants have "acted in a manner that is inconsistent with the Tribe's beneficial ownership of the Midview Property" by issuing a right-of-way without the Tribe's consent.  Am. Compl. ¶¶ 255-257.  The Tribe requests a decree requiring specific performance, including the transfer of the Midview Property into trust for the benefit of the Tribe, or in the in alternative, a declaration from this

Court that the Midview Exchange Agreement is invalid.  *Id.*  ¶¶ 258-259.  The claim is not viable in this Court under either theory.

First, the Tribe asserts that "Indian Reserved Water Rights are appurtenant to Reservation Lands, and therefore fall within the purview of the Indian Non-Intercourse Act, 25 U.S.C. § 177."  Am. Compl. ¶¶ 255-256.  For purposes of this motion, the United States does not dispute that Indian reserved water rights are subject to § 177.  Federal Defendants contend that the plain language of the Agreement did not authorize the Midview Property to be transferred to the Tribe.  *See* Ex. B (Midview Exchange), ¶¶ 6-8.  But, even if it had, there would be no claim against the United States under the Indian Non-Intercourse Act for failing to do so because, as the Tribe acknowledges, that statute's purpose was "to prevent unfair, improvident or improper disposition by Indians of lands owned or possessed by them to other parties, *except the United States*, without the consent of Congress."  Am. Compl. ¶ 256 (emphasis added).

Any right-of-way or property transfer *by the United States* would not be prohibited by 25 U.S.C. § 177.  The case cited by the Tribe in the Amended Complaint (¶ 256) recognizes this very principle.  *See Federal Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 118-119 (1960).  "[T]here is no such requirement with respect to conveyances to or condemnations by the United States or its licensees; 'nor is it conceivable that it is necessary, for the Indians are subjected only to the same rule of law as are others in the State.'"  *Id*. at 119; *see also Henkel v. United States,* 237 U.S. 43, 50-51 (1915) (Secretary within his authority to condemn the land).  And even if that were not the case, any claim that that 25 U.S.C. § 177 invalidated the Midview Agreement would have accrued decades ago when the Agreement was signed in 1967.  28 U.S.C. § 2401(a)("every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues").

34

Second, the Tribe's request for specific performance of the alleged contractual duty is outside the scope of this Court's jurisdiction.  The Tucker Act and Little Tucker Act grant the Court of Federal Claims (and in limited circumstances, the district courts) jurisdiction over contract claims.  28 U.S.C. §§ 1346(a)(2), 1491(a); *see Bill Barrett Corp. v. U.S. Dep't of Interior*, 601 F. Supp. 2d 331, 336 (D.D.C. 2009) (affirming Court of Federal Claims jurisdiction over contract-based claims) (citing *Amber Res. Co. v. United States*, 538 F.3d 1358, 1378 (Fed. Cir. 2008).  The Tucker Act and Little Tucker Act, however, make a claim for money damages the sole remedy in a breach of contract action against the government and therefore impliedly forbid declaratory relief and specific performance.  *Sharp v. Weinberger*, 798 F.2d 1521, 1523 (D.C. Cir. 1986).

Accordingly, the Tribe's eighth claim should be dismissed under Rule 12(b)(1) for lack of jurisdiction or under Rule 12(b)(6) for failure to state a claim.

## VII.    The Court Lacks Jurisdiction Over the Tribe's First, Second, Fourth, and Fifth Claims Regarding the Deferral Agreement

The Tribe's first, second, fourth, and fifth claims are also contract-based claims, but with respect to the Deferral Agreement.  The first claim alleges that the Tribes is entitled to the benefit of its bargain under the 1965 Deferral Agreement and requests a declaration that the agreement is a binding quantification of the Tribe's *Winters* reserve water rights.  Am. Compl. ¶ 216.  The second claim alleges that the Department of Interior has failed to recognize the 1965 Deferral Agreement as a binding quantification of the Tribe's *Winters* reserved water rights and requests a declaration that the Tribe has administrative, regulatory, legislative, and adjudicatory jurisdiction, and the authority to encumber its *Winters* reserved water rights.  *Id*. ¶¶ 219-220. The fourth claim alleges that the Deferral Agreement remains a valid contract among the Federal Defendants, the Central Utah Water Conservancy District, and the Tribe and requests a

declaration that the Deferral Agreement is a valid and binding agreement, or alternatively, a declaration that CUPCA's § 507 waiver is limited and does not impact contractual rights under the Deferral Agreement.  *Id.* ¶¶ 227-232.  And the fifth claim alleges Federal Defendants have failed to "secure storage and related water works" that were recognized in the Deferral Agreement and requests a declaration that Federal Defendants have an ongoing statutory, contractual, and trust obligation to develop the full amount of the Tribe's *Winters* reserved water rights.  *Id.* ¶¶ 238-241.  Each should be dismissed because the district courts do not have jurisdiction to issue declaratory relief in breach of contract cases against the United States and, in any event, the claims would fall outside the applicable six-year statute of limitations.

First, as discussed above, the Tucker Act and Little Tucker Act grant the Court of Federal Claims (and, in limited circumstances, the district courts) jurisdiction over breach of contract claims against the government.  28 U.S.C. §§ 1346(a)(2), 1491(a); *see Bill Barrett Corp.*, 601 F. Supp. 2d at 336.  In so doing, they impliedly forbid declaratory relief.  *Sharp*, 798 F.2d at 1523. Here, the Tribe's first, second, fourth, and fifth claims all seek declaratory relief.  Am. Compl. ¶¶ 216, 220, 232-233, 241.  The Court therefore lacks jurisdiction and should dismiss these claims.

Second, the Tribe's claims are time-barred because the Complaint was filed decades after the statute of limitations expired.  "[E]very civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."  28 U.S.C. § 2401(a).  Claims accrue as soon as a Plaintiff can "maintain a suit in court."  *Spannaus v. U.S. Dep't of Justice*, 824 F.2d 52, 56-57 (D.C. Cir.1987); *see also Menominee Tribe v. United States*, 726 F.2d 718, 721 (Fed. Cir. 1984) (statutes of limitations accrue when plaintiffs "were capable enough to seek advice, launch an inquiry, and discover through their agents the facts underlying their current claim").  The Deferral Agreement was

signed by the parties in 1965.  *See* Ex. A.  While it is true that over the decades that followed

some of the provisions of the Deferral Agreement were not met, these facts were known to the

Tribe since the 1980s.  *See* Am. Compl. ¶¶ 153-155 (Deferral Agreement set a forty-year

timeframe to complete Central Utah Project), ¶ 161 (1986 indefinite postponement to Upalco

Unit); ¶ 168 (Ute Indian Unit "abandoned" in 1980 Bureau of Reclamation report).  Prior to the

enactment of CUPCA, Tribe Chairman Luke Duncan testified at a congressional hearing in 1988

acknowledging that Title V of CUPCA, was a compromise by the Tribe, the State of Utah, the

water district, and the federal government to settle claims under the Deferral Agreement.  *See*

*Ute Indian Water Settlement Act of 1988: Hearing on H.R. 5307 Before the H. Comm. on*

*Interior and Insular Affairs*, 100th Cong. 24 (1988) (Statement of Rep. Howard Nielson) ("1988

H.R. Hrg."); *see also* Ex. F at 225 (Testimony of Luke Duncan).  Claims under the Deferral

Agreement accrued when the Tribe "knew or should have known" that provisions under the

Deferral Agreement would not be met.  Having knowledge of the material facts giving rise to

claims under the Deferral Agreement in the 1980s, those claims are now time-barred.

The Tribe's first, second, fourth, and fifth claims under the Deferral Agreement should be

dismissed under Rule 12(b)(1) because the Court lacks jurisdiction.

**VIII.  The Tribe Fails to State a Claim for Violation of the Equal Protection Guarantee**

The Tribe's twelfth claim (the equal protection claim) should be dismissed because the

Tribe fails to allege discriminatory intent and lacks standing, as a sovereign government, to

assert a violation of its members' equal protection rights.  Nor does the Tribe allege any conduct

within the statute of limitations.

### A. The Tribe Fails to Allege Discriminatory Intent

The Tribe claims that water management in the Uinta Basin "favors non-Indian water users in the Uinta Basin to the detriment of the Tribe and its members, resulting in the diminishment of the Tribe's reserved water rights on the impermissible basis of race, national origin, and religion."  Am. Compl. ¶ 276.  Throughout the Amended Complaint, the Tribe discusses the historical maintenance and administration of the Irrigation Project in actions that occurred well beyond the permissible statute of limitations, but the Tribe fails to allege any discriminatory intent.

To succeed on a claim based upon unlawful racial discrimination under the equal protection guarantee, a plaintiff must demonstrate the government's action had "a racially discriminatory purpose." *Washington v. Davis*, 426 U.S. 229, 238–42 (1976).  Although the discriminatory purpose need not be explicit, and can be demonstrated through conduct, "disproportionate impact alone is not sufficient to prove discriminatory intent unless no other reasonable inference can be drawn." *McCleskey v. Kemp*, 753 F.2d 877, 892 (11th Cir. 1985) (*citing Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264-66 (1977)). Any differences in treatment on the basis of tribal membership, however, is not race-based discrimination, but rather would be political discrimination against a tribe and its members, and therefore would only need to be rationally connected to furthering a legitimate government purpose. *See Narragansett Indian Tribe v. National Indian Gaming Comm'n*, 158 F.3d 1335, 1341 (D.C. Cir. 1998); *see also Kahawaiolaa v. Norton,* 386 F.3d 1271, 1279 (9th Cir. 2004), *cert. denied,* 545 U.S. 1114 (2005) ("[T]he recognition of Indian tribes remains a political, rather

than racial determination.  Recognition of political entities, unlike classifications made on the

basis of race or national origin are not subject to heightened scrutiny.").[22]

Even assuming the claim was one of racial discrimination, the Tribe has failed to state a

claim.  The Tribe asserts that Federal Defendants have "delegated authority in a manner that

favors non-Indian waters users to the detriment of the Tribe and its members."  Am. Compl. ¶

276.  Yet the Tribe never specifically alleges intentional discrimination, merely alleging

disproportionate benefits to non-Indian water users "over the life of the UIIP."  *Id.* ¶ 99.  The

Tribe alleges that a "disproportionately high portion of the UIIP Lands designated as

[temporarily non-assessable ("TNA")] or [permanently non-assessable ("PNA")] are Indian trust

lands, owned either by the Tribe or tribal members" yet also acknowledges that in 2008 "the

primary reasons for designating lands as TNA or PNA are limiting factors such as topography,

soil conditions, or the inability of the UIIP to deliver water."  Am. Compl. ¶¶ 98, 94.  These

factors are not intentionally discriminatory nor based on race, national origin, or religion.  While

the Tribe alleges water storage in Uinta Basin Replacement Projects were "designed to

disproportionately allocate benefits to non-Indians and burdens to the Tribe and its members,"

those actions occurred in the 1990s and focus on the "disproportionate losses to the Ute Tribe"

and "dismal benefits to the Tribe."  *Id.* ¶ 207.  These allegations[23] are decades beyond the statute

of limitation, address group allocations, and fail to allege discriminatory intent.

---

[22] Because the APA's review standard effectively mirrors this rational basis standard, courts often review equal protection claims within an accompanying APA claim.  *See, e.g., Cooper Hosp. / Univ. Med. Ctr.. v. Burwell*, 179 F. Supp. 3d 31, 47 (D.D.C. 2016).  Of course, the Tribe has not brought an APA claim here.

[23] As pled, this claim is not premised on intentional discrimination but rather the erroneous belief that the United States owes the Tribe a duty of undivided loyalty, rather than balancing the needs and interests of all water users.  However, the "Government cannot follow the fastidious standards of a private fiduciary, who would breach his duties to his single beneficiary, solely by representing potentially conflicting interests without the beneficiary's consent."  *United States v.*

While the Tribe complains that Federal Defendants have made a number of historic bargains that have adversely impacted its members (the Midview Exchange Agreement, the 1965 Deferral Agreement, the 1990 Compact, and CUPCA), the Complaint presents no evidence, nor alleges any fact, that these actions were taken to have an intentionally adverse impact on the Tribe within the statute of limitations.  Nor has the Tribe alleged that United States has provided insufficient reasons for treating similar situations differently.  The 1906 Act authorized the construction of extensive irrigation systems to serve parcels allotted to individual Indians as well as non-Indians.  It was intended to benefit Indians by appropriating funds for several Indian tribes, in addition to allottees who were members of the Ute Indian Tribe, but it was also intended to benefit non-Indians by providing irrigation systems to be used by "any person, association, or corporation under and upon compliance with the provisions of the laws of the State of Utah." 34 Stat. 325, 375-76.  Thus, once constructed, the irrigation systems would serve both Indians and non-Indians.  The 1906 Act had no discriminatory basis and it was rational for the United States to permit "any person" to use the irrigation systems so long as that use was legally permissible under the State of Utah.  Sixty years later, the principal purpose of the Midview Exchange Agreement authorized the exchange of water between Indian lands and lands higher on the Lake Fork drainage.  Ex. B (Midview Exchange), ¶¶ 6-8.  The basis of the exchange was not based on Ute Tribe's political status but rather geographic elevation.  In 1992, when CUPCA was enacted, it was also similarly clear that the purpose of the Central Utah Project would be to provide water for growth in the Uinta Basin for both the Indians and non-Indian water users.  106 Stat. 4600, 4650-51.

_____

*Jicarilla Apache Nation,* 564 U.S. 162, 182 (2011) (*quoting Nevada v. United States,* 463 U.S. 110, 128 (1983)).

40

Therefore, the Court should dismiss the Tribe's twelfth claim because the claim is time barred under Rule 12(b)(1) and the Tribe has failed to state a claim under Rule 12(b)(6).

## B. The Tribe Lacks Standing to Assert the Equal Protection Guarantee on Its Members' Behalf

Further, the Tribe cannot base its claim on "Federal Defendants' discriminatory practices violat[ing] the Constitutional rights of the Tribe and its members," because the Tribe, as a group, is not protected by the U.S. Constitution's guarantees that the law will equally protect individuals.  Am. Compl. ¶ 277; *see Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995).  As early as *Brown v. Board*, the Supreme Court talked about the "personal interest of the plaintiffs in admission to public schools . . . on a nondiscriminatory basis."  349 U.S. 294, 300 (1955).  Even accepting all allegations as true, there is no factual allegation that the United States has discriminated against an individual tribal member.  The Tribe claims it and its members have been deprived of 'life, liberty, or property, without due process of law' by favoring 'non-Indian waters users in the Uinta Basin to the detriment of the Tribe and its members.'  Am. Compl. ¶¶ 275-276.  However, the Tribe lacks standing to assert a claim based on the alleged disparate and discriminatory treatment of the Ute Tribe (as a group) or of its members (as individual persons).  The party invoking federal jurisdiction bears the burden of establishing the elements of standing.  *Warth v. Seldin*, 422 U.S. 490, 508 (1975).  One "irreducible constitutional minimum" element of standing is an injury-in-fact suffered by the plaintiff.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  The injury must affect the plaintiff in a "personal and individual way."  *Id*. at 560 n.1.

The Tribe can assert no "personal and individual" injury to its equal protection rights because, as a government, it has no equal protection rights.  The Tribe is not an individual.  As a sovereign government, it has no equal protection rights to assert separately from its members'

rights.  Therefore, the Tribe's equal protection claim fails insofar as it is brought on the Tribe's behalf.  Instead, the Tribe attempts to assert its members' equal protection rights on their behalf.  Although a governmental body may sometimes bring a claim on its constituents' behalf, the governmental body must be more than "a nominal party" to the action.  *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607–08 (1982).  The Tribe has not addressed that issue, and therefore has not carried its burden of pleading elements sufficient to establish standing to enforce its members' equal protection rights.

Because the Tribe lacks standing to assert a violation of its members' equal protection rights, this Court should dismiss the Tribe's twelfth claim.

## CONCLUSION

The United States respectfully requests that this Court dismiss the Amended Complaint in its entirety.  The Court lacks jurisdiction to adjudicate or quantify water rights alleged in Count One, Two, Five, Eight, and Ten.  The Court may dismiss those claims under Rule 12(b)(6) and may also dismiss claims One, Two, Five, and Eight for failure to state a claim within the statute of limitations under Rule 12(b)(1).  Counts One through Eleven should be dismissed under Rule 12(b)(6) because the Amended Complaint does not identify any cause of action for these non-constitutional claims.  The Court should similarly dismiss Counts Three, Five, Six, Seven, Nine, Ten, and Eleven because the Tribe has not identified an enforceable trust duty and, even if they had, the claims belong in the Court of Federal Claims.  Counts Three and Eleven should be dismissed pursuant to Rule 12(b)(6) because those claims were waived and released in a 2012 settlement agreement, or—in the alternative—summary judgment should be granted to the Federal Defendants under Rule 56.  Counts One, Two, Four, Five, and Eight should be dismissed

42

under Rule 12(b)(6) because the Tribe may not seek specific performance or declaratory relief against Federal Defendants for contract-based claims under the Midview Exchange and Deferral Agreements.  Count Twelve should be dismissed under Rule 12(b)(6) because the Tribe lacks standing and failed to allege discriminatory intent under the Equal Protection Guarantee.  Counts One, Two, Four, and Fifth should be dismissed under Rule 12(b)(6) because they were waived and released by CUPCA.  Lastly, all but Counts Three, Ten, and Eleven fail to state a claim within the statute of limitations and this Court should dismiss those counts under Rule 12(b)(1).

Dated: March 22, 2019

JEAN E. WILLIAMS
Deputy Assistant Attorney General
Environment & Natural Resources Division

 /s/ *Daniela A. Arregui*

DANIELA A. ARREGUI
(New York Bar No. 4714713)
Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
Tel: (202) 305-0447
Fax: (202) 305-0506
daniela.arregui.labarca@usdoj.gov

*Counsel for the United States*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 22, 2019, I filed the foregoing electronically through the Court's CM/ECF system, which caused notice to be sent to the parties.

*/s/ Daniela A. Arregui*

DANIELA A. ARREGUI