## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UTE INDIAN TRIBE OF THE UINTAH
AND OURAY RESERVATION,

        *Plaintiff*,

        v.

UNITED STATES DEPARTMENT OF
INTERIOR, et al.,

        *Defendants*.

Civil Action No. 1:18-cv-00547 (CJN)

## MEMORANDUM OPINION

This litigation concerns a century-old dispute about water rights.  The Ute Indian Tribe brings sixteen claims against various federal and state Defendants for alleged mismanagement of water-development projects in northeastern Utah.  Defendants have moved to dismiss some claims and to transfer the remainder to the District of Utah.  ECF Nos. 67–70.  For the reasons below, the Court grants the Federal Defendants' Motion to Dismiss, ECF No. 68, and Motion to Transfer, ECF No. 69, as well as the State Defendant Central Utah Water Conservancy's Motion to Dismiss, ECF No. 70.  All other pending Motions are denied as moot.

### I.      Background

### A.  Facts and Procedural History

Plaintiff Ute Indian Tribe of the Uintah and Ouray Indian Reservation is a federally recognized tribe whose land spans "an arid plateau in the Green River Basin of northeastern Utah at the foot of the Uinta Mountains."  *Ute Indian Tribe of the Uintah & Ouray Indian Rsrv. v. United States*, 2021 WL 1602876, at *1 (Fed. Cl. Feb. 12, 2021) ("*Ute I*"); *see also* Pl.'s Second Am. Compl. ¶ 28 ("Compl."), ECF No. 57.  The Tribe's Reservation lies within the drainage of the

Colorado River, Compl. ¶ 28, but because river levels vary and Utah receives almost no rain in the summer, water-storage facilities are used to collect snow melt and maintain a consistent water supply throughout the year, Compl. ¶¶ 24–25.

The Tribe filed this suit against the U.S. Department of Interior and two of its technical bureaus, the Bureau of Indian Affairs and the Bureau of Reclamation ("Federal Defendants"), as well as the Utah Water Conservancy.  It later added claims against the State of Utah (together with the Utah Water Conservancy, the "State Defendants") after the Court permitted Utah to intervene. The Tribe alleges breaches of rights established by statute, contract, and the Constitution.  *See* Compl. ¶¶ 236–359.  Each claim arises from Defendants' alleged mismanagement of various water-development projects affecting the Green River Basin, *id.*, some of which began more than a hundred years ago.

Over the last century, the federal government has undertaken a number of efforts— including enactment of several pieces of federal legislation—concerning the development and maintenance of water conveyances within the Tribe's Reservation.  The 1899 Indian Appropriations Act ("1899 Act"), for example, authorized the Secretary of the Department of Interior to "grant rights of way for the construction . . . of dams, ditches, and canals, on or through the [Reservation] for the purpose of diverting . . . waters of the streams in said reservation for useful purposes" "in his discretion."  30 Stat. 941 (1899).

In 1906, Congress enacted the Uintah Indian Irrigation Project, which granted rights of way authorizing the construction of a network of canals to convey water from three rivers that flow across the Reservation for the purpose of irrigating around 100,000 acres of allotted tribal land.[1]

---

[1] These include the Strawberry-Duchesne, the Lake Fork-Yellowstone, and the Uinta-Whiterocks rivers.  *See* Compl. ¶ 69.

*See* Indian Dep't of Appropriations Act of 1906 ("1906 Act"), Pub. L. No. 59-258, 34 Stat. 325, 375-76 (1906); *see also* Compl. ¶¶ 36–39. In 1967, the Tribe (in conjunction with the United States) transferred some of the water it receives through Uintah Indian Irrigation Project canals to non-Indian water users in exchange for "state-based water rights" held by the Moon Lake Water Users Association. *Id.* ¶ 125; *see also id.* ¶¶ 123–24, 126–37; Midview Exchange Agreement ¶¶ 6–8, Defs.' Ex. B, ECF No. 68-2.

In 1956, Congress enacted the Colorado River Storage Project, which (among other things) authorized the Central Utah Project. *See* Pub. L. No. 84-485, 70 Stat. 105 (1956). If fully implemented, the Project would have constructed irrigation and water-storage facilities in six units, including two units (the Uintah and Ute Indian Units) with reservoirs designated to supply water to the land of Tribal members. Fed. Defs.' Mot. Partial Dismissal at 5 ("Mot."), ECF No. 68. But construction on those Units was first deferred, then abandoned. *See* Compl. ¶¶ 53, 155, 169, 175–76.

The Tribe—after commissioning a report to identify its water rights ("Decker Report")[2]—signed the "1965 Deferral Agreement" with the United States and the Central Utah Water Conservancy. *See id.* ¶¶ 154–64; 1965 Deferral Agreement, Defs.' Ex. A, ECF No. 68-1. Under the Agreement, the Tribe deferred the use of some of its water, Compl. ¶ 155, in exchange for a recognition that the Decker Report accurately describes its water rights, *id.* ¶ 156; a commitment to "address the Tribe's water storage needs," *id.* ¶ 159; and a promise to complete the Uintah and Ute Indian Units by January 1, 2005, *id.* ¶ 160–62.

---

[2] The Tribe hired E.L. Decker, a former Bureau of Reclamation employee, to identify all the Tribe's practically irrigable acreage, as well as the total volume of water necessary to irrigate those acres each year. Compl. ¶¶ 52–54.

By 1992, however, it had become clear that Interior would not complete the Uintah or Ute Indian Units. *Id.* ¶¶ 170–76, 191; *see also* Mot. at 7–8. To remedy this, Congress passed the Central Utah Project Completion Act of 1992 ("1992 Act"), Compl. ¶¶ 182–185, 191–206, which purported to settle once and for all any claims that the Tribe might have under the 1965 Deferral Agreement. *See* Reclamation Projects Authorization and Adjustment Act of 1992, Pub. L. No. 102-575 §§ 501–07, 106 Stat. 4600, 4650–55 (1992). Title V of the 1992 Act, the "Ute Indian Rights Settlement," afforded the Tribe approximately $2 million per year in compensatory repayments in exchange for an express waiver of "any and all claims relating to its water rights covered under the" 1965 Deferral Agreement. *Id.* § 507, 106 Stat. at 4655; Compl. ¶ 192–93.

Twenty years later, in 2012, the Tribe and the United States executed another settlement to resolve a dispute in the Court of Federal Claims. *See* Joint Stipulation of Dismissal with Prejudice, *Ute Indian Tribe of the Uintah & Ouray Rsrv. v. United States*, No. 06-866 (Fed. Cl. June 1, 2012); *see also* 2012 Settlement Agreement, Defs.' Ex. D, ECF No. 68-4. There, the Tribe sought (among other things) money damages for Interior's alleged mismanagement of its nonmonetary trust assets. *See* 2012 Settlement Agreement ¶¶ 2, 4. In exchange for $125 million, the Tribe agreed to waive any claims that the United States (1) "failed to preserve . . . or maintain [the Tribe]'s non-monetary trust assets or resources," (2) "inappropriately transferred, sold, encumbered, allotted, managed, or used [the Tribe's] non-monetary trust assets or resources," or (3) "failed to deposit monies into [the Tribe's] trust funds" in a "timely manner." *Id.* ¶ 4.

Six years later, in March 2018, the Tribe filed this sixteen-count lawsuit.[3] After granting the State of Utah's Motion to Intervene, ECF No. 52, the Court gave the Tribe leave to file a

---

[3] The Tribe also filed a companion case in the U.S. Court of Federal Claims, alleging the same breaches of fiduciary trust at issue here. *See Ute I*, 2021 WL 1602876, at *3–4. On February 12, 2021, Judge Hodges dismissed the case. *See id.* at 11.

Second Amended Complaint against both Federal and State Defendants.  *See* ECF No. 57. Defendants then moved to dismiss, arguing that claims one through eleven and sixteen should be dismissed under Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6).[4]  *See* ECF Nos. 67–68, 70.  Defendants have not moved to dismiss the remaining claims—which concern the execution and implementation of a water-exchange contract between the United States and the State of Utah  (Claims 12–15)—but instead move to transfer them to the District of Utah, Motion to Transfer, ECF No. 69.

## II.    Legal Standards

On a motion to dismiss for lack of subject-matter jurisdiction, "the party asserting federal jurisdiction . . . has the burden of establishing it," and the Court presumes that it "lack[s] jurisdiction unless the contrary appears affirmatively from the record." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006) (quoting *Renne v Geary*, 501 U.S. 312, 316 (1991)).  If the Court has jurisdiction, it will then decide whether Plaintiffs have stated a claim.  *See* Fed. R. Civ. P. 12(b)(6).  "[I]n deciding a Rule 12(b)(1) motion, it is well established in this Circuit that a court is not limited to the allegations in the complaint but may consider material outside of the pleadings in its effort to determine whether the court has jurisdiction in the case." *Bennett v. Ridge*, 321 F. Supp. 2d 49, 52 (D.D.C. 2004).

On a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), "the plaintiff bears the burden of establishing a factual basis for the court's exercise of personal jurisdiction over the defendant." *Capital Bank Int'l Ltd. v. Citigroup, Inc.*, 276 F. Supp. 2d 72, 74 (D.D.C. 2003); *see also Williams v. Romarm, SA*, 756 F.3d 777, 785 (D.C. Cir. 2014).  To prevail, "[t]he plaintiff

---

[4] The State of Utah, Utah's Governor, and the Utah State Engineer join the Federal Defendants' Motion to Dismiss in full.  *See* ECF No. 67 at 1.

must allege specific facts connecting the defendant with the forum," as "[b]are allegations and conclusory statements are insufficient." *Capital Bank*, 276 F. Supp. 2d at 74.

On a Rule 12(b)(6) motion, the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged." *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003) (quoting *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000)). "While a complaint . . . does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of [its] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations and citations omitted). Indeed, the claim to relief must be "plausible on its face," and a plaintiff's pleadings must "nudge[ the] claims across the line from conceivable to plausible." *Id.* at 570. When resolving a Rule 12(b)(6) motion, the Court may take judicial notice of publicly available records, like the reports of administrative bodies or unsealed litigation records. *New Vision Photography Program v. D.C.*, 54 F. Supp. 3d 12, 23 (D.D.C. 2014); *see also* Fed. R. Evid. 201(b). Courts are also free to consider settlement agreements, even those not mentioned in or attached to the complaint, so long as the Parties do not dispute their validity. *See Rogers v. Johnson-Norman*, 466 F. Supp. 2d 162, 170 n.5 (D.D.C. 2006); *Halldorson v. Sandi Grp*, 934 F. Supp. 2d 147, 152 (D.D.C. 2013).

Lastly, on a motion to transfer, the Court must first determine whether the action could have been raised in the transferee district. *See S. Utah Wilderness All. v. Norton*, 315 F. Supp. 2d 82, 86 (D.D.C. 2004). If so, then the Court will balance the public and private interests at play to decide whether transfer promotes convenience and equity. *See Valley Cmty. Pres. Comm'n v. Mineta*, 231 F. Supp. 2d 23, 44–45 (D.D.C. 2002), *transferred to* 246 F. Supp. 2d 1163 (D.N.M.

2002), *aff'd* 373 F.3d 1078 (10th Cir. 2004).  In doing so, courts typically consider six private interests: (1) the plaintiff's choice of forum; (2) the defendant's choice of forum; (3) where the claims arose; (4) the convenience of the parties; (5) the convenience of the witnesses; and (6) the ease of access to sources of proof.  *Foote v. Chu*, 858 F. Supp. 2d 116, 121 (D.D.C. 2012); *see also Trout Unlimited v. U.S. Dep't of Agric.*, 944 F. Supp. 13, 16 (D.D.C. 1996), *transferred to* 320 F. Supp. 2d 1090 (D. Colo. 2004).  They also weigh three public interests: "(1) the transferee forum's familiarity with the governing laws and the pendency of related action in that forum; (2) the relative congestion of the calendars of the potential transferee and transferor courts; and (3) the local interest in deciding local controversies at home."  *Foote*, 858 F. Supp. 2d at 123.  But it remains the burden of the moving party to show that transfer is appropriate.  *Trout Unlimited*, 944 F. Supp. at 17.

### III.    Analysis

Courts typically begin with "jurisdictional questions," *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007), because "[j]urisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the Court is that of announcing the fact and dismissing the cause," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).  "Rather than assuming (without deciding) jurisdiction and going on to address the merits . . . a court must first establish as an antecedent matter that it has jurisdiction." *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 510 (D.C. Cir. 2018) (internal quotation marks omitted).

Nevertheless, courts may "choose among threshold grounds for denying audience to a case on the merits," *Sinochem*, 549 U.S. at 431, and "may address certain nonjurisdictional, threshold issues so long as those issues can occasion a dismissal short of reaching the merits," *Matar v. Transp. Sec. Admin.*, 910 F.3d 538, 541 (D.C. Cir. 2018) (internal quotations marks omitted and

alterations adopted).  In this case, one of those threshold nonjurisdictional issues is whether the Tribe's claims are "time-barred," because resolving timeliness "does not involve any consideration of the merits of [the Tribe's] claims." *Ajenifuja v. Dangote*, 485 F. Supp. 3d 120, 125–26 (D.D.C. 2020) (collecting cases); *see also Elec. Privacy Info. Ctr. v. Fed. Aviation Admin.*, 821 F.3d 39, 41 n.2 (D.C. Cir. 2016) (avoiding an "arduous inquiry" into standing because timeliness afforded an "alternative . . . threshold ground for dismissal").

Accordingly, the Court will determine whether some of the Tribe's claims should be dismissed as untimely before assessing personal jurisdiction and any merits-focused deficiencies under Rule 12(b)(6).

## A.  Statute of Limitations

### 1.  Claims one, two, four, and five

The Tribe's first, second, fourth, and fifth claims all seek declaratory relief based on the Defendants' alleged violations of the Tribe's rights under the 1965 Deferral Agreement, as well as Acts and court cases predating that Agreement.  *See* Compl. ¶¶ 236–49, 255–71.  Specifically, the Tribe seeks declarations that the 1965 Deferral Agreement is a "quantification" of the Tribe's water rights (Count 1, *id.* ¶ 243); that it grants the Tribe the "administrative, regulatory, legislative, and adjudicatory jurisdiction" to encumber and "lease" those water rights without approval from the Secretary of Interior (Claim 2, *id.* ¶ 249; *see* ¶ 162); that it still "bind[s]" (and so cannot be challenged by) Federal Defendants and the Central Utah Water Conservancy (Count 4, *id.* ¶ 262); and that it and prior cases and agreements obligate the United States to build whatever water-storage infrastructure necessary to protect the full scope of the Tribe's quantified water rights (Counts 1 & 5, ¶¶ 243, 271).

But these claims, like those in "every civil action commenced against the United States," are "barred unless the complaint is filed within six years after the right of action first accrues." 28 U.S.C. § 2401(a). Claims accrue as soon as a plaintiff could have "maintain[ed] a suit in court." *Spannaus v. U.S. Dep't of Justice*, 824 F.2d 52, 56–57 (D.C. Cir. 1987), *overruled on other grounds by Jackson v. Modly*, 949 F.3d 763 (D.C. Cir. 2020). Thus, the Tribe's claims accrued as soon it knew or should have known that Defendants would not meet or honor its alleged rights under the 1965 Deferral Agreement or earlier cases and agreements.

The 1965 Deferral Agreement required Interior to finish all six units of the Central Utah Project by January 1, 2005, including the two units (the Upalco and Ute Indian Units) designated to service the water rights described by the Decker Report. Compl. ¶ 162; *see also* 1965 Deferral Agreement at 5. But the Tribe has known since 1980 that Defendants "abandoned" the Ute Indian Unit, Compl. ¶ 176, and since 1986 that the Upalco Unit was "indefinitely postponed," *id.* ¶ 169. The Tribe has also known, since at least 1992, that Defendants would not honor the Tribe's understanding of the scope of its water rights. *See* Compl. ¶¶ 182–98. After all, in 1992, Congress passed the Central Utah Project Completion Act, which expressly designed and included a settlement agreement in Title V to "quantify the Tribe's reserved water rights" and "put the Tribe in the same economic position it would have enjoyed had the features contemplated by the [1965 Deferral Agreement] been constructed." 1992 Act, § 501(b)(1), (3), 106 Stat. at 4651.

Thus, as of the 1980s, and certainly by 1992, the Tribe knew that Defendants would not meet the specific obligations described in the 1965 Deferral Agreement, as well as in other alleged sources. It could have long ago sought judicial declarations about the source and scope of its enforceable water rights, as well as relief for the Defendants' failures to secure those rights.

The Tribe counters by suggesting that its claims did not accrue until 2012, or, if they did, that they are saved by either the continuing-violations doctrine or a tolling provision within the Indian Trust Accounting Statute.  Pl.'s Opp'n Fed. Defs.' Mot. ("Opp'n") at 38–41, ECF No. 81. But the Tribe fails to show that accrual began in 2012.  *See* Opp'n at 38–39.  The Tribe's 2012 Settlement Agreement with the United States includes no provisions about tolling or claim accrual. *See generally* 2012 Settlement Agreement.  And although the Tribe could, by 2012, infer that Interior did not share its view of its water rights, the Tribe knew that back in 1992, when the United States allegedly failed to honor or compensate the Tribe for the full scope of its "water rights." *See* Compl. ¶¶ 191–98.

The Tribe's saving arguments do not fix the problem. The Indian Trust Accounting Statute, for example, tolled only claims involving tribal trust funds, not nonmonetary assets like water rights, *Rosales v. United States*, 89 Fed. Cl. 565, 580 (Fed. Cl. 2009).  And the continuing-violation doctrine does not overcome the "general rule of claim accrual" without "a clear directive" from Congress.  *Earle v. D.C.*, 707 F.3d 299, 306 n.9 (D.C. Cir. 2012) (collecting cases) (internal quotation marks omitted and alteration adopted).  The Tribe points to no congressional directive inviting the Court to apply the continuing-violation doctrine.[5]

In sum, the Tribe could have sought "advice, launch[ed] an inquiry, and discover[ed] through [its] agents the facts underlying [its] current claim[s]" back in 1992.  *See Menominee Tribe v. United States*, 726 F.2d 718, 721 (Fed. Cir. 1984) (en banc).  The six-year statute of limitations

---

[5] The Tribe is right, of course, that the continuing-violation doctrine tolls claims alleging an unreasonable delay of agency action.  *See The Wilderness Soc. v. Norton*, 434 F.3d 584, 588 (D.C. Cir. 2006).  But that is because the APA (5. U.S.C. § 706(1)) imposes upon federal agencies an ongoing obligation to avoid unreasonable delay.  *See Appalachian Voices v. McCarthy*, 989 F. Supp. 2d 30, 44–46 (D.D.C. 2013).  The Tribe does not plead the claims discussed in this section under § 706(1), and it offers no other basis for applying the continuing-violation doctrine.

on the Tribe's first, second, fourth, and fifth claims has thus run, 28 U.S.C. § 2401(a). The Tribe cannot raise them now, more than two-and-a-half decades later.

## 2.  Claim eight

The Tribe's eighth claim is similarly time-barred.  That Claim seeks a declaration that the 1967 Midview Exchange Agreement[6] either required the United States to transfer several properties "into trust for [the] benefit of the Tribe," Compl. ¶ 285, or violated the Indian Non-Intercourse Act's prohibition on conveying "lands owned" by Indians "without the consent of Congress," *id.* ¶ 286 (quoting *Federal Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 119 (1960); *see also* 25 U.S.C. § 177.  The Tribe alleges that the Federal Defendants "acted in a manner that is inconsistent with the Tribe's beneficial ownership of the Midview Property" by granting non-Indian water users a right-of-way without first securing the Tribe's consent.  Compl. ¶ 284–90.

But this claim accrued back in 1967, when the allegedly unlawful conveyance occurred. *See* 28 U.S.C. § 2401(a); *see also* Comp. ¶ 134 ("[t]he Midview Exchange is an illegal conveyance").  So as with the first, second, fourth, and fifth claims, the six-year statute of limitations ran on the Tribe's eighth claim long ago.  *Id.*  The Tribe turns back to the continuing-violation doctrine, *see* Opp'n at 38–39, but, again, the Tribe's alleged harms emerged from "a single governmental action"—the allegedly unlawful conveyance—so the doctrine does not apply, *Boling v. United States*, 220 F.3d 1365, 1373 (Fed. Cir. 2000).[7]

---

[6] The Tribe signed the Midview Exchange Agreement to swap water rights with non-Indian members of the Moon Lake Water Users Association.

[7] As the Tribe's first, second, fourth, fifth, and eight claims are untimely, the Court need not determine whether those claims suffer from other jurisdictional defects. *Elec. Privacy Info. Ctr.*, 821 F.3d at 41 n.2. To be sure, Federal Defendants suggest that one other claim (claim ten) might be jurisdictionally problematic because it  involves the quantification of water rights, and

## B.  Personal Jurisdiction over the Utah Water Conservancy

Before assessing pleading deficiencies under Rule 12(b)(6), the Court turns to one other threshold inquiry: whether it may exercise personal jurisdiction over State Defendant Central Utah Water Conservancy.[8]  To establish personal jurisdiction, the Tribe must plead specific facts showing that jurisdiction is appropriate under the District of Columbia's long-arm statute, D.C. Code § 13-423(a).

The Tribe asserts specific jurisdiction based on "suit-related conduct" that "create[s] a substantial connection" with the District.  *Walden v. Fiore*, 571 U.S. 277, 284 (2014); *see* Pl.'s Opp'n to Water Conservancy's Mot. ("Opp'n to Water Conservancy") at 7, ECF No. 80.  It alleges that the Water Conservancy's involvement in the execution of the 1965 Deferral Agreement and efforts to construct "federally-financed" water projects "demonstrate [that] this Court may exercise personal jurisdiction over [the Water Conservancy] without violating due process."  Opp'n to Water Conservancy at 7–9 (discussing Compl. ¶¶ 151–58, 210–18, 239–40, 325).

It is unlikely that those actions, without more, are sufficient to constitute either "transacting any business in the District of Columbia," D.C. Code § 13-423(a)(1), or "causing tortious injury in the District of Columbia," *id.* § 13-423(a)(3).  But the Court need not reach that question, because even if the Conservancy's contacts were otherwise sufficient under the long-arm statute, each involved "dealing[s] with . . . federal instrumentalit[ies]"—both Congress, through the

---

the McCarran Amendment "withholds the United States' consent to be sued" in water-right quantification actions unless "the rights of all competing claimants are adjudicated."  Mot. at 19.  The Court need not resolve that issue, however, because Federal Defendants advance it only "to the extent" that claim ten "relate[s] to water rights quantification," *id.*, and that claim does not involve the quantification of water rights.  *See* Compl. ¶¶ 296–301.  Instead, it seeks a declaration that Federal Defendants are violating a specific trust duty set forth in § 505(c) of the 1992 Act; it does not ask the Court to measure or quantify water rights at all.  *See id.*

[8] The Tribe includes the Water Conservancy in four of its sixteen claims: claims one, two, four, and sixteen.  *See* Compl. ¶¶ 236, 244, 255, 346.

receipt of appropriated funds, and the Executive, through the execution of the 1965 Deferral

Agreement and construction of associated projects. *Morgan v. Richmond Sch. of Health & Tech.,*

*Inc.*, 857 F. Supp. 2d 104, 108–09 (quoting *Envtl. Rsch. Int'l, Inc. v. Lockwood Greene Eng'rs,*

*Inc.*, 355 A.2d 808, 813 (D.C. 1976) (en banc)).   Under the District of Columbia's long-arm statute,

courts cannot assert "personal jurisdiction over non-residents whose only contact . . . involves

uniquely governmental activities." *Id.* at 108 (quoting *Siam Kraft Paper Co. v. Parsons &*

*Whittemore, Inc.*, 400 F. Supp. 810, 812 (D.D.C. 1975).   That "government contacts" exception

covers the receipt of federal funds, the negotiation and execution of contracts between a defendant

and an Executive Agency, and the contacts necessary to coordinate joint projects with a federal

instrumentality. *See id.* (collecting cases).   As the Tribe has failed to allege activities that fall

outside of the "government contacts" exception, it does not establish personal jurisdiction over the

Water Conservancy.

## C.   The Motion to Dismiss

The Federal Defendants argue, and the Tribe does not contest, that to proceed here, the

Tribe must identify a specific and cognizable cause of action for each claim it asserts. *See Floyd*

*v. D.C.*, 129 F.3d 152, 155 (D.C. Cir. 1997).   The Federal Defendants argue that because the Tribe

has failed to identify such a cause of action for its first eleven claims, those claims should be

dismissed.[9] *See* Mot. at 16–18; Fed. Defs.' Reply at 1–4 ("Reply"), ECF No. 91; *see also Int'l*

*Union, Sec., Police & Fire Profs. of Am. v. Faye*, 828 F.3d 969, 972 (D.C. Cir. 2016) (stating a

cause of action "goes to the merits").   The Tribe argues that those claims allege that Defendants

---

[9] As discussed in Part III.A, *supra*, the Tribe's failure to abide by the statute of limitations for claims one, two, four, five, and eight resolves those claims.   But even if those claims were within the statute of limitations, for the reasons discussed below, the Court finds that they would still fail.

breached various fiduciary trust duties, and that a cause of action can be inferred from the existence of such a duty. *See* Opp'n at 10.

It is the case that a cause of action can be implied from the alleged violation of a trust duty. But such an implied cause of action depends on the existence of "*specific* trust duties in a statute, regulation, or treaty." *El Paso Nat. Gas Co. v. United States*, 750 F.3d 863, 892 (D.C. Cir. 2014) (emphasis added); *see also Shoshone Bannock Tribes v. Reno*, 56 F.3d 1476, 1482 (D.C. Cir. 1995). To be sure, the United States holds water rights in trust for the Tribe. *See, e.g.*, *Arizona v. California*, 373 U.S. 546, 598–601 (discussing water rights reserved under *Winters v. United States*, 207 U.S. 564 (1908)). But that is not the kind of specific trust obligation that creates an implied cause of action. *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 177 (2011). Instead, "[t]he Government assumes Indian trust responsibilities only to the extent it expressly accepts those responsibilities by statute." *Id.* at 177. As a result, if "the Tribe cannot identify a specific . . . trust-creating statute or regulation that the Government violated, . . . neither the Government's 'control' over [Indian assets] nor common-law trust principles matter." *Id.* at 177. (quoting *United States v. Navajo Nation*, 556 U.S. 287, 302 (2009)) (alteration in original).

The Court must thus determine whether the Tribe has plausibly identified a source that gives rise to the specific trust duties the Defendants allegedly breached.[10] In its briefs, the Tribe

---

[10] The Tribe alleges that Defendants have breached their fiduciary duties in at least seven ways: (1) failure to protect and develop the full scope of the Tribe's water rights (Claims one and five, Compl. ¶¶ 243, 265); (2) failure to recognize the Tribe's sovereign authority to administer its water rights (Claim two, *id.* ¶ 247); (3) failure to consult the Tribe before letting non-Indians use the Tribe's diverted water assets (Claim three and eight, *id.* ¶¶ 254, 288); (4) failure to treat the 1965 Deferral Agreement as valid and binding (Claim four, *id.* ¶ 262); (5) failure to build the Tribe enough water-storage facilities, especially for irrigation and crop production efforts (Claims six, seven, and nine, *id.* ¶¶ 276, 282–83, 295); (6) failure to make the Bottle Hollow Reservoir a sustainable cold-water fishery (Claim ten, *id.* ¶¶ 297, 301); and (7) failure to provide the Tribe with a historical accounting of efforts to manage the Tribe's monetary and nonmonetary trust assets (Claim eleven, *id.* ¶ 304).

relies principally on three: the 1899 Act, the 1906 Act, and the 1992 Act. *See* Opp'n at 13–24. The Court examines each in turn.

### 1. The 1899 Act

The Tribe points first to the 1899 Indian Appropriations Act. Opp'n at 14–18 (discussing 1899 Act, 30 Stat. at 941). There, Congress authorized the Secretary of the Interior to grant non-Indian water users rights of way to build "dams, ditches, and canals" on the Tribe's reservation:

> That the Secretary of the Interior be, and he is hereby authorized, *in his discretion*, to grant rights of way for the construction and maintenance of dams, ditches, and canals, on or through the Uintah Indian Reservation in Utah, for the Purpose of diverting and appropriating the waters of the streams in said reservation for useful purposes: *Provided*, That all such grants shall be subject at all times to the paramount rights of the Indians on said reservation to so much of said waters as may have been appropriated, or may hereafter be appropriated or needed by them for agricultural and domestic purposes; and it shall be the duty of the Secretary of the Interior to prescribe such rules and regulations *as he may deem necessary* to secure to the Indians the quantity of water needed for their present and prospective wants, and to otherwise protect the rights and interests of the Indians and the Indian service.

1899 Act, 30 Stat. at 941 (first and third emphases added). The Tribe reads the Act's reference to the "paramount rights of the Indians" and the Secretary's "duty" to "protect the rights and interests of the Indians" as establishing a specific trust duty to build water "storage" facilities for the Tribe. Opp'n at 15. Indeed, the Tribe goes further, arguing that the water "storage infrastructure" compelled by the 1899 Act must (1) ensure that the Tribe receives "adequate irrigation water throughout the irrigation season on a yearly basis"; (2) "preserve unused Indian water rights for future uses that will economically benefit the Tribe"; and (3) "prevent . . . downstream users" from appropriating Indian water rights without "compensation to the Tribe." *Id.* The Court disagrees.

The 1899 Act gave the Secretary an affirmative power (the power to let non-Indians divert tribal waters) subject to one limitation—an obligation to promulgate whatever "rules and regulations" the Secretary "deem[s] necessary to secure" tribal water "and to otherwise protect the

15

rights" of the Tribe.  30 Stat. at 941.  The trust duties identified by the Tribe—duties to irrigate, store water, and guarantee compensation—do not appear expressly in the Act.  Indeed, under the plain language of the 1899 Act, the Secretary may promulgate whatever water-protection rules "he . . . deem[s] necessary," even if those rules vary from the Tribe's preferences.  *Id.*  As "the Government assumes Indian trust responsibilities only to the extent it *expressly* accepts those responsibilities by statute," the 1899 Act cannot be the source of the specific trust duties the Tribe advances here.  *Jicarilla*, 564 U.S. at 177 (emphasis added).

## 2.  The 1906 Act

The Tribe turns next to the 1906 Act, which authorized the development of the Uintah Indian Irrigation Project. Opp'n 18–22 (discussing 1906 Act, 34 Stat. at 375–76).  The 1906 Act set out three mandates: (1) that approved "irrigation systems" be built "under the laws" of "Utah," with "title" to "be in the Secretary of the Interior in trust for the Indians, and he may sue and be sued in matters relating thereto"; (2) that the "irrigation systems may be used" by non-Indians, including "any person, association, or corporation under and upon compliance" with the law of "Utah"; and (3) that "when the Indians have become self-supporting" the Tribe "pay back into the Treasury the cost of the work done."  1906 Act, 34 Stat. at 375–76.  The Tribe contends that this language, in combination with other regulatory and statutory provisions affording the Secretary of Interior and the Bureau of Indian Affairs "managerial control" over tribal waters conveyed through Project irrigation systems,[11]  creates "an enforceable trust duty to manage and maintain the [Project]" assets for the Tribe, as well as "provide an accounting" that details how Defendants have administered "these trust assets."  Opp'n at 21–22.

---

[11] Specifically, the Tribe cites 22 Fed. Reg. 10479, 10637–38 (Dec. 24, 1957) (25 C.F.R. § 171) and the Congressional Act of May 28, 1941 55 Stat. 209.  *See* Opp'n 20–21.

But it is well-settled that statutory provisions that merely declare that assets are held "in trust" do not create specific, enforceable trust duties. *United States v. Mitchell*, 445 U.S. 535, 541–42 (1980) ("*Mitchell I*") (holding that a statute which held land "in trust for the sole use and benefit of the [Indian owner]" did not create a specific trust duty to manage timber on that land); *see also Hopi Tribe v. United States*, 782 F.3d 662, 669 (Fed. Cir. 2015). That is especially true here, as Interior is charged with managing the Uintah Indian Irrigation Project for the benefit of many water users, both Indian and non-Indian alike. *See* 34 Stat. at 375. Indeed, the Supreme Court has held that when Interior manages projects for both Indian and non-Indian users, "the Government cannot follow the fastidious standards of a private fiduciary." *Nevada v. United States*, 463 U.S. 110, 128 (1983).

Moreover, the 1906 Act's "sue and be sued" language is a waiver of sovereign immunity and does not speak to whether the Act creates specific trust duties at all. *See El Paso*, 750 F.3d at 891–92. Neither does Interior's general administrative control over the irrigation systems that are part of the Project. *See Navajo*, 556 U.S. at 301 ("The Federal Government's liability cannot be premised on control alone.").

To be sure, there is a point at which the government's role in managing a project for the sole benefit of a Tribe can create specific trust duties. In *United States v. Mitchell*, 463 U.S. 206 (1983) ("*Mitchell II*"), for example, the Supreme Court held that Interior's "elaborate control" over tribal forests created enforceable trust duties. *Id.* at 224–26. But there, Interior controlled "virtually every aspect of forest management, including the size of sales, contract procedures, advertisements, and methods of billing, deposits and bonding requirements, administrative fee deductions, procedures for sales by minors, allowable heights of stumps, tree marking and scaling rules, base and top diameters of trees for cutting, and the percentage of trees to be left as a seed

source." *Id.* at 220.  Indeed, "[t]he regulatory scheme was designed to assure that the Indians receive the benefit of whatever profit the forest is capable of yielding."  *Id.* at 221–22 (internal quotation marks omitted) (alteration adopted).

Here, by contrast, Interior manages the Uintah Indian Irrigation Project for the benefit of Indian and non-Indian water users under the laws of Utah.  *See* 34 Stat. at 375; *see also* 25 C.F.R. § 171.6(a).  The 1906 Act (and the subsequent statutory provisions applying it) does not grant the United States an exclusive right to use and occupy the water-storage and irrigation infrastructure created as part of the Project, nor does it bar the Tribe from irrigating its own land, manage every aspect of irrigation on Tribal lands, or seek to maximize profits for the Tribe.  *Compare* 1906 Act & 25 C.F.R. § 171, *with Grey v. United States*, 21 Cl. Ct. 285, 293–94 (distinguishing Interior's authority under 25 C.F.R. § 171 from *Mitchell II*) & *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 468–69 (2003).  Thus, the Tribe has not demonstrated that Congress created an irrigation scheme so pervasive or comprehensive that it suggests that Congress "expressly accept[ed]" a specific trust duty to manage and store the Tribe's water.  *Jicarilla*, 564 U.S. at 177.

### 3.  The 1992 Central Utah Project Completion Act

The Tribe next argues that § 203(f) of the 1992 Act creates a specific trust duty to implement the Uinta Basin Replacement Project, a water-storage plan designed "to replace the never-constructed Uintah and Upalco Units of the Central Utah Project."  Opp'n at 22.  But § 203 of the 1992 Act merely gives the Secretary authorization to rehabilitate, maintain, construct, and lease irrigation facilities associated with the Central Utah Project.  *See* 106 Stat. at 4613, § 203(f)(1), (3)–(6).  Section 203(f)(2) does say that "[t]he Secretary shall retain any trust responsibilities to the Uintah Indian Irrigation Project," but the provision does not expressly identify any existing or new responsibilities.  *Id.* § 203(f)(2).  Again, bare "trust" language is not

enough, *Mitchell I*, 445 U.S. at 541, and the Tribe's suggestion that § 203 creates any ongoing trust duties is especially unpersuasive in light of § 203(b), which anticipates that authorization for § 203 projects may not proceed.

In sum, neither the 1899 Act, the 1906 Act, nor the 1992 Act demonstrate that the government "expressly accepts" any of the specific trust duties alleged by the Tribe. *See Jicarilla*, 564 U.S. at 177. And as the Tribe has not identified an enforceable duty, it fails to allege a necessary predicate for establishing an implied cause of action.[12] *See El Paso*, 750 F.3d at 892.

### D. The Tribe's Discrimination Claims

The Tribe's sixteenth claim alleges that Defendants have discriminated against the Tribe in violation of its members' constitutional rights to equal protection and due process, as well as their statutory rights under the Civil Rights Act of 1964, 42 U.S.C. § 2000d. *See* Compl. ¶¶ 346–59. As a threshold matter, the government argues that the Tribe lacks standing to assert claims on

---

[12] Even if the Tribe had pleaded an enforceable trust duty, its first, second, fourth, and fifth claims would still be dismissed as waived by statute. *See South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 343 (1998) (describing Congress's power to "modify or eliminate tribal rights" via statute). Those claims allege various breaches of the Defendants' obligations under the 1965 Deferral Agreement. *See* Mot. at 34–35. But § 507 of the 1992 Act expressly waived "any and all claims relating to [the Tribe's] water rights covered under the [1965 Deferral] [A]greement," as soon as the tribe received the "moneys" described in §§ 504, 505, and 506. *See* 106 Stat. at 4655. The Tribe acknowledged its receipt of those funds in a 2006 complaint filed in the Court of Federal Claims. *See* 2006 CFC Compl. ¶¶ 15–18, 36, Defs.' Ex. H, ECF No. 68-8; *see New Vision Photography Program*, 54 F. Supp. 3d at 23 (noting on a Rule 12(b)(6) motion, that courts may consider prior litigation records).

The government likewise argues that claims three and eleven should be dismissed under a 2012 Settlement Agreement. *See* Mot. 32–33; *Rogers*, F. Supp. 2d at 170 n.5 (taking notice of undisputed settlement records). While it is true that those claims concern the type of violations expressly waived in ¶ 4 of the 2012 Settlement Agreement (*e.g.*, mismanagement of nonmonetary assets, like irrigation infrastructure), it is not clear at this stage of the litigation that every violative act occurred before the Settlement Agreement or falls outside the waiver exception concerning the Tribe's "water rights." *Compare* 2012 Settlement Agreement ¶ 4 (waiver), *with id.* ¶ 6(b) (waiver exception).

behalf of its members, either collectively (as a tribal corporation) or in its representative capacity

for individual members (*parens patriae*).  Mot. at 40–41.  As equal-protection rights are held by

individuals, rather than sovereign entities (like a Tribe), the Court turns first to the Tribe's *parens*

*patriae* standing.  *See Coal. For Econ. Equity v. Wilson*, 122 F.3d 692, 704 (9th Cir. 1997).

The doctrine of *parens patriae* gives a state standing to litigate quasi-sovereign interests

on behalf of "its populace."  *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S.

592, 601–02 (1982).  The government argues that the Tribe cannot assert *parens patriae* standing

here, because that doctrine "does not apply to claims against the United States," and is otherwise

"reserved for situations in which a sovereign brings claims on behalf of all its citizens."  Mot. at

41 (emphasis omitted).

The Tribe certainly "faces an uphill climb in establishing standing in its *parens patriae*

capacity" because of "the so-called '*Mellon* bar,'" which "declares that a [sovereign] lacks

standing as *parens patriae* to bring an action against the federal government."  *Gov't of Manitoba*

*v. Bernhardt*, 923 F.3d 173, 179–80 (D.C. Cir. 2019) (discussing *Mass. v. Mellon*, 262 U.S. 447,

485–86 (1923)).  The Tribe tries to sidestep *Mellon* by framing its sixteenth claim as an attempt to

force Defendants to follow federal law, as opposed to a challenge postured against the federal

government.

But the Court of Appeals recognizes no such distinction.  *See id.* at 181.  Indeed, when

determining whether a state could bring a suit *parens patriae* under the Administrative Procedure

Act ("APA"), the Court of Appeals treated the state's challenge to an agency action as a *Mellon*-

barred suit against the federal government.  *Id.*  And in dicta, it treated constitutional claims the

same way: "There is no reason to treat *parens patriae* actions alleging constitutional claims against

the federal government differently from those alleging federal statutory claims."  *Id.* at 183.  In

other words, the Court of Appeals approached *parens patriae* claims challenging agency actions and federal statutes, as well as claims alleging constitutional violations, all as *Mellon*-barred challenges directed against the federal government.

In any event, even if the Tribe could carve out a new exception to the *Mellon* bar, claim sixteen would fail because the Tribe does not adequately allege animus. *See Dep't of Homeland Sec. v. Regents of the univ. of Ca.*, 140 S. Ct. 1891, 1915 (2020). "To plead animus, a plaintiff must raise a plausible inference that an invidious discriminatory purpose was a motivating factor in the relevant decision." *Id.* (quoting *Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266 (1977) (internal quotations omitted)). But the Tribe does little more than allege that the "benefits" of various water-management projects were disproportionately distributed to "non-Indian water users," while the burdens were "disproportionately allocate[d]" to the Tribe. Opp'n at 45. Allegations of disproportionate impact are not enough to plausibly allege animus. *See Arlington Heights v*, 429 U.S. at 264–66.

The Tribe's parallel claims against the State Defendants are also inadequately pleaded. The Complaint seeks relief from the "actions" that allegedly "violate [the Tribe's] due process and equal protection[]" rights safeguarded by the Fourteenth Amendment, 42 U.S.C.§§ 1981, 1983, as well as the Civil Rights Act of 1964. *See* Compl. 104 ¶ 24. But § 1981 "does not create a private right of action against state actors." *Campbell v. Forest Preserve Dist. of Cook Cnty., Ill.*, 752 F.3d 665, 671 (7th Cir. 2014); *see also Sledge v. D.C.*, 869 F. Supp. 2d 140, 145 (D.D.C. 2012). And with regard to Title VI, the Tribe has not stated facts that plausibly allege that either the State of Utah or any other State actor intentionally discriminated against it based on race or any another

protected class within the last four years.[13]  *See Alexander v. Sandoval*, 532 U.S. 275, 281 (2001)

("Title VI itself directly reaches only instances of intentional discrimination.").

Moreover, as "neither a State nor its officials acting in their official capacities are 'persons'

under § 1983," the Tribe cannot use that provision to assert damages claims against the State of

Utah (or the Utah Governor and State Engineer, in their official capacities).  *Will v. Mich. Dep't

of State Police*, 491 U.S. 58, 71 (1989); *see also U.S. ex rel. Long v. SCS Bus. and Tech. Inst., Inc.*,

173 F.3d 870, 874 (D.C. Cir. 1999).  It also cannot seek damages from either the Utah Governor

or State Engineer in their individual capacities, because the Tribe does not allege that "they

themselves acted [in violation of the constitution]."  *Ashcroft v. Iqbal*, 556 U.S. 662, 683 (2009).

Instead, as in *Iqbal*, the Tribe merely alleges that they were high-level officials at the time some

discriminatory conspiracy allegedly occurred—not that either official personally participated in

the so-called conspiracy "to racially segregate and racially discriminate against the [Tribe]."

*Compare id.* at 679–81, 685, *with* Opp'n at 21 (citing Compl. ¶ 1).  And as the Tribe does not

allege that either named State actor is personally participating in an "ongoing violation of federal

law," the Tribe cannot seek declaratory or injunctive relief under § 1983 either.  *Green v. Mansour*,

474 U.S. 64, 71, 73 (1985).

In short, the Tribe fails to plausibly allege any discretionary conduct that might give rise

to relief under claim sixteen.

---

[13] Because Title VI does not have its own statute of limitations, courts apply "the statute of limitations from 42 U.S.C. § 1981 and § 1983 which in turn, rely on the respective personal injury statute of limitations in a jurisdiction."  *Richards v. Duke Univ.*, 480 F. Supp. 2d 222, 237–38 (D.D.C. 2007).  The Tribe's alleged injuries occurred in Utah, and Utah applies a four-year statute of limitations to § 1983 claims.  *Sheets v. Salt Lake Cnty*, 45 F.3d 1383, 1387 (10th Cir. 1995).

### E.  Transfer to Utah

Federal Defendants have moved to transfer the Tribe's remaining claims to the United States District Court for the District of Utah.  *See* Mot. Transfer, ECF No. 69.  State Defendants support the Motion.  Resp. to Mot. To Transfer, ECF No. 72, at 1.  Under 28 U.S.C. § 1404(a), a federal court "may transfer any civil action to any other district . . . where it might have been brought" when it finds that the "convenience of the parties and witnesses" and the "interest of justice" favor transfer.  *See Hawksbill Sea Turtle v. FEMA*, 939 F. Supp. 1, 3 (D.D.C. 1996) (discussing 28 U.S.C. § 1404(a)).

There is no doubt that the Tribe could have brought the remaining claims in the District of Utah (and the Tribe does not contend otherwise).  *See* Mot. Transfer at 7; Opp'n Transfer at 4–16. Each claim relates to the execution and implementation of the Green River Block Exchange Contract ("Contract"), a Utah-wide water-exchange project under which Utah agrees to forgo its water rights from part of the Green River to help the United States meet various federal objectives. Compl. ¶¶ 307–45.  And these claims touch on the same agency action that is now pending on appeal in the Court of Appeals for the Tenth Circuit after consideration in the District of Utah.  *See Center for Biological Diversity v. Dep't of the Interior*, 2021 WL 2826751 (D. Utah July 7, 2021), *appeal filed*, *Center for Biological Diversity v. U.S. Dep't of the Interior*, No. 21-4098 (10 Cir. Aug. 17, 2021).

Furthermore, the Contract was negotiated and executed in Utah, by Utah state officials and an Interior Reclamation official stationed in Utah.  Mot. Transfer at 7.  Before executing the Contract, Interior prepared an Environmental Assessment (as required by the National Environmental Policy Act) in Utah.  The Tribe is also located in Utah, and the harms alleged in its

claims all pertain to the Tribe's water resources in Utah.  *See* Compl. 229, 307–45.  The Court is thus satisfied that these claims could have been filed in Utah.  *See* 28 U.S.C. § 1391(e)(1).

Next, the public-interest factors that assist the Court in evaluating a motion to transfer all balance in favor of Utah.  These include "(1) the transferee forum's familiarity with the governing laws and the pendency of related actions in that forum; (2) the relative congestion of the calendars of the potential transferee and transferor courts; and (3) the local interest in deciding local controversies at home." *Bader v. Air Line Pilots Ass'n, Int'l*, 63 F. Supp. 3d 29, 36 (D.D.C. 2014) (quoting *Foote*, 858 F. Supp. 2d at 123).

First, related litigation concerning the same agency action (executing the Contract and related NEPA analysis) was just recently decided in the District of Utah and is presently pending on appeal, so this factor strongly favors transfer.  *Barham v. UBS Fin. Servs.*, 496 F. Supp. 2d 174, 180 (D.D.C.2007) ("[T]he most significant factor weighing in favor of transferring [a] case is the presence of closely related litigation."); *see also Holland v. A.T. Massey Coal*, 360 F.Supp.2d 72, 77 (D.D.C. 2004) ("[T]he fact that there is an ongoing case dealing with similar issues in another jurisdiction weighs very heavily in favor of a transfer under § 1404(a).").  The need to avoid inconsistent judgments is especially compelling here as Judge Barlow has already considered and resolved certain disputes over this agency action.  *See Cal. Farm Bureau Fed'n v. Badgley*, 2005 WL 1532718, at *2 (D.D.C. June 29, 2005).

Second, although Utah has about half as many cases pending as this District, docket congestion is relatively neutral.  *See* Mot. Transfer at 11.  So this factor does not strongly point one way or the other.

The third and "arguably most important" public interest factor weighs decisively in favor of transfer.  *Pres. Soc. of Charleston v. U.S. Arm Corp of Eng'rs* ("*PSC*"), 893 F. Supp. 2d 49, 57

(D.D.C. 2012).  The residents of Utah have a "compelling interest . . . in having this localized controversy decided at home." *Trout Unlimited*, 944 F. Supp. at 19.  That principle holds true here, where the dispute involves "federal decisions that impact the local environment," and "judicial review of an administrative action." *W. Watersheds Project*, 942 F. Supp. 2d at 102 (quoting *Sierra Club v. Flowers*, 276 F. Supp. 2d 62, 70 (D.D.C. 2003)).  The water-management decisions that flow from the disputed Contract manage a natural resource (the Green River impounded in the Flaming Gorge Unit) located in Utah.  *See* Compl. ¶¶ 307–45.  The Contract's implementation, and even the harms alleged by the Tribe's claims, will all occur in Utah.  *See id.* Under such circumstances, courts in this district commonly find that compelling local interests support transfer.  *See, e.g.*, *Harvey*, 437 F. Supp. 2d at 46–47, 49–50 (transferring case involving federal management of Florida lake); *Shawnee Tribe v. United States*, 298 F. Supp. 2d 21, 26–27 (D.D.C. 2002) (transferring case involving sale of federal land in Kansas); *Trout Unlimited*, 944 F. Supp. at 19–20 (transferring case involving federal management of Colorado reservoir).[14]

On balance, the private interest factors favor transfer too. These include, "1) the plaintiff's choice of forum; 2) the defendant's choice of forum; 3) whether the claim arose elsewhere; 4) the convenience of the parties; 5) the convenience of the witnesses . . . ; and 6) the ease of access to sources of proof." *Bader*, 63 F. Supp. 3d at 34 (citation omitted); *Trout Unlimited*, 944 F. Supp. at

---

[14] In response the Tribe contends that a "substantial factual nexus" exist with the District because its claims are "tied to the government-to-government relationship between the Tribe and the Federal Government." Opp'n Transfer at 6.  But these claims focus on a federal decision that relates specifically to Utah.  Claim twelve challenges Interior's decision to prepare an Environmental Assessment under NEPA, instead of a more rigorous Environmental Impact Statement. Compl. ¶¶ 307–20. And claims thirteen, fourteen, and fifteen all turn on the negotiation, execution, and implementation of a Contract involving natural resources in Utah, and the effects that Contract might have on the Tribe's water in Utah. *Id.* ¶¶ 321–45.  To be sure, resolving the Tribe's claims will touch on interpreting federal statutes and actions.  But that fact alone does not weigh against transfer.  *See PSC*, 893 F. Supp. 2d at 55.

16.  First, although a plaintiff's choice is ordinarily given some deference, much less is due here because the Tribe, its alleged injuries, and the natural resource at issue are all substantially (indeed, nearly exclusively) connected to the proposed transferee district—Utah.  *PSC*, 893 F. Supp. 2d at 49.  Second, the Federal Defendants' preference is entitled to special weight here because "the economic and environmental impacts of the Project will be felt most acutely" in their favored forum.  *Gulf Restoration Network v. Jewell*, 87 F. Supp. 3d 303, 313 (D.D.C. 2015).  Third, the claims arose in Utah, "where the decisionmaking process" leading up to the disputed Contract "occurred."  *Nat'l Ass'n of Home Builders v. EPA*, 675 F. Supp. 2d 173, 179 (D.D.C. 2009).  The Contract was negotiated and signed in Utah and the Federal Defendants directed public comments and public meetings about the Contract's environmental impact to Utah, not the District.  *See* Compl. ¶ 230. Fourth, as the Tribe and Intervenor Defendant are both in Utah and the Federal Defendants prefer Utah, it is clearly more convenient, geographically speaking at least, to litigate in Utah.  Lastly, the fifth and six factors regarding access to witnesses and proof have little relevant here, because the Tribe's claims will be litigated on the basis of an administrative record as required by the APA, 5 U.S.C. §§ 701–06.  *S. Utah Wilderness All. v. Norton*, 2002 WL 32617198, at *4 (D.D.C. June 28, 2002). [15]

In sum, the aforementioned factors balance strongly in favor of transfer.  The claims involved here concern Utah-based resources and a Tribe located in Utah. The "interests of justice are promoted when a localized controversy is resolved in the region it impacts."  *See W. Watersheds Project*, 942 F. Supp. 2d at 102.  And "Plaintiff['s] allegations are far more likely to

---

[15] One of the Tribe's primary reasons for opposing transfer—that the statute authorizes the transfer of an action, rather than isolated claims—is now moot because this Court will dismiss all of the Tribe's other claims and transfer the entire action (now made up of these four claims) to Utah. *See* Opp'n Transfer 4–5.

constitute a 'matter of great public concern' to the citizens of [Utah] than to the citizens of the District of Columbia." *DeLoach v. Philip Morris Cos.*, 132 F. Supp. 2d 22, 26 (D.D.C. 2000). The Court will thus transfer the remaining claims—claims twelve through fifteen—to the District of Utah.

## IV.    Conclusion

For the forgoing reasons, the Court grants Federal Defendants' Motion to Dismiss, ECF No. 68, and Motion to Transfer, ECF No. 69, as well as State Defendant Central Utah Water Conservancy's Motion to Dismiss, ECF No. 70.  All other pending Motions are denied as moot. An appropriate Order will accompany this Memorandum Opinion.


DATE:  September 15, 2021

_____

CARL J. NICHOLS
United States District Judge

27